**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ACCIDENT FUND INSURANCE COMPANY OF AMERICA; WILLARD E. ALEXANDER; ALLEGHENY TECHNOLOGIES INCORPORATED DEFINED BENEFIT MASTER FUND; ALUMINUM COMPANY OF AMERICA, INC.; AMERICAN FRIENDS OF THE HEBREW UNIVERSITY; THE AMERICAN UNIVERSITY IN CAIRO; AMPHENOL CORPORATION PENSION PLAN; ANNE ARUNDEL COUNTY, MARYLAND, T/A ANNE ARUNDEL COUNTY RETIREMENT & PENSION SYSTEM; BRUCE A. BASSOCK; JEFFREY L. BASSOCK; STEPHEN A. BASSOCK; BLUE MOON FUND F/K/A W. ALTON JONES FOUNDATION INC.; THE TRUSTEES OF BOSTON COLLEGE; BOWDOIN COLLEGE; THE BRADLEY TRUSTS; BROAD FOUNDATION; BROADSWORD LIMITED; BROWN FAMILY PARTNERSHIP; CALIFORNIA STATE AUTOMOBILE ASSOCIATION (INTER-INSURANCE BUREAU); CCC INVESTMENT TRUST; PACTIVE CORPORATION GENERAL EMPLOYEE BENEFIT TRUST; CENTRAL STATES SOUTHEAST AND SOUTHWEST AREAS PENSION FUND; THE CHILDREN'S HOSPITAL FOUNDATION; COLLEGE OF THE HOLY CROSS; THE COMMONFUND FOR NONPROFIT ORGANIZATIONS AND ITS SUBSIDIARIES AND AFFILIATES (D/B/A COMMONFUND GROUP), ON BEHALF OF ITS HIGH YIELD BOND FUND, MULTI-STRATEGY BOND FUND AND EQUITY OPPORTUNITIES FUND (AS SUCCESSOR IN INTEREST TO ITS GROWTH OPPORTUNITIES FUND), COMMONFUND INSTITUTIONAL CORE PLUS BOND FUND, LLC (AS SUCCESSOR IN INTEREST TO THE CIF CORE PLUS BOND FUND), and COMMONFUND ABSOLUTE RETURN INVESTORS COMPANY; CONGREGATION OF DIVINE PROVIDENCE; DALLAS POLICE & FIRE PENSION SYSTEM; DALLAS SYMPHONY FOUNDATION, INC.; DEERFIELD, L.L.C.; DEL MONTE CORPORATION DEFINED BENEFIT MASTER TRUST; DELTA AIR LINES BENEFIT TRUSTS; DEMETER TRUST; DEPAUW UNIVERSITY; JOAN DILLER; STANLEY DILLER; DOMINION RESOURCES; RETAIL CLERKS PENSION TRUST; THE UNIVERSITY OF CONNECTICUT FOUNDATION, INC.; EDWIN GOULD FOUNDATION; EXIMIUS CAPITAL FUNDING LTD.; EXORA INVESTMENTS LLC; FATHER FLANAGAN'S TRUST FUND; RICHARD AND MARISSA FERGUSON; FIRST | Civil Action No.<br><br>10 CV 4539 (LMM)<br><br>ECF Case |

CHURCH OF CHRIST, SCIENTIST, THE MOTHER
CHURCH PENSION & BENEFIT TRUST, AND THE
CHRISTIAN SCIENCE TRUSTEES FOR GIFT AND
ENDOWMENTS; THE FISHER SCIENTIFIC INT'L INC.
DEFINED BENEFIT MASTER TRUST; THE FOUNDATION
FOR RESEARCH AND THE RESEARCH DEVELOPMENT
FOUNDATION; SALLY FREUND; FRED GALLAND;
GENERAL MOTORS INVESTMENT MANAGEMENT
CORP.; CHARLES GENUARDI; GOLDSMITH FAMILY
FOUNDATION; GOLDSMITH TESTAMENTARY TRUSTS;
BENNETT GOODMAN; JOHN F. GOTTSHALL; GRANITE
GROWTH INVESTMENT III, LP; GRANITE GROWTH
INVESTMENT VI, LP; AND GRANITE GROWTH
INVESTMENT LLC, IV; ALAN GREEN; LYDIA GREEN;
SANDRA GREEN; HEBREW REHABILITATION CENTER
FOR THE AGED; HONEYWELL PENSION INVESTMENT
COMMITTEE; HORACE MANN INSURANCE COMPANY,
HORACE MANN LIFE INSURANCE CO., HORACE MANN
TEACHERS INSURANCE COMPANY AND ALLEGIANCE
LIFE INSURANCE COMPANY; HOWW, L.L.C.;
INTERNATIONAL MONETARY FUND STAFF
RETIREMENT PLAN; INTERNATIONAL PAPER; J.C.
PENNEY CORPORATION, INC. BENEFIT PLAN; JANE
GERBEN TRUST, BY ITS TRUSTEE FRED GALLAND;
JOANNE YAMPOL REVOCABLE TRUST; JOANNE
YAMPOL; JOSEPH YAMPOL; ANTHONY YAMPOL
TRUST; BARRY YAMPOL TRUST; BRIAN YAMPOL
TRUST; ERIC YAMPOL TRUST; JOSEPH YAMPOL TRUST
#2; JESSICA YAMPOL TRUST; YAMPOL FAMILY TRUST;
ELIZABETH M. JOHNSTON; CAROL JUDELSON; PETER
KALKUS IRA; KAMILCHE COMPANY; DEVON KELLY;
WILLIAM KELLY; COSTAS KONDYLIS; THE KROGER
CO. MASTER RETIREMENT TRUST; L-3
COMMUNICATIONS CORPORATION; LEHIGH
UNIVERSITY; LEVINE INVESTMENTS LIMITED
PARTNERSHIP; WILLIAM AND BONNIE LOFTUS;
LUKESWOOD HOLDINGS, L.P., LUKESWOOD, L.L.C;
MELVIN MARKEY; MARY HITCHCOCK MEMORIAL
HOSPITAL N/K/A DARTMOUTH-HITCHCOCK;
MARYLAND-NATIONAL CAPITAL PARK AND
PLANNING EMPLOYEES RETIREMENT SYSTEM;
RICHARD MILLER; SAN DIEGO COUNTY EMPLOYEES
RETIREMENT ASSOCIATION; JAMES T. MORLEY;
MUSEUM OF SCIENCE; NAVY EXCHANGE SERVICE
COMMAND RETIREMENT TRUST; THE NEW YORK
PUBLIC LIBRARY, ASTOR, LENOX AND TILDEN
FOUNDATIONS; NEW YORK TIMES COMPANIES

PENSION TRUST; ORCHID INVESTMENTS L.L.C.;
HARRY ORGLER; CELANESE AMERICA CORP.
RETIREMENT PENSION PLAN; CHARLES AND ROBERT
PATURICK; SARAH PATURICK; THE PENATES
FOUNDATION; PEOPLES ENERGY CORPORATION
PENSION TRUST; PICTET & CIE; ILENE POWERS; PSEG
MASTER RETIREMENT TRUST; PSEG QUALIFIED CIV;
PSEG NUCLEAR LLC MASTER DECOMMISSIONING
TRUST;  QWEST PENSION TRUST, QWEST
OCCUPATIONAL HEALTH TRUST; RESEARCH
BENEFICIAL TRUST;  STEPHEN ROBIN; MONSANTO
COMPANY (MONSANTO PENSION TRUST); SPRINT
CORPORATION; SPRUGOS INVESTMENTS, L.L.C.;
STICHTING BEDRIJFSPENSIOENFONDS VOOR DE
METAAL EN TECHNISEHE BEDRIJIFSTAKKEN;
STICHTING BLUE SKY ACTIVE HIGH YIELD FIXED
INCOME USA FUND; TENNESSEE VALLEY AUTHORITY
RETIREMENT SYSTEM; TEXAS COUNTY AND DISTRICT
RETIREMENT SYSTEM; JOHN T. THORNTON; THE
TIMKEN COMPANY COLLECTIVE INVESTMENT TRUST
FOR RETIREMENT TRUSTS; TRINITY COLLEGE;
UNIVERSITY AT BUFFALO FOUNDATION, INC.; THE
EDGERTON FOUNDATION; UNIVERSITY OF
MINNESOTA FOUNDATION INVESTMENT ADVISORS;
TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA;
VIRGINIA RETIREMENT SYSTEM; WAGNER & BROWN,
LTD.; JOSEPH WALLENDAL; WELLS COLLEGE;
WESLEYAN COLLEGE; WESTERN CONFERENCE OF
TEAMSTERS PENSION TRUST FUND; WESTERN
PENNSYLVANIA TEAMSTERS AND EMPLOYERS
PENSION FUND; WRH OFFSHORE HIGH YIELD
PARTNERS, L.P.; XL INVESTMENTS, LTD. AND XL RE
LTD.; GAIL YAMPOL; HOPE YAMPOL; SIMON YOUNG;
COMMONWEALTH OF PENNSYLVANIA STATE
EMPLOYEES' RETIREMENT SYSTEM; CATERPILLAR,
INC. PENSION MASTER TRUST; MLC INVESTMENTS
LIMITED, AS TRUSTEE FOR THE W.M. POOL-HIGH
YIELD FIXED INTEREST TRUST;

Plaintiffs,

-v-

DENNIS P. COYLE; ERLAND E. KAILBOURNE; PETE J.
METROS; and LESLIE J. GELBER,

Defendants.

## COMPLAINT AND JURY DEMAND

The above-listed Plaintiffs (collectively, "Plaintiffs") were at relevant times investment management clients of W.R. Huff Asset Management Co., L.L.C. ("Huff") and are beneficial owners of high yield and subordinated convertible debt securities issued by Adelphia Communications Corporation ("Adelphia" or the "Company") and Arahova Communications Inc. f/k/a Century Communications Corporation ("Century Communications" or "Century"), which Huff purchased on Plaintiffs' behalf pursuant to the investment management contracts in place between them. Plaintiffs, upon personal knowledge as to themselves and their own acts (as well as the acts of their agent, Huff), and upon their own knowledge and other facts obtained through an extensive investigation by Huff and its undersigned counsel, which has included, among other things, review and analysis of Adelphia's publicly-filed documents, press releases, prospectuses, and offering memoranda, materials filed publicly in other Adelphia-related lawsuits, as well as news articles and analysts' reports concerning Adelphia and certain of the Defendants herein, allege and say as follows by way of Complaint against Defendants Dennis P. Coyle ("Coyle"), Erland E. Kailbourne ("Kailbourne"), Pete J. Metros ("Metros") and Leslie J. Gelber ("Gelber") (collectively, "Defendants" or the "Outside Directors"). Plaintiffs, through their agent, Huff, also reviewed and relied on complaints filed by the United States Securities and Exchange Commission, Adelphia, the Official Committee of Unsecured Creditors of Adelphia, and the Adelphia Recovery Trust. Plaintiffs, through their agent, Huff, also reviewed and relied on the publicly filed indictment and superseding indictment of Defendants John Rigas, Timothy Rigas and Michael Rigas. Based on the foregoing, Plaintiffs believe that substantial, additional evidentiary support exists for the allegations herein, which will be uncovered after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION

1.      This is a case against the so-called Outside Directors of Adelphia. In a company like Adelphia, which was dominated by its founding family and controlling shareholders, the Rigas Family, the Outside Directors were a crucial line of defense for

purchasers of Adelphia securities against deception, self-dealing and looting by those same controlling shareholders.  That line of defense was all the more crucial given the frequency with which Adelphia accessed the capital markets.  Of particular relevance to this matter, Adelphia, with the approval of the Outside Directors, issued high yield notes and subordinated convertible debt that were sold to Plaintiffs in five separate public offerings and numerous secondary market transactions since June 1999.  Recklessly abdicating their responsibilities as outside directors of Adelphia, Defendants were complicit in unprecedented acts of self-dealing by corporate insiders in a publicly-traded company.  As a result, Huff, acting pursuant to its discretionary authority conferred upon it by investment management contracts with the Plaintiffs, purchased the securities on Plaintiffs' behalf and for their account in reliance on materially misleading and deceptive offering materials and public filings that concealed the true state of affairs at Adelphia, including filings signed by Defendants.

2.      Huff and Plaintiffs were completely unaware that Adelphia, purported to be the Country's sixth largest cable operator -- and the Rigas family who founded and controlled it -- had entered into multi-billion dollar transactions for the Rigases' own benefit that had created multi-billion dollar liabilities on the part of Adelphia with no benefit to the Company. These facts were never disclosed in the public disclosures, financial statements, registration statements or prospectuses signed and/or approved by the Defendants on which Plaintiffs, through Huff, actually relied.  Defendants similarly failed to disclose to Huff and Plaintiffs that the Rigas Family had purchased securities in Adelphia with funds borrowed by the Company. Finally, Defendants recklessly failed to disclose that Adelphia committed numerous violations of covenants contained in the indenture agreements governing the debt securities it issued to the public, which meant that Adelphia lacked the authority to make at least four of the public offerings out of which Plaintiffs, through Huff, purchased bonds.

3.      Had the true facts been disclosed -- about the Rigases' self-dealing; about the Company's actual earnings, debt and liabilities; about its flagrant breach of its indenture covenants -- Adelphia would never have been able to complete the public offerings it made since

June 1999 -- and certainly not at the prices that Plaintiffs paid.

4.       Before making the decision to invest in Adelphia debt securities, Huff, acting on Plaintiffs' behalf, read and reviewed Adelphia's registration statements, prospectuses, 10-Ks, 10-Qs, 8-Ks, public filings and financial statements.  Because it was purchasing debt securities -- which are extensions of credit to the Company -- Huff examined the publicly-available information concerning Adelphia's capital structure in order to make a judgment as to Adelphia's creditworthiness.   Huff reviewed this information to determine how much of Adelphia's debt was senior to the debt securities being offered to Plaintiffs through Huff, what assets were available to support that debt, and how much equity the Company had.  From Huff's perspective, the less debt that Adelphia had that was senior to its bonds, and the more equity capital that was junior to its bonds, the more attractive its bonds became as an investment.  As part of its due diligence on behalf of the Plaintiffs, Huff also examined the indenture agreements for the debt securities offered by Adelphia to determine what covenants were contained in those agreements.

5.       Huff was aware that Adelphia's business model, like those of most other companies in the cable television industry, required ongoing capital expenditures to build, maintain, upgrade and expand its cable service infrastructure.  Since the Company's operations did not yet generate sufficient cash to fund these expenditures, Adelphia needed other sources of financing -- bank loans and injections of capital through the sale of debt and equity securities -- in order to continue.  Consequently, Huff, pursuant to its investment management contracts with Plaintiffs, examined Adelphia's registration statements, prospectuses, 10-Ks, 10-Qs, 8-Ks, public filings and financial statements to evaluate whether Adelphia could continue to obtain the liquidity that it needed to function.  That evaluation included looking at how much was available for Adelphia to borrow under its bank credit facilities, as well as whether anything in Adelphia's reported financial condition and results jeopardized its ability to obtain capital infusions from the securities markets -- such as whether Adelphia had exceeded the total amount of indebtedness permitted under the bond indenture covenants, which would prevent the Company from issuing

new public debt securities.

6.      Based on its review of the information Adelphia disclosed -- which consistently generated a B+ credit rating from Standard & Poor's for Adelphia's senior unsecured debt securities -- Huff determined that Adelphia was a good investment for the Plaintiffs.

7.      The truth was far different.    Adelphia's registration statements, prospectuses, public filings and financial statements on which Huff relied contained numerous material misrepresentations and omissions that completely undermined Huff's ability to make informed investment decisions about Adelphia's securities.  These documents presented a picture of Adelphia's capital structure that was totally false:  Adelphia had far more debt that was senior to the securities sold to Plaintiffs through Huff -- and, thus, had a higher priority claim to repayment out of Adelphia's assets -- and far less equity than its financial statements presented.

8.      Moreover, unknown to Plaintiffs and Huff, the bank credit facilities that were represented to be available to Adelphia to provide the liquidity necessary for the Company to continue operations had been exhausted through undisclosed borrowings made by the Rigases. In short, the Rigases used a substantial portion of the proceeds of those borrowings to purchase Adelphia securities, giving the illusion that they had injected new equity into Adelphia to enhance the Company's financial health when, in fact, they had merely created new debt for Adelphia that was senior to Plaintiffs' securities without conferring any legitimate benefit to Adelphia or the senior noteholders.  Making matters even worse, Adelphia flagrantly violated indenture covenant restrictions on, inter alia, engaging in transactions with affiliate entities, making or permitting certain defined Restricted Payments, and incurring too much indebtedness, with the result that these covenants prohibited at least two of the securities offerings from which Plaintiffs, through Huff, purchased notes.

9.      Adelphia's Outside Directors owed duties to Plaintiffs under the securities laws to ferret out and disclose all material information concerning Adelphia -- including the rampant Rigas Family self-dealing taking place.  To Plaintiffs' detriment, these Defendants

recklessly disregarded and failed to disclose the true facts concerning Adelphia's financial condition.

10.    Defendants knew that bond purchasers like Plaintiffs (through Huff) would rely on the statements contained in the registration statements, prospectuses and public filings of Adelphia in making their investment decisions. They likewise knew that Huff would be alarmed if it knew that the proceeds of Plaintiffs' investments were being made available to the Rigases for their own personal use. Nevertheless, Defendants recklessly failed to disclose in the Company's financial statements that Adelphia and its subsidiaries were allowing the Rigas Family to access Company cash for personal use and were liable for billions of dollars of debt borrowed by the Rigas Family -- debt that was senior to the notes purchased by Plaintiffs through Huff but omitted from Adelphia's balance sheet. Defendants also failed to disclose that the Rigas Family used Adelphia as a personal piggy-bank to fund a plethora of private transactions and line the pockets of Rigas Family members. Had the Outside Director Defendants properly discharged their responsibilities, the true facts would have been made known to Huff and it would not have purchased the notes for the Plaintiffs at the prices they paid, if at all.

11.    Indeed, the truth about Adelphia was very different from the picture of Adelphia portrayed in the public filings signed and/or approved by the Outside Directors. For example, what were represented to be multi-hundred million dollar equity investments by the Rigas Family (and, accordingly, sources of additional financial protection for noteholders) were, in fact, disguised senior debts because the Rigases purchased equity and other investments with funds from secured credit facilities the Company was obligated to repay. The total amount of Adelphia's debt was grossly understated, the equity capital grossly overstated, the capital structure fundamentally misrepresented, and the source and flow of funds concealed. In fact, by borrowing money to finance the Rigas Family's acquisition of Adelphia securities, Adelphia artificially and deceptively inflated the Company's value, making it appear far more financially healthy than it actually was.

12.    When the truth was finally disclosed, it precipitated: (1) an almost

immediate cessation in the trading of the Company's stock; (2) criminal investigations by two separate grand juries convened by the offices of the United States Attorney for the Southern District of New York and the Middle District of Pennsylvania; (3) an investigation by the United States Securities and Exchange Commission ("SEC"); and (4) the resignations of John J. Rigas, the Chief Executive Officer, Timothy J. Rigas, the Chief Financial Officer, and three other members of the Rigas Family from officer and director positions with the company. By Friday, May 24, 2002, The Wall Street Journal reported that investigators were calling Adelphia "one of the largest cases of inside dealings ever seen at a public company." Nevertheless, disclosure of the truth did not precipitate an immediate cessation of the wrongful activities, as they continued.

13. The shock to the market from the disclosure of the truth was so severe as to initially drive the price of Adelphia's stock down by 70% before NASDAQ suspended trading on May 15, 2002. After trading resumed, the stock continued to plummet, closing at $.70 a share on the last trading day before NASDAQ de-listed the stock in early June due to Adelphia's failure to file its 10-K for the year ending December 31, 2001. By June 7, 2002, Adelphia stock -- which had traded as high as 86.56 in May 1999 -- closed in over-the-counter trading at 30 cents, after falling as low as 13 cents.

14. The Company has also dropped any pretense that the public filings relied upon by Huff on Plaintiffs' behalf were materially complete and accurate. To the contrary, Adelphia has restated its financial results for the fiscal year ended December 31, 2000 and released preliminary restated financial results for the fiscal year ended December 31, 2001 and announced it may need to restate its results for 1999. This constitutes an admission by Adelphia that the balance sheets and financial statements it issued for these periods are materially false, misleading and incomplete.

15. Adelphia also inflated its subscriber count, overstated its capital expenditures, improperly capitalized labor expenses and inflated its earnings through phony payments from digital converter box vendors for "marketing support." All of this occurred under the watchful eye of the Outside Directors whose duty it was to uncover and disclose such

fraudulent activity.

16.    This Complaint seeks to recover damages from Defendants, all of whom were outside directors of Adelphia during the relevant time period, for the economic losses suffered by Plaintiffs on their investments in Adelphia debt securities.   Defendants all signed and/or approved SEC filings, registration statements and prospectuses that were materially false and misleading.   Specifically, they misrepresented and/or failed to disclose, *inter alia*, the following material information:

- Adelphia and its subsidiaries were liable for at least ***$3.1 billion*** in so-called "off balance sheet" loans taken by entities controlled by the Rigas Family.

- The financial statements for 1999, 2000 and 2001 were false and required restatement.

- The Company overstated the number of its cable television subscribers by as many as 500,000 subscribers.

- The Company falsely overstated the amount of money Adelphia spent to upgrade its cable systems.

- Adelphia overstated its earnings through a host of accounting gimmicks, including (1) phony payments from digital converter box vendors for "marketing support" that in reality were merely rebates on amounts paid by Adelphia for the converter boxes; (2) failing to reduce earnings by the decline in value of securities that Adelphia had accepted as payment for services to certain interactive cable service providers; (3) understating amounts paid to television programming providers; (4) improperly capitalizing labor expenses; and (5) improperly recognizing revenue from deferred billing arrangements with customers.

- Several Adelphia bond offerings represented to be valid were, in fact, issued in violation of indenture covenants, including, *inter alia*, covenant

restrictions on the amount of overall debt that Adelphia could carry, the making and permitting of certain defined Restricted Payments, and affiliate transactions.

- The Rigas Family used substantial portions of the proceeds of the loans guaranteed by Adelphia and/or its subsidiaries to purchase $1.4 billion of Adelphia stock and debt securities, as well as to fund the Rigas Family's acquisition of numerous other assets for its own use and benefit.

- Adelphia implemented a cash management system ("CMS") that was the very antithesis of reasonable corporate controls on the use of corporate cash. In fact, the CMS was a vehicle for commingling the funds of Adelphia, its subsidiaries and the affiliates controlled by the Rigas Family. Rigas Family members took advances from the CMS for personal purposes at will.

- Adelphia funded the Rigas Family's acquisition of the Buffalo Sabres professional hockey franchise, and periodically "recapitalized" -- through an infusion of hundreds of millions of dollars -- the Rigas Family entity that held the ownership interest.

- The Rigas Family used $12 million in Adelphia corporate funds to build themselves a golf course near Coudersport, Pennsylvania.

- Adelphia paid $25 million in corporate funds for timber rights to a parcel of land owned by the Rigas Family near Coudersport, Pennsylvania.

- The Rigas Family compelled Adelphia to make over $1.3 million in payments to Praxis Capital Ventures in order to cover the salary that defendant Peter Venetis, John Rigas's son-in-law and a former Adelphia director, was drawing from that nearly-bankrupt entity.

- John Rigas withdrew $1 million a month from Adelphia for his own personal use at the same time that the Company publicly represented that

his total compensation from the Company was less than $2 million a year.

17.     Adelphia also generated "phantom" earnings in the form of management fees it was supposed to receive from the Rigas Family companies it managed.  These so-called Managed Entities often paid these fees using funds taken from the CMS or borrowed under the co-borrowing facilities, thereby paying the fees with Adelphia's money.  In some cases, the Managed Entities simply failed to pay the management fees at all.  All of this contributed to the deceptive overstatement of Adelphia's revenues, gross margins and Earnings Before Interest, Taxes, Depreciation and Amortization ("EBITDA"), and understatement of the Company's net loss.

18.     Huff, on behalf of its clients (the Plaintiffs here), purchased Adelphia debt securities in direct, eyeball reliance on the registration statements, prospectuses, 10-Ks, 10-Qs and 8-Ks filed with the SEC that were either signed by Defendants or issued with their knowledge and approval.  Defendants knew that Adelphia's and Century's bonds were traded on the open market in reliance on Adelphia's public SEC filings that contained material misrepresentations and omissions.   The effect of these material misrepresentations and omissions, *inter alia*, was to:  (1) give Huff (and, thus, the Plaintiffs) a materially false account of the Company's capital structure and financial condition by fundamentally misrepresenting the amount of liabilities on Adelphia's balance sheet; (2) give Huff (and, thus, the Plaintiffs) false information about the amount of bank debt that was effectively senior in repayment priority to the debt securities Adelphia offered to the public; (3) mislead Huff (and, thus, the Plaintiffs) into believing that Adelphia's founding and controlling owners were pumping hundreds of millions of dollars of their own money into Adelphia as new capital; (4) falsely lead Huff (and, thus, the Plaintiffs) to believe that Adelphia was prudently managing its cash and other assets and that there were reasonable internal controls in place at Adelphia, and (5) as to several of the bond offerings, falsely represent that the issuance of the bonds was valid.  Had it not been for the materially false and misleading statements and omissions contained in Adelphia's publicly-filed statements, there would not have been a market for any of the securities at issue.

## BACKGROUND

19.     Plaintiffs consist of charities, endowments, foundations, state and local pension funds (teachers, police, firefighters, and municipal and state employees), employee pension plans formed under the Employee Retirement Income Security Act of 1976 ("ERISA"), and other institutions and investors who hired Huff to manage their bond portfolios.  Among the investment management activities that it performed for the Plaintiffs, Huff purchased, held and sold high yield corporate bonds, like those issued by Adelphia.  The Plaintiffs depend on the returns from the investments made by Huff to fund their beneficiaries' needs.

20.     Between June 1999 and March 27, 2002, Huff purchased on behalf of the Plaintiffs high yield debt securities issued by Adelphia and Century.  The investment decisions to purchase those securities were at all times made by Huff, which exercises investment discretion with respect to the Plaintiffs' accounts.  Plaintiffs through Huff purchased many of these securities directly through five public offerings.  Huff also purchased Adelphia and Century debt securities for the Plaintiffs in the secondary market.

21.     If Adelphia's financial statements were accurate, in 2002 Adelphia would have been the Country's sixth largest provider of cable television services, with a purported total of approximately 5.8 million subscribers.  Adelphia was a holding company and accordingly conducted its operations through various subsidiaries, including Century, Olympus Communications ("Olympus") and FrontierVision Holdings ("FrontierVision").   Adelphia provided telecommunications services over broadband networks.  As of December 31, 2000, Adelphia claimed to own or manage cable television systems with broadband networks that passed in front of more than nine million homes and served approximately 5.7 million basic cable subscribers.  Adelphia was founded by John J. Rigas ("Rigas") and, until his resignation in May 2003, was dominated and controlled by Rigas and his family (the "Rigases" or the "Rigas Family").  Although the Rigas Family owned only 20% of Adelphia's outstanding common stock, it possessed shares with super-majority voting rights that enabled it to control over 60% of the voting power of Adelphia's outstanding shares, as well as eight of nine seats on Adelphia's

board of directors. In addition, members of the Rigas Family occupied five of the top management positions in the Company. Especially given the enormous power and control exercised by the Rigas Family, Defendants, as outside directors of Adelphia, had a duty to ensure that self-dealing and conflicts of interest were adequately disclosed and that related party transactions were carefully reviewed, that the finances of the Company were safeguarded, and that the Company's financial condition was fully and adequately disclosed to Huff and the Plaintiffs.

22. At all relevant times, Defendants Gelber and Metros were designees of the Rigas Family on Adelphia's board. Defendant Kailbourne was elected by Adelphia's non-Rigas shareholders. Defendant Coyle was a designee of FPL Group pursuant to a stock purchase agreement.

23. Huff made its purchases of, and continued to hold, Adelphia and Century securities on Plaintiffs' behalf in eyeball reliance on the financial data and representations made in the registration statements and prospectuses for each offering of high yield securities, as well as in Adelphia's 10-Ks, 10-Qs, 8-Ks, prospectuses for the Company's offerings of equity securities and subordinated convertible notes, and other public filings with the SEC.

24. In the course of making its purchases of Adelphia securities for the Plaintiffs, Huff relied on, *inter alia*, the Outside Directors to do their jobs as "watchdogs" of the Company. Each of these Defendants prepared, reviewed, signed and/or consented to the use of his name in the registration statements, prospectuses and other filings on which Huff relied. By doing so, Defendants represented to Huff that they had performed the requisite level of due diligence and faithfully discharged their obligations as outside directors in making the statements that induced Huff to invest in Adelphia securities on Plaintiffs' behalf.

25. In addition to their interest in Adelphia, the Rigas Family controlled a number of other entities engaged in a smorgasbord of investment and business activity. Some of these entities were engaged in the same business as Adelphia -- providing cable television services. The cable television entities outside of Adelphia controlled by the Rigas Family were

euphemistically called the "Managed Entities" in the registration statements and other filings with the SEC to focus attention on the fact that they were managed by Adelphia in exchange for a management fee. In fact, these Managed Entities -- along with other entities controlled by the Rigas Family but not engaged in the cable business (the "Rigas Entities") -- were used by the Rigas Family to "manage" Adelphia and were used to perpetrate a massive fraud -- a fraud which Defendants failed to disclose.

26.    None of the Outside Directors came forward with any information about the widespread abuses at the Company. Nevertheless, the fraud eventually became too big for the cover-up to continue. Consequently, on March 27, 2002, senior members of Adelphia's management, including Timothy J. Rigas, then Adelphia's chief financial officer, and James Brown, then Adelphia's VP of Finance, revealed for the first time in a telephone conference call that the Managed Entities had borrowed what was at that time reported to be approximately $2.3 billion as of December 31, 2001 under co-borrowing arrangements essentially guaranteed by Adelphia and its subsidiaries. However, even in that March 27 conference call, Adelphia was not forthcoming, as later revelations showed. For example, within several weeks, the amount of Adelphia's off-balance sheet debt ballooned to $2.5 billion as of December 31, 2001 and $3.1 billion as of April 30, 2002.

27.    During the March 27 call, Timothy Rigas acknowledged that the amount of these borrowings had not been previously disclosed or included as part of Adelphia's total debt on its audited consolidated balance sheet or other financial statements. Moreover, Adelphia also revealed for the first time that the Rigases had used hundreds of millions of dollars of the proceeds from these co-borrowing arrangements to fund their purchases of Adelphia stock and convertible subordinated notes. In other words, the Rigas Family used money loaned by Adelphia's banks -- and effectively guaranteed by Adelphia -- to buy Adelphia's equity and debt securities. The result was a massive, undisclosed margin loan for which the Company was on the hook, but from which the Company received no legitimate business benefit.

28.    In a press release also issued on March 27, seeking to calm the storm in

the markets Adelphia's disclosure provoked, the Company concealed the fact that the Rigas Family lacked the funds available to repay the loans. Instead, Adelphia misleadingly asserted that it "expect[ed] the Managed Entities to repay their borrowings in the ordinary course," and that the Company did "not expect that it will need to repay the amounts borrowed by the Managed Entities." On the March 27 call, Adelphia's representatives echoed these representations in a calculated effort to give analysts and investors a false sense of security. Of course, an immediate concern of Huff's was whether the Managed Entities had sufficient assets to cover their borrowings, or whether Adelphia would have to take up the slack, dramatically increasing Adelphia's debt and bringing the Company's liquidity into question. Reflecting these same concerns, participants in the March 27 call asked whether the Managed Entities' ownership of 300,000 cable subscribers was a sufficient asset base to support the loans that had been taken. In response, Messrs. Rigas and Brown falsely asserted that "there are substantial other assets that back those [debts] beyond the cable systems that are owned there," and that "[w]e have very strong interest coverage, very strong ability to kind of repay." Indeed, they assured investors that Adelphia was "very comfortable" that the loans were covered. Messrs. Rigas and Brown promised to provide "more clarity" in the future on the issue of the Managed Entities' ability to repay the co-borrowing facilities. However, the more "clarity" that Adelphia provided, the more it became apparent that the loans could not be repaid and that a massive scandal of corporate insider self-dealing and deception had been recklessly concealed by, among others, the Outside Directors.

29.     The March 27 announcement immediately caused an uproar in the securities markets. The market responded to these revelations by devaluing Adelphia's bonds, notes and stock. On May 14, 2002, the day that NASDAQ suspended trading, Adelphia's stock -- which peaked at $86.56 in May 1999 -- closed at $5.70, down over 70% since the March 27 announcement. On May 31, 2002, the last trading day before Adelphia's de-listing by NASDAQ, the stock closed at $.70 a share. On June 7, 2002, the stock traded over the counter at prices as low as $.13 a share, closing at $.30.

30.     Following the March 27 announcement, the Company failed to file its Form 10-K for the year ending December 31, 2001.  Its purported reason was that it needed to investigate the accuracy and completeness of its prior 10-K filings -- filings that its outside directors had signed and approved as fairly presenting the Company's financial condition. Adelphia's failure to file its 10-K compelled NASDAQ to suspend trading in Adelphia stock and, ultimately, de-list the stock.  That led to investigations by grand juries in the Southern District of New York and the Middle District of Pennsylvania, as well as by the SEC.  With the pressure mounting, John and Timothy Rigas finally resigned from their management positions.

31.     The Rigases and the Managed Entities lack the ability to repay the amounts borrowed under the co-borrowing facilities, a fact which neither Adelphia nor the Outside Directors ever disclosed.  The Managed Entities' "substantial other assets" turned out to be equity securities and convertible subordinated notes that the Rigases had purchased with the Company's debt, the value of which dropped precipitously upon the disclosure of Adelphia's myriad misrepresentations of its financial condition and concealment of management misconduct.  Shockingly, these "substantial other assets," to which Messrs. Rigas and Brown referred, were at the heart of the scandal itself.

32.     More details about the extent of the improper dealings between Adelphia and the Rigas Family emerged, as the Company reluctantly began to disclose the truth about the Rigases' abuse of their corporate positions.  Specifically, Adelphia disclosed that, besides purchasing Adelphia securities, the Rigases had used millions of dollars of Adelphia's cash and credit -- by means of carefully-crafted co-borrowing arrangements -- to, *inter alia*, finance the family's furniture business (Eleni Interiors), construct a golf course (The Golf Club at Wending Creek Farms) and acquire other assets for the benefit of the family, including $25 million in timber rights and an ownership interest in the Buffalo Sabres professional hockey team. Furthermore, Adelphia disclosed that its management had implemented a "cash management system," the CMS, that was, in fact, a means of circumventing corporate controls -- to the extent they even existed -- on the use of corporate funds that enabled the Rigas Family to withdraw

millions from the Company with the same ease as withdrawing money from an automatic teller machine. Indeed, Adelphia's disclosures suggest that a total breakdown of internal corporate controls occurred at the Company.

33.    The pattern of misappropriation of corporate funds and misuse of the Rigases' official positions revealed by these belated disclosures is so extensive that the only reasonable conclusion is that the Outside Directors recklessly disregarded the misconduct.

34.    On May 2, 2002, Adelphia issued a press release which revealed that it had reached a "tentative conclusion" that its long-time auditor, Deloitte & Touche LLP ("Deloitte"), had certified Adelphia financial statements that misrepresented its true debt liability on its balance sheets by at least $1.6 billion (this tentative figure would balloon to $2.5 billion just a few weeks later). After implementing a proper accounting treatment of the co-borrowing arrangements, Adelphia admitted that it "expect[eds such treatment would] result in a restatement of [Deloitte's previously certified] financial statements for 1999 and 2000 and interim financial statements for 2001." The May 2 press release further elaborated Adelphia's conclusions about the inaccuracy Adelphia's financial statements:

> The Company has tentatively concluded that it should reflect borrowings and related interest expense under certain co-borrowing arrangements associated with amounts payable directly or indirectly by certain Rigas family owned entities, primarily incurred in connection with other Rigas entities which purchased Adelphia securities, as liabilities in its consolidated financial statements, with a corresponding decrease in shareholders' equity. These borrowings approximated $1.6 billion as of December 31, 2001. They were approximately $1.2 billion as of December 31, 2000 and $700 million as of December 31, 1999.

35.    On May 15, 2002, Adelphia and its subsidiaries failed to make $38.3 million dollars in payments of interest on two of its bond issues. The Company also missed a multi-million dollar dividend payment on a series of preferred shares. Unbelievably, under the watchful eye of the Outside Directors, the Rigas Family *after March 27* extracted an additional $174 million of cash from Adelphia to pay off margin loans for its securities purchases.

36.    Then, on or about May 23, 2002, James and Michael Rigas, following the

path taken by their father and brother, John and Timothy, finally resigned as officers of the Company.

37.    Reflecting the continuing disarray of the Company's internal accounting practices, in the May 23 press release, Adelphia revised upward yet again -- by $900 million -- its "tentative" conclusion as to the degree to which its financial statements had understated the true amount of the Company's consolidated debt.  Specifically, Adelphia announced that it had "tentatively concluded that it should increase to approximately $2.5 billion the amount of indebtedness to be included in its consolidated financial statements, as of December 31, 2001, to reflect the full amount of principal borrowings and interest expense by entities affiliated with the Rigas family under certain co-borrowing arrangements for which the Company is jointly and severally liable."   The amount announced represented a nearly $1 billion increase over the Company's May 2 "tentative conclusion" that the amount borrowed under the co-borrowing facilities totaled $1.6 billion as of December 31, 2001.  In the May 23 press release, Adelphia also announced that it believed that "at April 30, 2002, the total amount of co-borrowings by entities affiliated with the Rigas family for which Adelphia is jointly and severally liable was approximately $3.1 billion."

38.    Adelphia issued its senior notes pursuant to indenture agreements that contained various covenants designed to protect investors in the debt securities.  Included among these provisions was a covenant that limited the total indebtedness that Adelphia could incur to 8.75 x EBITDA.  Once Adelphia's debt exceeded this threshold, it could not take out new loans or issue additional debt securities to the public, absent certain exceptions not available to the Company.

39.    In addition, the indentures contained a covenant that imposed restrictions on transactions between Adelphia or its subsidiaries, on the one hand, and the Managed Entities or Rigas Entities, on the other.  Such transactions were prohibited, if the terms would be less favorable than those Adelphia could obtain in an arms-length transaction with someone other than an affiliate.  Indeed, this covenant required Adelphia to obtain Board approval -- including

the express approval of the Outside Directors -- as well as a fairness opinion, for the very transactions that Adelphia routinely entered into with the Managed Entities without these protections.  Defendants repeatedly and recklessly approved related party transactions between Adelphia or its subsidiaries, on the one hand, and the Rigases, Managed Entities or Rigas Entities, on the other -- including most prominently the co-borrowing facilities -- without procuring the required fairness opinions.

    40.  Essentially admitting that it -- and the Outside Directors -- had flouted these covenants for years despite its contrary representations to Huff, Adelphia announced in its May 23 press release that it was in the process of determining whether it was in compliance with them.

    41.  These disclosures by Adelphia call into question the validity of several bond issues in which Plaintiffs (through Huff) participated.  Beginning in early 2001 -- and possibly as early as 2000 -- Adelphia's total indebtedness exceeded the 8.75 x EBITDA threshold.  As a result, Adelphia's offerings of high yield debt securities in June and October 2001 -- and the September 2000 and January 2001 offerings as well -- out of which Huff purchased a substantial amount of notes for Plaintiffs, breached the covenants in the then-existing indentures, and, thus, the notes in these offerings were not valid and never should have been issued.  In addition, Adelphia committed numerous other covenant violations, including breaches of the covenants against affiliate transactions and against restricted payments to subsidiaries, that undermined the validity of the note offerings.

    42.  The Outside Directors -- who were tasked with preventing Adelphia's breach of its indenture covenants and its concealment of those very breaches -- failed to disclose that, on account of the co-borrowing facilities, Adelphia issued notes in excess of its permissible level of indebtedness and engaged in patently unfair related-party transactions without obtaining the requisite fairness opinions.  Nevertheless, the Outside Directors recklessly signed off on these improper transactions and on offering documents and SEC filings which contained material misrepresentations as to covenant compliance.  Incredibly, it appears the Outside Directors may

have approved some of these transactions with input from Adelphia's professionals, or after receiving advice from professionals -- such as Deloitte and Adelphia's long-time outside counsel, Buchanan Ingersoll -- whose independence had clearly become compromised.

43.     On May 16, 2002, with the details of Adelphia's fraud having been widely disseminated, and in an effort to save their own skins, Defendants authorized a special committee ("Special Committee" or "Committee") to investigate the web of related company dealings launched and maintained through their own concerted actions and/or willful ignorance that were previously undisclosed to the public.

44.     The Special Committee's investigation into the issues raised by the March 27 disclosures led to the filing of a Form 8-K with the SEC on May 24, 2002 (the "May 2002 8-K") that purported to disclose details within the Company's knowledge about the Rigas Family's abuse of its control over Adelphia.

45.     However, the disclosures in the May 2002 8-K are heavily qualified. The qualifications *alone* reveal both the presumptively misleading nature of Adelphia's prior public statements and the complicity of the Defendants, who gave their imprimatur to those statements. For example, the May 2002 8-K provides that:

> [t]he Special Committee is continuing its investigation. This investigation may result in supplementing or revising information contained in this Form 8-K. In addition, *various sources have indicated that there may be other relationships and transactions between the Company and its subsidiaries, on the one hand, and Rigas Persons and Entities, on the other hand.* Accordingly, this Form 8-K may be supplemented or revised to reflect these other relationships and transactions.

(emphasis added).

46.     The May 2002 8-K also states that:

> [a]ll of the financial information contained in this Form 8-K is unaudited. The Company has announced that it expects to restate its financial statements for the years ended December 31, 1999 and 2000, and its interim financial statements for 2001 and possibly other periods.

According to GAAP, financial statements are to be restated only if the error involved is material and if the error was in existence at the time the financial statements were issued.

47.     Furthermore, while the May 2002 8-K provides a disturbing glimpse of what actually went on behind the scenes at Adelphia, it is itself the product of an incomplete and woefully inadequate investigation by the Special Committee (*i.e.*, the Defendants).  For example, since their resignation from the Company *en masse*,

> *The Rigas Parties have refused to review, or provide information for, this Form 8-K.* In addition, certain other current and former officers, executives and employees of the Company have been unavailable to review and provide information for this Form 8-K. Accordingly, the information in this Form 8-K may be incomplete and may be revised or supplemented by the Company.

(emphasis added).  Thus, even now, the Special Committee cannot stand behind the veracity and completeness of its already-disturbing disclosures.

48.     The May 2002 8-K documents a pattern of corporate fraud and abuse so pervasive that it could not have escaped the attention of the Outside Directors who were charged with ferreting out precisely this kind of deceptive conduct.

49.     Among the disclosures in the May 2002 8-K are the following:

* The Rigases paid for purchases of Adelphia securities through a series of bookkeeping entries that, when combined with Adelphia's selective disclosure practices, had the effect of deceptively and artificially inflating shareholder equity while at the same time artificially decreasing Adelphia's total consolidated debt;

* Adelphia and its subsidiaries commingled funds with the Rigas Entities and the Managed Entities by means of the CMS;

* The Rigas Family withdrew hundreds of millions of dollars from the CMS to fund the purchase of various assets for their personal use;

* Managed Entities either failed to pay Adelphia management fees to which

it was entitled, or paid these fees using corporate funds taken from the CMS, which had the effect of artificially inflating Adelphia's earnings;

- Adelphia paid millions of dollars to entities controlled by the Rigas Family for goods and services without any competitive bidding;

- Adelphia funded various pet projects of the Rigas Family, including the golf course, Peter Venetis's venture capital firm, Ellen Rigas's filmmaking career, and the Rigas Family's ownership of the Buffalo Sabres.

50.     On June 10, 2002, Adelphia filed yet another 8-K (the June 10, 2002 8-K) detailing additional fraudulent misrepresentations that had been made in reports (including financial statements in 10-Ks Defendants signed) of the Company's financial results. In this document, the Company announced that on June 9, 2002 it had "terminated the engagement of Deloitte & Touche LLP as the Company's independent accountants."

51.     Furthermore, in the June 10, 2002 8-K, Adelphia reported to the SEC that "[b]ased on the preliminary results of the investigation by the Special Committee, current management of the Company has determined that it will make certain adjustments to its results of operations for 2000 and 2001. . . ." These "adjustments" consisted of reductions of hundreds of millions of dollars in previously-reported EBITDA -- from $1,202,000,000 (which figure had been audited by Deloitte) to $1,042,000,000 for the year ended December 31, 2000, and from $1,409,000,000 to $1,199,000,000 for the year ended December 31, 2001.

52.     According to the June 10, 2002 8-K, Adelphia's previously-reported EBITDA was inflated by at least the following six fraudulent accounting practices:

- Adelphia conspired with its two main vendors of digital converter boxes to raise the price of each box by $26. Thereafter, for each digital converter box Adelphia purchased, the vendors rebated $26 of the purchase price back to Adelphia for "marketing support." Adelphia improperly treated these payments as a reduction of operating expenses, and treated the payments for the boxes as capital expenditures, resulting in overstatements

of EBITDA by $54 million in 2001 and $37 million in 2000.

- Adelphia accepted financial instruments as payment from certain interactive cable service providers.  When the value of these instruments subsequently declined, Adelphia did not reflect their reduction in value in reported EBITDA, resulting in overstatements of EBITDA by $52 million in 2001 and $28 million in 2000.

- Adelphia improperly accounted for the cost of certain contracts for television programming, resulting in overstatements of EBITDA by $42 million in 2001 and $23 million in 2000.

- The Company improperly capitalized labor expenses, resulting in overstatements of EBITDA by approximately $40 million in 2001 and 2000.

- The Company failed to properly account for transactions with its (former) subsidiary, Adelphia Business Solutions, the Rigas Entities and other parties, resulting in overstatements of EBITDA by approximately $18 million in 2001 and $19 million in 2000.

- Adelphia improperly recognized revenue from subscribers under deferred billing arrangements, resulting in overstatements of EBITDA by approximately $4 million in 2001 and $13 million in 2000.

53.   Finally, in the June 10, 2002 8-K, Adelphia reported that its current management believes the Rigas Family routinely provided "unreliable" information to the investing public.  Specifically, Adelphia now

> believes that the public information provided by prior management on other matters of interest to investors, such as the Company's rebuild percentage (the percentage of the Company's cable television systems that the Company believes have been upgraded to current standards), was unreliable, and the Company intends to correct the information, where material, as current management develops information it considers reliable.

54.     None of these activities was disclosed to Huff or the Plaintiffs by any of the Defendants.

55.     In light of the revelations that have emerged since March 27, 2002, numerous material misrepresentations and omissions in Adelphia's registration statements, prospectuses and SEC public filings since June 1999 have become apparent. Adelphia, as well as the Outside Directors who prepared, reviewed, signed, approved and/or consented to have their names appear in these documents, failed to disclose that: (1) the Managed Entities and the Rigases had borrowed as much as $2.5 billion under the so-called "co-borrowing" facilities as of December 31, 2001, for which Adelphia and its subsidiaries are jointly and severally liable to repay; (2) the Rigases used a substantial portion of the proceeds from those borrowings to purchase equity and/or debt securities in Adelphia and its subsidiaries, as well as to acquire numerous other assets for the their sole benefit and use; (3) the Rigases and the Managed Entities lacked the ability to repay the borrowings under the co-borrowing facilities, thereby leaving Adelphia and its subsidiaries straining to repay those loans, and further diminishing the company's liquidity; and (4) that, as a result of the Managed Entities' use of the co-borrowing facilities, Adelphia was in breach of the restrictions on indebtedness, restricted payments and affiliate transactions set forth in the indenture agreements for the debt securities it had issued to the public. All of this withheld information was and would have been highly material to Huff, the Plaintiffs and other purchasers of high yield debt securities issued by Adelphia and its subsidiaries.

56.     Following the publication of the June 10, 2002 10-K, the value of the Adelphia and Century notes purchased by Huff on Plaintiffs' behalf plummeted. Adelphia itself fell into a death spiral. Unable to obtain the liquidity necessary to keep its operations going, Adelphia filed for Chapter 11 protection on June 25, 2002. Adelphia's bankruptcy filing was caused by the violations of the securities laws detailed herein.

57.     On July 24, 2002, John Rigas, Timothy Rigas and Michael Rigas were arrested and charged with, among other things, securities fraud. John, Timothy and Michael

Rigas were subsequently indicted on securities fraud and other charges on September 23, 2002. John and Timothy were convicted of various charges after a jury trial and sentenced to lengthy prison terms. Michael eventually entered a guilty plea as part of a plea bargain.

## JURISDICTION AND VENUE

58.    The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77l(a)(2) and 77o, Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, Section 18(a) of the Exchange Act, 15 U.S.C. § 78r, and Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

59.    This Court has federal question jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, Section 22 of the Securities Act, 15 U.S.C. § 77v, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

60.    Venue is proper in this District pursuant to Section 22 of the Securities Act and Section 27 of the Exchange Act. Many of the acts or transactions constituting violations of the Securities Act and Exchange Act alleged herein occurred in this District. In addition, a number of the Defendants transact business in this district.

61.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

62.    Plaintiff, The Children's Hospital Foundation ("Children's Hospital"), has a business address at 34th Street & Civic Center Boulevard, Room 1334 ARC, Philadelphia, PA 19104. Through Huff, Children's Hospital purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 1 hereto.

63.    Plaintiff, Willard E. Alexander ("Alexander"), is an individual with an address at Village Road, New Vernon, NJ 07976. Through Huff, Alexander purchased Adelphia

securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 2 hereto.

64.     Plaintiff, Allegheny Technologies Incorporated Defined Benefit Master Trust ("Allegheny"), is a corporation with a business address at 1000 Six PPG Place, Pittsburgh, PA 15222.  Through Huff, Allegheny purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 3 hereto.

65.     Plaintiff, Aluminum Company of America, Inc. ("ALCOA"), is a corporation with a business address at 201 Isabelle Street, 5th Floor, Pittsburgh, PA 15212-5858.  Through Huff, ALCOA purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 4 hereto.

66.     Plaintiff, American Friends of the Hebrew University ("American Friends"), is a charitable organization with a business address at 1 Battery Park Plaza, 25th Floor, New York, NY 10004.  Through Huff, American Friends purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 5 hereto.

67.     Plaintiff, The American University in Cairo ("American University"), is a institution of higher education with a business address at 420 Fifth Avenue, 3rd Floor, New York, NY 10018-2729.  Through Huff, American University purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 6 hereto.

68.     Plaintiff, Amphenol Corporation Pension Plan ("ACPP"), is an employee pension plan with a business address at 358 Hall Avenue, Wallingford, CT 06492.  Through Huff, ACPP purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 7 hereto.

69.     Plaintiff, Anne Arundel County, Maryland, t/a Anne Arundel County Retirement & Pension System ("Anne Arundel County"), provides pension benefits to government employees and has a business address at 44 Calvert Street, Room 410, Annapolis, MD 21401-1930.   Through Huff, Anne Arundel County purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 8 hereto.

70.     Plaintiff, Bruce A. Bassock ("Bruce Bassock"), is an individual with an address at 180 Riverbank Road, Stamford, CT 06903-3706.   Through Huff, Bruce Bassock purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 9 hereto.

71.     Plaintiff, Jeffrey L. Bassock ("Jeffrey Bassock"), is an individual with an address at 202 Sharp Hill Road, Wilton, CT 06897-3129.   Through Huff, Jeffrey Bassock purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 10 hereto.

72.     Plaintiff, Stephen A. Bassock ("Stephen Bassock"), is an individual with an address at 857 Fifth Avenue, New York, NY 10021.   Through Huff, Stephen Bassock purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 11 hereto.

73.     Plaintiff, Blue Moon Fund f/k/a W. Alton Jones Foundation Inc. ("Blue Moon"), has a business address at 433 Park Street, Charlottesville, VA 22902-5178.   Through Huff, Blue Moon purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 12 hereto.

74.     Plaintiff, The Trustees of Boston College ("Boston College"), are the trustees of an institution of higher education and have a business address at 140 Commonwealth Avenue, St. Thomas More Hall, Suite 171, Chestnut Hill, MA 02467-3819.   Through Huff, Boston College purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 13 hereto.

75.     Plaintiff, Bowdoin College ("Bowdoin College"), is an institution of higher education with a business address at 5600 College Station, Brunswick, ME 04011-8447. Through Huff, Bowdoin College purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 14 hereto.

76.     Plaintiff, The Bradley Trusts ("Bradley"), have a business address at 1221 Avenue of the Americas, New York, NY 10020.   Through Huff, Bradley purchased Adelphia

securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 15 hereto.

77.     Plaintiff, The Broad Foundation ("Broad"), has a business address at 10900 Wilshire Boulevard, 12th Floor, Los Angeles, CA 90024-6532.  Through Huff, Broad purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 16 hereto.

78.     Plaintiff, Broadsword Limited ("Broadsword"), has a business address at 777 Third Avenue, New York, NY 10017.  Through Huff, Broadsword purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 17 hereto.

79.     Plaintiff, the Brown Family Partnership ("Brown"), has a business address c/o Wagner & Brown Ltd., P.O. Box 1714, Midland, TX 79702.  Through Huff, Brown purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 18 hereto.

80.     Plaintiff, California State Automobile Association (Inter-Insurance Bureau) ("CSAA"), has a business address at 100 Van Ness Avenue, San Francisco, CA 94142-9186.  Through Huff, CSAA purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 19 hereto.

81.     Plaintiff, CCC Investment Trust ("CCC"), has a business address at P.O. Box HM 1760, Hamilton HM HX, Bermuda.  Through Huff, CCC purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 20 hereto.

82.     Plaintiff, Pactive Corporation General Employee Benefit Trust ("Pactive Trust"), has a business address at 1900 West Field Court, Lake Forest, IL 60045.  Through Huff, the Pactive Trust purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 21 hereto.

83.     Plaintiff, Central States Southeast and Southwest Areas Pension Fund ("Central States"), is an employee pension plan with a business address at 9377 W. Higgins

Road, Rosemont, IL 60018. Through Huff, Central States purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 22 hereto.

84.     Plaintiff, Accident Fund Insurance Company of America ("Accident Fund"), has a business address at 27000 W. Eleven Mile Road, Mail Code B370, Southfield, MI 48034. Through Huff, Accident Fund purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 23 hereto.

85.     Plaintiff, College of the Holy Cross ("Holy Cross"), is an institution of higher education with a business address at One College Street, Worcester, MA 01610-2395. Through Huff, Holy Cross purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 24 hereto.

86.     Plaintiff, The Commonfund for Nonprofit Organizations and its subsidiaries and affiliates (d/b/a Commonfund Group), on behalf of its High Yield Bond Fund, Multi-Strategy Bond Fund and Equity Opportunities Fund (as successor in interest to its Growth Opportunities Fund), Commonfund Institutional Core Plus Bond Fund, LLC (as successor in interest to the CIF Core Plus Bond Fund), and Commonfund Absolute Return Investors Company ("Commonfund"), has a business address at 15 Old Danbury Road, Wilton, CT 06897. Through Huff, Commonfund purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 25 hereto.

87.     Plaintiff, Congregation of Divine Providence ("Divine Providence"), is a religious institution with a business address at Saint Anne Convent, 1000 St. Anne Drive, Melbourne, KY 41059. Through Huff, Divine Providence purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 26 hereto.

88.     Plaintiff, Dallas Police & Fire Pension System ("Dallas Police"), is a government employee pension plan with a business address at 2301 N. Akard Street, Suite 200, Dallas, TX 75201. Through Huff, Dallas Police purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 27 hereto.

89.     Plaintiff, Dallas Symphony Foundation, Inc. ("Dallas Symphony"), has a

business address at 2301 Flora, Suite 300, Dallas, TX 75201-2413.   Through Huff, Dallas Symphony purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 28 hereto.

90.     Plaintiff, Deerfield, L.L.C. ("Deerfield"), is a limited liability company with a business address at 5 East 59th Street, New York, NY 10022.   Through Huff, Deerfield purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 29 hereto.

91.     Plaintiff, Del Monte Corporation Defined Benefit Master Trust ("Del Monte Trust"), has a business address at One Market @ The Landmark, San Francisco, CA 94105.   Through Huff, Del Monte Trust purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 30 hereto.

92.     Plaintiffs, Delta Air Lines Benefit Trusts ("Delta Trusts"), have a business address at P.O. Box 20706, Atlanta, GA 30320-6001.   Through Huff, Delta Trusts purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 31 hereto.

93.     Plaintiff, Demeter Trust ("Demeter"), has a business address at 48 Elm Ridge Road, Pennington, NJ 08534.   Through Huff, Demeter purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 32 hereto.

94.     Plaintiff, DePauw University ("DePauw"), is an institution of higher education with a business address at 1575 Dierick Chase Lane, St. Louis, MO 63021.   Through Huff, DePauw purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 33 hereto.

95.     Plaintiff, Joan Diller ("Joan Diller"), is an individual with an address at P.O. Box 321, Alpine, NJ 07620.   Through Huff, Joan Diller purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 34 hereto.

96.     Plaintiff, Stanley Diller ("Stanley Diller"), is an individual with an address at P.O. Box 321, Alpine, NJ 07620.   Through Huff, Stanley Diller purchased Adelphia securities

at artificially inflated prices on the dates and in the amounts set forth on Exhibit 35 hereto.

97.     Plaintiff, Dominion Resources ("Dominion"), has a business address at 625 Liberty Avenue, Pittsburgh, PA 15222-3199. Through Huff, Dominion purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 36 hereto.

98.     Plaintiff, Retail Clerks Pension Trusts ("RCPT"), has a business address c/o Zenith Administratorx, 201 Queen Anne Avenue North, Suite 100, Seattle, WA 98109-4896. Through Huff, RCPT purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 37 hereto.

99.     Plaintiff, The University of Connecticut Foundation, Inc. ("UCFI"), has a business address at 2390 Alumni Drive, U-206, Storrs, CT 06268-0552. Through Huff, UCFI purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 38 hereto.

100.    Plaintiff, Edwin Gould Foundation ("Edwin Gould"), has a business address at 55 Exchange Place, New York, NY 10005. Through Huff, Edwin Gould purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 39 hereto.

101.    Plaintiff, Eximius Capital Funding Ltd. ("Eximius"), has a business address at 1776 On the Green, 67 Park Place, Morristown, NJ 07960. Through Huff, Eximius purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 40 hereto.

102.    Plaintiff, Exora Investments LLC ("Exora"), is a limited liability company with a business address at One Liberty Lane, Hampton, NH 03842. Through Huff, Exora purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 41 hereto.

103.    Plaintiff, Father Flanagan's Trust Fund ("FFTF"), has a business address at 14100 Crawford Street, Boys Town, ME 68010. Through Huff, FFTF purchased Adelphia

securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 42 hereto.

104.    Plaintiffs, Richard and Marissa Ferguson (the "Fergusons"), are individuals with an address at 23 Edgewater Hillside, Westport, CT 0680-6101. Through Huff, the Fergusons purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 43 hereto.

105.    Plaintiffs, First Church of Christ, Scientist, the Mother Church Pension & Benefit Trust, and the Christian Science Trustees for Gift and Endowments (collectively, "First Church of Christ"), have a business address at 175 Huntington Avenue, A08-01, Boston, MA 02115-3187. Through Huff, the First Church of Christ purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 44 hereto.

106.    Plaintiff, The Fisher Scientific Int'l Inc. Defined Benefit Master Trust ("Fisher Trust"), has a business address at One Liberty Lane, Hampton, NH 03842. Through Huff, the Fisher Trust purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 45 hereto.

107.    Plaintiffs, The Foundation for Research and The Research Development Foundation (collectively "FFR"), have a business address at 1 Riverview, Suite 1560, Houston, TX 77056. Through Huff, FFR purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 46 hereto.

108.    Plaintiff, Sally Freund ("Freund"), is an individual with an address at 260 Hillside Avenue, Chatham, NJ 07928. Through Huff, Freund purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 47 hereto.

109.    Plaintiff, Fred Galland ("Galland"), is an individual with an address at 6685 Woodbridge Drive, Boca Raton, FL 33434. Through Huff, Galland purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 48 hereto.

110.    Plaintiff, General Motors Investment Management Corp. ("GMIMC"), is a

corporation with a business address at 767 Fifth Avenue, 15th Floor, New York, NY 10153. Through Huff, GMIMC purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 49 hereto.

111.    Plaintiff, Charles Genuardi ("Genuardi"), is an individual with an address at 667 Thomas Jefferson Road, Wayne, PA 19087.  Through Huff, Genuardi purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 50 hereto.

112.    Plaintiff, Goldsmith Family Foundation ("Goldsmith Foundation"), has a business address at 1829 Reisterstown Road, Woodholme Center, Suite 430, Baltimore, MD 21208.  Through Huff, Goldsmith Foundation purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 51 hereto.

113.    Plaintiffs, Goldsmith Testamentary Trusts ("Goldsmith Trusts"), have a business address at 1829 Reisterstown Road, Woodholme Center, Suite 430, Baltimore, MD 21208.  Through Huff, the Goldsmith Trusts purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 52 hereto.

114.    Plaintiff, Bennett Goodman ("Goodman"), is an individual with an address at 280 Park Avenue, New York, NY 10017.  Through Huff, Goodman purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 53 hereto.

115.    Plaintiff, John F. Gottshall ("Gottshall"), is an individual with an address at 3149 Sussex Road, Raleigh, NC 27607.  Through Huff, Gottshall purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 54 hereto.

116.    Plaintiffs, Granite Growth Investment III, LP, Granite Growth Investment VI, LP, and Granite Growth Investment LLC, IV (collectively, the "Granite Growth Entities"), have a business address at One Cablevision Center, Liberty NY 12754.  Through Huff, the Granite Growth Entities purchased Adelphia securities at artificially inflated prices on the dates

and in the amounts set forth on Exhibit 55 hereto.

117.    Plaintiff, Alan Green ("Alan Green"), is an individual with an address at 140 Charles Street, Apt. 21, New York, NY 10014.   Through Huff, Alan Green purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 56 hereto.

118.    Plaintiff, Lydia Green ("Lydia Green"), is an individual with an address at 136 W. Boston Post Road, Mamaroneck, NY 10543-3605.   Through Huff, Lydia Green purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 57 hereto.

119.    Plaintiff, Sandra Green ("Sandra Green"), is an individual with an address at 1385 Broadway, Apt. 26A, Hewlett, NY 11557.   Through Huff, Sandra Green purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 58 hereto.

120.    Plaintiff, Hebrew Rehabilitation Center for the Aged ("HRCA"), is a rehabilitation center with a business address at 1200 Centre Street, Boston, MA 02131-1097. Through Huff, HRCA purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 59 hereto.

121.    Plaintiff, Honeywell Pension Investment Committee ("HPIC"), manages investments for employee pension plans and has a business address at 101 Columbia Turnpike, Morristown, NJ 07960.   Through Huff, HPIC purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 60 hereto.

122.    Plaintiffs, Horace Mann Insurance Company, Horace Mann Life Insurance Co., Horace Mann Teachers Insurance Company and Allegiance Life Insurance Company (collectively, "Horace Mann"), are insurance companies with a business address at 1 Horace Mann Plaza, Springfield, IL 62715.   Through Huff, Horace Mann purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 61 hereto.

123.    Plaintiff, HOWW, L.L.C. ("HOWW"), is a limited liability company with

a business address at 300 Beachview Drive (3 North), Vero Beach, FL 32963.  Through Huff, HOWW purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 62 hereto.

124.    Plaintiff, International Monetary Fund Staff Retirement Plan ("IMF Plan"), is an employee retirement plan with a business address at 700 19th Street NW, HQ 5-604, Washington, DC 20431.  Through Huff, the IMF Plan Alternative purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 63 hereto.

125.    Plaintiff, International Paper ("IP"), has a business address at 6400 Poplar Avenue, Memphis, TN 38197.  Through Huff, IP purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 64 hereto.

126.    Plaintiff, J.C. Penney Corporation, Inc. Benefit Plan ("JCPBP"), manages investments for an employee benefit plan and has a business address at 6501 Legacy Drive, Mail Stop 134, Room # A3722, Plano, TX 75024-3698.  Through Huff, JCPBP purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 65 hereto.

127.    Plaintiff, Jane Gerben Trust, by its Trustee Fred Galland ("Gerben Trust"), has a business address at 6685 Woodbridge Drive, Boca Raton, FL 33434.  Through Huff, the Gerben Trust purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 66 hereto.

128.    Plaintiff, Joanne Yampol Revocable Trust ("Yampol Revocable Trust"), has a business address at 2323 State Road 84, Ft. Lauderdale, FL 33312.  Through Huff, the Yampol Revocable Trust purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 67 hereto.

129.    Plaintiff, Joanne Yampol ("Joanne Yampol"), is an individual with an address at 2323 State Road 84, Ft. Lauderdale, FL 33312.  Through Huff, Joanne Yampol purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set

forth on Exhibit 68 hereto.

130.   Plaintiff, Joseph Yampol ("Joseph Yampol"), is an individual with an address at 2323 State Road 84, Ft. Lauderdale, FL 33312.   Through Huff, Joseph Yampol purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 69 hereto.

131.   Plaintiff, Anthony Yampol Trust ("Anthony Yampol Trust"), has a business address at 2323 State Road 84, Ft. Lauderdale, FL 33312.   Through Huff, the Anthony Yampol Trust purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 70 hereto.

132.   Plaintiff, Barry Yampol Trust ("Barry Yampol Trust"), has a business address at 2323 State Road 84, Ft. Lauderdale, FL 33312.   Through Huff, the Barry Yampol Trust purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 71 hereto.

133.   Plaintiff, Brian Yampol Trust ("Brian Yampol Trust"), has a business address at 2323 State Road 84, Ft. Lauderdale, FL 33312.   Through Huff, the Brian Yampol Trust purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 72 hereto.

134.   Plaintiff, Eric Yampol Trust ("Eric Yampol Trust"), has a business address at 2323 State Road 84, Ft. Lauderdale, FL 33312.   Through Huff, the Eric Yampol Trust purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 73 hereto.

135.   Plaintiff, Joseph Yampol Trust #2 ("Joseph Yampol Trust #2"), has a business address at 2323 State Road 84, Ft. Lauderdale, FL 33312.   Through Huff, the Joseph Yampol Trust #2 purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 74 hereto.

136.   Plaintiff, Jessica Yampol Trust ("Jessica Yampol Trust"), has a business address at 2323 State Road 84, Ft. Lauderdale, FL 33312.   Through Huff, the Jessica Yampol

Trust purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 75 hereto.

137.   Plaintiff, Yampol Family Trust ("Yampol Family Trust"), has a business address at 2323 State Road 84, Ft. Lauderdale, FL 33312.  Through Huff, the Yampol Family Trust purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 76 hereto.

138.   Plaintiff, Elizabeth M. Johnston ("Johnston"), is an individual with an address at 35 Gate House Road, Bedminster, NJ 07921.  Through Huff, Johnston purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 77 hereto.

139.   Plaintiff, Carol Judelson ("Judelson"), is an individual with an address at 965 Fifth Avenue, New York, NY 10021.  Through Huff, Judelson purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 78 hereto.

140.   Plaintiff, Peter Kalkus IRA ("Kalkus IRA"), is an individual retirement account with an address at 1901 West Toller Drive, Suite 105, Littleton, OH 80127.  Through Huff, the Kalkus IRA purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 79 hereto.

141.   Plaintiff, Kamilche Company ("Kamilche"), has a business address at P.O. Box 21866, Seattle, WA 98111-3866.  Through Huff, Kamilche purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 80 hereto.

142.   Plaintiff, Devon Kelly ("Devon Kelly"), is an individual with an address at 51 Thackeray Drive, Short Hills, NJ 07078.  Through Huff, Devon Kelly purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 81 hereto.

143.   Plaintiff, William Kelly ("William Kelly"), is an individual with an address at 51 Thackeray Drive, Short Hills, NJ 07078.  Through Huff, William Kelly purchased

Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 82 hereto.

144.    Plaintiff, Costas Kondylis ("Kondylis"), is an individual with an address at 31 West 27th Street, New York, NY 10001.   Through Huff, Kondylis purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 83 hereto.

145.    Plaintiff, The Kroger Co. Master Retirement Trust ("Kroger Trust"), has a business address at 2800 East 4th Street, Hutchinson KS 67501.   Through Huff, the Kroger Trust purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 84 hereto.

146.    Plaintiff, L-3 Communications Corporation ("L-3"), is a corporation with a business address at 600 Third Avenue, New York, NY 10016.   Through Huff, L-3 purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 85 hereto.

147.    Plaintiff, Lehigh University ("Lehigh"), is an institution of higher education with a business address at 27 Memorial Drive West, Bethlehem, PA 18015-3088. Through Huff, Lehigh purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 86 hereto.

148.    Plaintiff, Levine Investments Limited Partnership ("Levine Investments"), is a limited partnership with a business address at 1702 East Highland, Suite 310, Phoenix, AZ 85016.   Through Huff, Levine Investments purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 87 hereto.

149.    Plaintiffs, William and Bonnie Loftus (the "Loftuses"), are individuals with an address at 15 Lafayette Court, 6B, Greenwich, CT 06830.   Through Huff, the Loftuses purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 88 hereto.

150.    Plaintiff, Lukeswood Holdings, L.P. ("Lukeswood Holdings"), is a limited

partnership with a business address at 16 Harbor View Avenue, Norwalk, CT 06854.  Through Huff, Lukeswood Holdings purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 89 hereto.

151.    Plaintiff, Lukeswood, L.L.C. ("Lukeswood"), is a limited liability company with a business address at 16 Harbor View Avenue, Norwalk, CT 06854.  Through Huff, Lukeswood purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 90 hereto.

152.    Plaintiff, Melvin Markey ("Markey"), is an individual with an address at 150 Ridgefield Drive, York, PA 17403.  Through Huff, Markey purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 91 hereto.

153.    Plaintiff, Mary Hitchcock Memorial Hospital n/k/a Dartmouth-Hitchcock ("Dartmouth-Hitchcock"), is a hospital with a business address at One Medical Center Drive, Lebanon, NH 07356.  Through Huff, Dartmouth-Hitchcock purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 92 hereto.

154.    Plaintiff, Maryland-National Capital Park and Planning Employees Retirement System ("Maryland-National Capital PPERS"), is a government employee retirement system with a business address at 6611 Kenilworth Avenue, Suite 100, Riverdale, MD 20737. Through Huff, Maryland-National Capital PPERS purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 93 hereto.

155.    Plaintiff, Richard Miller ("Miller"), is an individual with an address at 26-01 Broadway, Fairlawn, NJ 07410.  Through Huff, Miller purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 94 hereto.

156.    Plaintiff, San Diego County Employees Retirement Association ("SDCERA"), is a government employee retirement system with a business address at 401 West A Street, Suite 1300, San Diego, CA 92101-7906.  Through Huff, SDCERA purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 95 hereto.

157.   Plaintiff, James T. Morley ("Morley"), is an individual with an address at 54 Huntington Road, Newtown, CT 06570.   Through Huff, Morley purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 96 hereto.

158.   Plaintiff, Museum of Science ("MOS"), is a cultural and educational institution with a business address at Science Park, Boston, MA 02114-1099.   Through Huff, MOS purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 97 hereto.

159.   Plaintiff, Navy Exchange Service Command Retirement Trust ("NESCRT"), has a business address at 83 Bertolotto Avenue, Little Ferry, NJ 07643.   Through Huff, NESCRT purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 98 hereto.

160.   Plaintiff, The New York Public Library, Astor, Lenox and Tilden Foundations ("NYPL"), is a municipal library with a business address at 188 Madison Avenue, 5th Floor, New York, NY 10016-4314.   Through Huff, the NYPL purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 99 hereto.

161.   Plaintiff, New York Times Companies Pension Trust ("NYTPT"), is a corporation with a business address at 229 West 43rd Street, 13th Floor, New York, NY 10036. Through Huff, the NYTPT purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 100 hereto.

162.   Plaintiff, Orchid Investments, L.L.C. ("Orchid"), is a limited liability company with a business address at One Liberty Lane, Hampton, NH 03842.   Through Huff, Orchid purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 101 hereto.

163.   Plaintiff, Harry Orgler ("Orgler"), is an individual with an address at 9311 Hanlin Court, Charlotte, NC 28277.   Through Huff, Orgler purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 102 hereto.

164.    Plaintiff, Celanese America Corp. Retirement Pension Plan ("Celanese Pension Plan"), is an employee pension plan with a business address at 1601 W. LBJ Freeway, Dallas, TX 75234.   Through Huff, Celanese Pension Plan purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 103 hereto.

165.    Plaintiffs, Charles and Robert Paturick ("Charles and Robery Paturick"), are individuals with an address at 1119 Split Rail Lane, Fairfax Station, VA 22039.   Through Huff, Charles and Robert Paturick purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 104 hereto.

166.    Plaintiff, Sarah Paturick ("Sarah Paturick"), is an individual with an address at 188 E. 64th Street, New York, NY 10021.   Through Huff, Sarah Paturick purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 105 hereto.

167.    Plaintiff, The Penates Foundation ("Penates Foundation"), has a business address at One Liberty Lane, Hampton, NH 03842.   Through Huff, the Penates Foundation purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 106 hereto.

168.    Plaintiff, Peoples Energy Corporation Pension Trust ("Peoples Energy Trust"), has a business address at 130 East Randolph Drive, Chicago, IL 60601.   Through Huff, the Peoples Energy Trust purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 107 hereto.

169.    Plaintiff, Pictet & Cie, has a business address at Bd Georges-Favon 29 case postale 5130, 1211 Geneve 11 Suisse.   Through Huff, Pictet & Cie purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 108 hereto.

170.    Plaintiff, Ilene Powers ("Powers"), is an individual with an address at 1829 Reisterstown Road, Woodholme Center, Suite 430, Baltimore, MD 21208.   Through Huff, Powers purchased Adelphia securities at artificially inflated prices on the dates and in the

amounts set forth on Exhibit 109 hereto.

171.    Plaintiff, PSEG Master Retirement Trust, PSEG Qualified CIV and the PSEG Nuclear LLC Master Decommissioning Trust ("PSEG"), has a business address at 80 Park Plaza, Mail Code T-6, Newark, NJ 07102.  Through Huff, PSEG purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 110 hereto.

172.    Plaintiffs, Qwest Pension Trust and Qwest Occupational Health Trust (collectively, the "Qwest Trusts"), have a business address at 1801 California Street, Suite 3800, Denver CO 80202.  Through Huff, the Qwest Trusts purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 111 hereto.

173.    Plaintiff, Research Beneficial Trust ("RBT"), has a business address at 2323 State Road 84, Ft. Lauderdale, FL. 33312.  Through Huff, RBT purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 112 hereto.

174.    Plaintiff, Stephen Robin ("Robin"), is an individual with an address at P.O. Box 283, Woodstock, NY 12498.  Through Huff, Robin purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 113 hereto.

175.    Plaintiff, Monsanto Company (Monsanto Company Master Pension Trust) ("Monsanto"), has a business address at 800 North Lindbergh Boulevard, G5EB, St. Louis, MO 63167.  Through Huff, Monsanto purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 114 hereto.

176.    Plaintiff, Sprint Corporation ("Sprint"), is a corporation with a business address at 6200 Sprint Parkway, KSOPHF0302-3B24, Overland Park, KS 66251.  Through Huff, Sprint purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 115 hereto.

177.    Plaintiff, Sprugos Investments, L.L.C. ("Sprugos"), is a limited liability company with a business address at 4000 Jones Bridge Road, HQ 5-604, Chevy Chase, MD 20815.  Through Huff, Sprugos purchased Adelphia securities at artificially inflated prices on the

dates and in the amounts set forth on Exhibit 116 hereto.

178.   Plaintiff, Stichting Bedrijfspensioenfonds voor de Metaal en Technisehe Bedrijifstakken ("Stichting Bedrijfspensioenfonds"), has a business address at Burgemeester Elsenlaan 329, P.O. Box 5210, 2280 HE Rijswiik, Netherlands.   Through Huff, Stichting Bedrijfspensioenfonds purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 117 hereto.

179.   Plaintiff, Stichting Blue Sky Active High Yield Fixed Income USA Fund ("Stichting Blue Sky"), has a business address at Professor E.M. Meijerslaan 1, Postbus 123, Amstlveen, Netherlands 1180 AC.   Through Huff, Stichting Blue Sky purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 118 hereto.

180.   Plaintiff, Tennessee Valley Authority Retirement System ("TVARS"), is an employee retirement system with a business address at 400 W. Summer Hill Drive, ET 8B, Knoxville, TN 37902.   Through Huff, TVARS purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 119 hereto.

181.   Plaintiff, Texas County and District Retirement System ("TCDRS"), is a government employee retirement system with a business address at Barton Oaks Plaza IV, 901 South Mopac, Suite 500, Austin, TX 78746-5789.   Through Huff, TCDRS purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 120 hereto.

182.   Plaintiff, John T. Thornton ("Thornton"), is an individual with an address at 157 Wapoos Trail, Chatham, MA 02633.   Through Huff, Thornton purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 121 hereto.

183.   Plaintiff, The Timken Company Collective Investment Trust for Retirement Trusts ("Timken"), has a business address at 1835 Dueber Avenue S.W., GNE - 07, Canton, OH 44706-0928.   Through Huff, Timken purchased Adelphia securities at artificially

inflated prices on the dates and in the amounts set forth on Exhibit 122 hereto.

184.    Plaintiff, Trinity College ("Trinity"), is an institution of higher education with a business address at 200 Summit Street, Hartford, CT 06106-3100.  Through Huff, Trinity purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 123 hereto.

185.    Plaintiff, University at Buffalo Foundation, Inc. ("UBFI"), has a business address at P.O. Box 900, Buffalo, NY 11426-0900.  Through Huff, UBFI purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 124 hereto.

186.    Plaintiff, The Edgerton Foundation ("Edgerton"), has a business address at 494 South Spalding Drive, Beverly Hills, CA 90212.  Through Huff, Edgerton purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 125 hereto.

187.    Plaintiff, University of Minnesota Foundation Investment Advisors ("UMFIA"), has a business address at 220 South Sixth Street, Suite 1225, Minneapolis, MN 55402.  Through Huff, UMFIA purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 126 hereto.

188.    Plaintiff, Trustees of the University of Pennsylvania ("UPenn"), has a business address at 3535 Market Street, Suite 500, Philadelphia, PA 19104.  Through Huff, UPenn purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 127 hereto.

189.    Plaintiff, Virginia Retirement System ("VRS"), is a government employee retirement system with a business address at P.O. Box 2500, Richmond, VA 23218-2500.  Through Huff, VRS purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 128 hereto.

190.    Plaintiff, Wagner & Brown, Ltd. ("W&B"), has a business address at P.O. Box 1714, Midland, TX 79702.  Through Huff, W&B purchased Adelphia securities at

artificially inflated prices on the dates and in the amounts set forth on Exhibit 129 hereto.

191.    Plaintiff, Joseph Wallendal ("Wallendal"), is an individual with an address at 65 Old Clinton Road, Flemington, NJ 08822.  Through Huff, Wallendal purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 130 hereto.

192.    Plaintiff, Wells College ("Wells"), is an institution of higher education with a business address at 170 Main Street, Aurora, NY 13026.  Through Huff, Wells purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 131 hereto.

193.    Plaintiff, Wesleyan College ("Wesleyan"), is an institution of higher education with a business address at 237 High Street, Middleton, CT 06459.  Through Huff, Wesleyan purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 132 hereto.

194.    Plaintiff, Western Conference of Teamsters Pension Trust Fund ("WCTPTF"), has a business address at 2323 Eastlake Avenue E, Seattle, WA 98102.  Through Huff, WCTPTF purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 133 hereto.

195.    Plaintiff, Western Pennsylvania Teamsters and Employers Pension Fund ("WPTEPF"), has a business address at 1450 Two Chatham Center, Pittsburgh, PA 15219-3427.  Through Huff, WPTEPF purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 134 hereto.

196.    Plaintiff, WRH Offshore High Yield Partners, L.P. ("WRH Offshore"), is a limited partnership with a business address at 1776 On the Green, 67 Park Place, Morristown, NJ 07960.  Through Huff, WRH Offshore purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 135 hereto.

197.    Plaintiff, XL Investments, Ltd. And XL Re Ltd. ("XL Re"), have a business address at One Bermudiana Road, Hamilton HN JX Bermuda.  Through Huff, XL Re

purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 136 hereto.

198.   Plaintiff, Gail Yampol ("Gail Yampol"), is an individual with an address at 2323 State Road 84, Ft. Lauderdale, FL 33312.   Through Huff, Gail Yampol purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 137 hereto.

199.   Plaintiff, Hope Yampol ("Hope Yampol"), is an individual with an address at 171 West 12th Street, Apt. 6C, New York, NY 10011.   Through Huff, Hope Yampol purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 138 hereto.

200.   Plaintiff, Simon Young ("Young"), is an individual with an address at 16 Westwood Avenue, Brockton, MA 02401.   Through Huff, Young purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 139 hereto.

201.   Plaintiff, Commonwealth of Pennsylvania State Employers' Retirement System ("SERS"), one of the nation's oldest and largest statewide retirement plans for public employees that ranks among the top pension plans in the country, provides retirement benefits and services to active and retired state employees, their survivors and beneficiaries for the Commonwealth of Pennsylvania.   SERS' main office is located at 30 North Third Street, Suite 150, Harrisburg, PA   17101-1716.   Through Huff, SERS purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 140 hereto.

202.   Plaintiff, the Caterpillar, Inc. Pension Master Trust ("Caterpillar"), has a business address at 100 N.E. Adams Street, Peoria, IL   61629.   Through Huff, Caterpillar purchased Adelphia securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 141 hereto.

203.   Plaintiff, MLC Investments Limited, as Trustee for the W.M. Pool-High Yield Fixed Interest Trust ("MLC"), has a business address at Level 22, NAB House, 255 George Street, Sydney, Australia   NSW2000.   Through Huff, MLC purchased Adelphia

securities at artificially inflated prices on the dates and in the amounts set forth on Exhibit 142 hereto.

204.    Defendant Dennis P. Coyle ("Coyle") served as an outside director of Adelphia from 1995 until 2003.  From June 13, 2001 until 2003, Coyle also served as a member of the Audit Committee of Adelphia's board of directors.  Coyle was a designee of the FPL Group on Adelphia's board.  As described in greater detail below, Coyle signed Adelphia SEC filings on which Huff relied in making its purchases of Adelphia and Century securities on Plaintiffs' behalf, thereby attesting that all of the statements and representations made in those documents were true, accurate and complete.

205.    Coyle was an experienced transactional attorney who, prior to joining Adelphia's board, had been a partner in a law firm as well as general counsel and secretary of FPL Group, Inc. and Florida Power & Light (as well as a director of the latter company) for several years.  Coyle thus was well versed in the legal standards relating to corporate governance and the duties of independent directors.

206.    Defendant Erland E. Kailbourne ("Kailbourne") served as an outside director of Adelphia from 1999 until 2003.  From June 13, 2001 until 2003, Kailbourne also served as a member of the Audit Committee of Adelphia's board of directors.  As described in greater detail below, Kailbourne signed Adelphia SEC filings on which Huff relied in making its purchases of Adelphia and Century securities on Plaintiffs' behalf, thereby attesting that all of the statements and representations made in those documents were true, accurate and complete.

207.    Prior to joining Adelphia's board, Kailbourne had spent 37 years at Fleet National Bank (New York Region) ("Fleet").  During a substantial portion of that time, Kailbourne served as Chairman and CEO of Fleet.  In addition, as of 2002, Kailbourne had served as a director in at least 18 different organizations and companies.  Kailbourne had extensive familiarity with corporate governance issues and with the duties of directors (and, in particular, independent directors) in publicly-held corporations.

208.    Defendant Pete J. Metros ("Metros") served as an outside director of

Adelphia from 1986 until 2003. At all relevant times, Metros also served as a member of the Audit Committee of Adelphia's board of directors. Metros was a designee of the Rigas Family on Adelphia's board. As described in greater detail below, Metros signed Adelphia SEC filings on which Huff relied in making its purchases of Adelphia and Century securities on Plaintiffs' behalf, thereby attesting that all of the statements and representations made in those documents were true, accurate and complete.

209.     During an extensive career as a corporate executive that began in 1964, Metros had served (i) President of Dresser-Rand Company, (ii) a Manager of General Electric, (iii) President of Siemens Dematic AG, (iv) President of Rapistan Demag Corp. and (v) President of Rapistan Corp. In addition, Metros had served as a director of Adelphia Business Solutions (Adelphia's telecom affiliate), Borroughs Corp. and several other companies. Metros had extensive familiarity with corporate governance issues and with the duties of directors (and, in particular, independent directors) in publicly-held corporations.

210.     Defendant Leslie J. Gelber ("Gelber") served as an outside director of Adelphia from 1999 until 2003. Gelber was a designee of the Rigas Family on Adelphia's board. As described in greater detail below, Gelber signed Adelphia SEC filings on which Huff relied in making its purchases of Adelphia and Century securities on Plaintiffs' behalf, thereby attesting that all of the statements and representations made in those documents were true, accurate and complete.

211.     Gelber also had an extensive career in corporate America, with a focus on the energy sector. Gelber had served at various times as (i) President of ESI Energy (a former subsidiary of the FPL Group), (ii) President of Cogen Technologies, (iii) President and Chief Operating Officer of Caithness Energy, (iv) Director of Corporate Development for the FPL Group, (v) Chairman of FPL's cable television subsidiary and (vi) President of FPL's information services subsidiary. Gelber also served as a director of COSO Funding Corp. and SEGS Funding Corp. Like his fellow outside directors on Adelphia's board, Gelber had extensive familiarity with corporate governance issues and with the duties of directors (and, in

particular, independent directors) in publicly-held corporations.

212.   Coyle, Kailbourne, Metros and Gelber (collectively, the "Outside Directors" or "Defendants"), because of their positions with Adelphia, had access to the material adverse undisclosed information about the Company's business, operations, products, growth, financial statements, and financial condition, as alleged herein.  Said Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

213.   At various times during the relevant period, Metros, Kailbourne and Coyle were all members of Adelphia's Audit Committee.  The Audit Committee met once to review the Company's financial condition and results of operation for the year ended December 31, 1999. The Audit Committee met four times during the year ended December 31, 2000.  As disclosed in Adelphia's Schedule 14A filed with the SEC on or about July 6, 2000, on June 12, 2000, Adelphia's board adopted a written charter (the "Charter") for the Audit Committee defining its primary duties and responsibilities.  According to the Charter, the Audit Committee's primary duties and responsibilities were to (i) monitor the integrity of the Company's financial reporting process and systems of internal controls regarding finance, accounting and legal compliance; (ii) monitor the independence and performance of the Company's independent auditors (i.e., Deloitte) and internal auditing department; and (iii) provide an avenue of communication among the Company's auditors, management, the internal auditing department and the board of directors.  Furthermore, the Audit Committee was provided with the authority to conduct any investigation appropriate to fulfilling its responsibilities, and had direct access to the Company's auditors as well as anyone else at the Company.  The Audit Committee also had the ability to retain, at the Company's expense, special legal, accounting or other consultants or experts as it deemed necessary in the performance of its duties.

213.   The Charter assigned to the Audit Committee the following specific

duties, among others:

          a.     to review the Company's annual audited financial statements and unaudited quarterly financial results prior to filing or distribution, including holding a discussion with management and the Company's management and Deloitte of major issues regarding accounting principles, practices and judgments that could significantly affect the Company's financial statements, and also discuss the results of the audit and/or any significant changes to the Company's accounting principles and any items required to be communicated by Deloitte in accordance with Statement on Auditing Standards No. 61;

          b.     in consultation with management, Deloitte and the internal audit function, to consider the integrity of the Company's financial reporting processes and controls, discuss any significant financial risk exposures and the steps management has taken to monitor, control and report such exposures, review significant findings prepared by Deloitte and the internal auditing department together with management's responses;

          c.     to review the independence and performance of the outside auditors and annually recommend to the board of directors the appointment of outside auditors or approve any discharge of auditors when circumstances warrant;

          d.     to review and discuss with the outside auditors all significant relationships they have with the Company that could impair their independence; and

          e.     to review Deloitte's audit plan and discuss scope, staffing, reliance upon management, and internal audit and general audit approach.

        215.    As directors, Audit Committee members and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the NASDAQ National Market (the "NASDAQ"), and governed by the provisions of the federal securities laws, the Outside Directors each had a duty to disseminate promptly accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to

correct any previously-issued statements that had become known to have been materially false or misleading, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information.   The Outside Directors' misrepresentations and omissions since June 7, 1999 violated these specific requirements and obligations.

216.   The Outside Directors participated in the drafting, preparation, and/or approval of the various registration statements, prospectuses, public, shareholder and investor reports and other communications complained of herein and were aware of or recklessly disregarded the misstatements contained therein and omissions therefrom, and were aware of or recklessly disregarded their materially false and misleading nature.  Because of their Adelphia Board and Audit Committee membership, each of the Outside Directors had access to the material adverse undisclosed information about Adelphia's business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Adelphia and its business issued or adopted by the Company materially false and misleading.

217.   The Outside Directors, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various registration statements, prospectuses, SEC filings, press releases and other public statements pertaining to the Company discussed herein.  Each Outside Director was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each Outside Director is responsible for the accuracy of the registration statements, prospectuses, public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

## HUFF'S RELATIONSHIP TO THE PLAINTIFFS

218.   Huff is an investment manager and registered investment adviser under the Investment Advisers Act of 1940 that purchases high yield notes predominantly for public and private pension funds, charities, foundations and other institutions, and high net worth

individuals, many of whom are Plaintiffs in this matter.  The Plaintiffs hired Huff to manage their high yield bond portfolios and depend on the income generated from those investments to fund their own needs, including the provision of pension benefits to retired employees.

219.    Each Plaintiff granted Huff complete discretion to invest on its behalf under the terms of an investment management agreement.  Decisions concerning whether to buy or sell particular securities for Plaintiffs' accounts are solely Huff's; the Plaintiffs have no role whatsoever in these investment decisions.

220.    In exercising this discretionary authority, Huff made numerous investment decisions to purchase Adelphia notes on the Plaintiffs' behalf.  In making these investment decisions, Huff specifically read, reviewed and actually relied on the representations contained in all of Adelphia's registration statements, prospectuses, indenture agreements, and other SEC filings.  Relying on the representations in these documents, Huff purchased hundreds of millions of dollars of Adelphia senior (and, in one instance, convertible subordinated) notes directly out of five public offerings and numerous secondary market transactions for the benefit of the Plaintiffs.

221.    None of the Plaintiffs had any input, at any time, into Huff's decision to purchase Adelphia securities for their accounts.

222.    As explained below, unbeknownst to Huff, these Adelphia filings on which it relied in making the decision to purchase Adelphia securities turned out to be filled with outright falsehoods and omissions concerning Adelphia's true financial picture.

## SUBSTANTIVE ALLEGATIONS

### I.    The True State of Affairs at Adelphia

#### A.    Overview

223.    Adelphia's May 2002 8-K and June 10, 2002 8-K provide an astonishing look at what prior public disclosures and audited financial statements utterly failed to disclose and/or misrepresented.  At all relevant times, Adelphia was administered not in the manner of a healthy, independent cable company -- as portrayed to Huff and the general public -- but rather

as a goose from which the Rigas Family, through carefully constructed related entities, could pluck the golden eggs. Not only were funds of Adelphia consistently commingled with those of purportedly separate companies, but Adelphia was in reality a guarantor -- without benefit -- of billions of dollars of loans whose proceeds were used for purposes ranging from buying hundreds of millions of dollars of Adelphia securities to paying a Rigas Family member millions of dollars for documentary film development to financing the purchase of the Buffalo Sabres hockey team. The Rigases used the CMS as a family bank account. Adelphia and the Outside Directors recklessly failed to disclose that these improprieties were taking place, or their true nature and extent.

224.    The "co-borrowing facilities" loaned money that flowed through Adelphia and out its doors, leaving behind actual but publicly undisclosed liabilities. In addition, certain Rigas Entities purchased hundreds of millions of dollars of Adelphia junior debt and equity securities -- which, at the time, the Company announced to the public with great fanfare. However, Adelphia and the Defendants failed to disclose, among other things, that these purchases were in large part "paid for" either with entries on Adelphia's books that were essentially laundered corporate "IOUs," or with money borrowed from senior credit facilities for which Adelphia itself was jointly and severally liable.

225.    Thus, unknown to Huff and the Plaintiffs, Adelphia was guaranteeing loans taken out to purchase its own junior securities on a massive scale, which artificially inflated the value of the Company and increased its borrowing capabilities, enabling the Company to continue to finance the personal expenditures of the Rigas Family. Because their full extent was not disclosed, the loans dramatically distorted the capital structure of Adelphia. The Rigas Family's purchases of Adelphia securities, while having the appearance of injecting new capital into the Company and retiring debt, in reality did no such thing. Because the Rigas Family made their purchases with borrowings on credit facilities for which Adelphia and its subsidiaries were ultimately liable, the Rigas Family's "investments" merely served to increase the Company's overall debt load. Making matters worse for Plaintiffs, this additional debt came

in the form of bank debt that was senior to -- and, thus, ostensibly had a higher repayment priority than -- the notes owned by Plaintiffs.  Thus, instead of providing the beneficial capital infusions represented by Adelphia and the Defendants, the Rigases' securities purchases only served to worsen Plaintiffs' overall position.  All of these transactions were given the financial seal of approval by Adelphia's Outside Directors.

## B.    The Co-Borrowing Credit Facilities

226.    Beginning in at least 1998, various subsidiaries of the Company and Managed Entities entered into co-borrowing credit facilities with lenders, including the Bank Defendants (collectively, the "Co-Borrowing Facilities").   Under the terms of these lending arrangements, each co-borrower under each of the credit facilities was permitted to borrow up to the entire amount of the available credit under the applicable facility.  As confirmed by the May 2002 8-K, both the Adelphia subsidiary and Managed Entity on a given co-borrowing facility are jointly and severally liable to repay all amounts borrowed under the facility, regardless of which entity actually borrowed the money.  These credit facilities were collateralized by a pledge of the stock of each co-borrower, and the stock of the co-borrower's pledged or guarantor subsidiaries.

227.    During the year ended December 31, 2001, the Company's subsidiaries were parties to the following co-borrowing credit facilities:

- On March 29, 1996, Telesat Acquisition Limited Partnership ("TALP")[1], Global Acquisition Partners, L.P., (a subsidiary of the Company) and Highland Video Associates, L.P. ("HVA")[2], entered into a $200,000,000 co-borrowing loan agreement (the "TALP Facility"). This agreement was refinanced and terminated on September 28, 2001, as described below.

---

[1]    TALP was a subsidiary of Olympus Communications, L.P., which until October 1999 was a joint venture owned by Adelphia and FPL Group, Inc.

[2]    John, Timothy, Michael, James and Ellen Rigas Venetis, the wife of Peter Venetis, are all of the general partners of Highland Holdings.  They directly, or indirectly through Highland Holdings, own all of the partnership interests in HVA.  HVA in turn owns substantially all of the partnership interests in the "HVA Entities," which own or operate certain cable systems.

- On May 6, 1999, UCA Corp., UCA LLC, National Cable Acquisition Associates, L.P., Grand Island Cable, Inc., SVHH Cable Acquisition, L.P. and Tele-Media Company of Hopewell-Prince George, each a subsidiary of the Company, and HHC[3], closed on an $850,000,000 co-borrowing credit facility with several banks, which remained in effect at December 31, 2001 (the "UCA/HHC Co-Borrowing Facility").

- On April 14, 2000, Century Cable Holdings, Ft. Myers Cablevision, LLC, each a subsidiary of the Company, and HPGI[4], closed on a $2,250,000,000 co-borrowing credit facility with several banks (the "CCH Co-Borrowing Facility"). In addition, on September 28, 2000, Century Cable Holdings, Ft. Myers Cablevision, LLC, and HPGI, closed on a $500,000,000 9 1/4 year term loan. This term loan is part of the credit facility that closed on April 14, 2000, and all of the indebtedness under this facility remained outstanding at December 31, 2001. Adelphia Business Solutions Operations, Inc. ("ABSO"), a subsidiary of Adelphia Business Solutions, Inc. ("ABIZ"),[5] which filed for bankruptcy court protection on March 27, 2002, was an unrestricted borrower under the revolving credit portion of this co-borrowing credit facility, and borrowed $500,000,000 in a number of transactions. The proceeds of these transactions were deposited into the Adelphia CMS. As of December 31, 2001, ABSO was allocated $500,000,000 of the outstanding loans under this co-borrowing credit

---

[3] John, Timothy, Michael, James and Ellen Rigas Venetis directly or indirectly own Doris Holdings L.P. ("Doris L.P."), NCAA Holdings, Inc. and Illiad Holdings, Inc. These companies collectively own the "HHC Entities," which operate cable systems.

[4] John, Timothy, Michael, James and Ellen Rigas Venetis own all of the equity interests in Highland Prestige Georgia, Inc. ("HPGI"). HPGI is the parent of the "Highland Prestige Entities," which own or operate cable systems.

[5] ABIZ was a consolidated subsidiary of the Company on December 31, 2001, and became a former subsidiary of the Company on January 11, 2002 by virtue of a spin-off transaction.

facility. The Company's subsidiaries under this credit facility and HPGI are each jointly and severally liable for the ABSO borrowings. ABSO, as an unrestricted borrower, is liable only for its own borrowings.

- On September 28, 2001, Olympus Cable Holdings, LLC, Adelphia Company of Western Connecticut and Adelphia Holdings 2001, LLC, each a subsidiary of the Company, HVA, and CTCC[6], closed on a $2,030,000,000 co-borrowing credit facility with several banks which remained in effect at December 31, 2001 (the "Olympus Co-Borrowing Facility"). A portion of the proceeds from this facility were used to repay and terminate the $200,000,000 TALP Co-Borrowing Facility dated March 29, 1996 identified above.

228.   Since use of the co-borrowing facilities commenced, Adelphia's practice has been to disclose on its consolidated balance sheets and financial statements only those amounts that were borrowed directly by its subsidiaries under the facilities.  Amounts borrowed by the Managed Entities were not disclosed as part of Adelphia's balance sheets and financial statements, notwithstanding the fact that Adelphia and its subsidiaries were (and remain) jointly and severally liable for repayment of the Managed Entities' borrowings and that such disclosures were required under Generally Accepted Accounting Principles ("GAAP").  As discussed in greater detail below, this practice resulted in the presentation in Adelphia's registration statements, prospectuses, public SEC filings and other reports of an extremely misleading picture of the Company's financial condition and results.

229.   As of December 31, 2001, the maximum aggregate amount that could be borrowed by the co-borrowers under all of the co-borrowing credit facilities was $5,630,000,000. Between January 1999 and March 2002, the Managed Entities borrowed billions of dollars under

---

[6]   CTCC (Coudersport Television Cable Company) is an operating cable company 100% of which is owned by John J. Rigas.

these facilities, which they used for purposes having nothing to do with the legitimate business of Adelphia and its subsidiaries.  Indeed, as of December 31, 2001, at least $2.5 billion of Managed Entity borrowings remained outstanding, which Adelphia and its subsidiaries are liable to repay.

230.    Adelphia and the Outside Directors failed to disclose that the Managed Entities were borrowing massive amounts of money under the co-borrowing facilities -- and that they were using the proceeds of these borrowings to buy assets and engage in transactions that benefited only the Rigas Family with no legitimate corporate benefit or purpose for Adelphia. The overall effect of the Managed Entities' borrowings on Adelphia -- again, an undisclosed effect -- was to impair Adelphia's working capital and add to Adelphia's already significant interest expense.

231.    Nor did the Managed Entities' borrowing binge end in 2001.  According to the May 2002 8-K, the total amount outstanding under all of the co-borrowing credit facilities as of April 30, 2002 was approximately $4.58 billion -- meaning that the Managed Entities borrowed approximately an additional $1.5 billion in the first four months of 2002.   These transactions all took place under the watchful eye of the Outside Directors.

## C.      Commingling of Funds Among Adelphia, Adelphia's Subsidiaries and Related Parties

232.    In addition to running up huge Company debts via the Managed Entities' use of the co-borrowing facilities, the Rigas Family systematically commingled the funds of Adelphia, its subsidiaries, the Managed Entities and the other Rigas Entities, and treated all of these funds as available for their personal use.

233.    The vehicle for the Rigas Family's commingling of corporate and personal monies was Adelphia's CMS.  As disclosed in the May 2002 8-K, the "Adelphia CMS Participants" included Adelphia, its subsidiaries, Managed Entities and the Rigas Entities.  The CMS was a vast pot into which the Adelphia CMS Participants deposited their cash -- including amounts borrowed under the co-borrowing facilities -- and from which they withdrew funds as needed -- whether for legitimate corporate purposes or not.  Under the CMS, all cash received by

-58-

Adelphia, its subsidiaries and the Rigas Entities (including amounts borrowed under the Co-Borrowing Facilities) was swept, on a regular basis, into accounts maintained at First Union of Florida (now Wachovia) in Pensacola, Florida.  In turn, expenses of Adelphia, its subsidiaries and the Rigas Entities were paid from the same accounts.  Revenues and expenses of particular entities were accounted for through intercompany payables and receivables within the CMS.  Adelphia subsidiaries also transferred funds back and forth with other subsidiaries, Managed Entities and Rigas Entities, resulting in an elaborate set of accounting entries purporting to document inter-company liabilities.  As explained in the May 2002 8-K:

> [e]ach Adelphia CMS Participant (i) deposits all or some of its cash generated or otherwise obtained from its operations, borrowings and other sources into the Adelphia CMS, (ii) withdraws cash from the Adelphia CMS to be used for its expenses, capital expenditures, repayments of debt and other uses, and (iii) engages in transfers of funds with other Adelphia CMS Participants. *The operation of the Adelphia CMS results in the commingling of funds among the Adelphia CMS Participants, which include Company subsidiaries and Rigas Entities.* These transactions create numerous related party payables and receivables among the Adelphia CMS Participants.

(Emphasis added).

234.    The sheer scope of this commingling negates any suggestion that its existence could go unnoticed by the Outside Directors.  Indeed, the CMS had been in place for many years with the blessing of Deloitte and Adelphia's board, including Defendants.  Nor should the Defendants have failed to appreciate the drain on Adelphia's working capital and other corporate resources caused by the Rigas Family's use of the CMS -- all without any legitimate benefit flowing to Adelphia from the Rigas Family's transactions.  However, none of the Defendants disclosed the inner-workings of this system to investors.

235.    The CMS was also an instrument for self-dealing by the Rigas Family.  As the May 2002 8-K reveals, "[t]ransactions involving Adelphia CMS Participants sometimes occur, that result in payables and receivables between and among various Adelphia CMS Participants and/or other Rigas Persons and Entities."  In other words, individual members of the

Rigas Family commingled, transferred and withdrew monies from the CMS.  As described in greater detail below, the Rigas Family used corporate monies taken from the CMS for a wide variety of personal pursuits.  Simply put, the Outside Directors let Adelphia serve -- undisclosed -- as the Rigas Family's personal cash machine.

236.    The wide ranging commingling of funds achieved through the CMS allowed Adelphia, among other things, to move loan proceeds and resultant debt between "CMS Participant" balance sheets in a corporate shell game.  As stated in the May 2002 8-K:

> [c]ertain Adelphia CMS Participants that are Managed Cable Entities are co-borrowers with certain of the Company's subsidiaries under revolving credit and term loan agreements. Borrowings under these co-borrowing credit facilities are generally deposited in the Adelphia CMS. On a quarterly basis, the Company records journal entries to record the indebtedness attributed to the co-borrowers with corresponding adjustments to their receivables or payables. Such adjustments are based on consideration of the net effect of quarterly transactions between the Company and certain of its subsidiaries, on the one hand, and the Managed Cable Entities, on the other hand.

Adelphia had no regular policy for billing and collection of the receivable balances from its subsidiaries or the Rigas Entities.  Indeed, Defendants never imposed one.

237.    For example, at the close of the third quarter of 2000, Adelphia arbitrarily reclassified $187,001,026 of co-borrowing debt on Adelphia's books and placed that debt on the books of HPGI, a Rigas Entity, as debt of HPGI under the CCH Co-Borrowing Facility. Adelphia made similar reclassifications of Adelphia's co-borrowing debt to HPGI under the CCH Co-Borrowing Facility at the end of the quarters ending on December 31, 2000, March 31, 2001 and June 30, 2001.  In another instance, at the end of the quarter ending September 30, 2001, Adelphia reclassified approximately $215,009,000 of Adelphia's co-borrowing debt as transferred it to the books of Highland Video, a Rigas Entity that is also a co-borrowed on the CCH Co-Borrowing Facility.  For each of these reclassifications and transfers, no attempt was made to verify that the Rigas Entity had drawn down, or otherwise benefited from, the funds drawn down from the co-borrowing facility.  The transfer was purely arbitrary, and served the

purpose of concealing the true of amount of Adelphia's debt.

238.   Although proceeds from the co-borrowing facilities were deposited in Adelphia's CMS, Adelphia's allocation on its books of primary responsibility for that debt to the Managed Entities -- combined with Adelphia's practice of not disclosing Managed Entity borrowings under the co-borrowing facilities on Adelphia's financial statements -- enabled Adelphia to hide from investors billions of dollars in such borrowings.   Although the debt incurred remained the ultimate responsibility of Adelphia and its subsidiaries, borrowings "allocated," or "reallocated" through quarterly or periodic "adjustments," to Rigas Entities and/or Managed Entities, were never disclosed.

239.   The very existence of the CMS should have been a fundamental concern to Defendants in connection with evaluating the state of Adelphia's internal controls and monitoring related party transactions between Adelphia and the Rigas Family.

**D.   Rigas Entity Securities Purchases**

240.   Among the Rigas Family's preferred uses of proceeds from the co-borrowing facilities was the funding of their acquisition of Adelphia securities.   These purchases served a highly useful purpose:  they artificially boosted the confidence of Adelphia investors by giving the appearance that the Rigas Family was injecting hundreds of millions of dollars of new capital into Adelphia -- capital that Adelphia was purportedly using in part to retire senior bank debt.   In fact, the Rigas Family's purchases were being funded by Adelphia's incurrence of additional, undisclosed senior bank debt, with the result that Adelphia had far less equity, and far more debt, than its public filings represented.

241.   The May 2002 8-K reveals many details about the Rigas Family's securities purchases and how they were funded.   Two Rigas-controlled entities, Highland 2000 and Highland Holdings, entered into a number of transactions since January 1, 2001 relating to the acquisition of debt or equity securities of the Company that were funded through use of the co-borrowing facilities.

242.   In each transaction consummated by Highland 2000, the "purchase price"

for the securities was settled through a series of bookkeeping entries as follows:

- o The securities were issued by the Company to Highland 2000, and the Company recorded a receivable from Highland 2000 for the amount of the purchase price.

- o A Managed Cable Entity was allocated, as among the co-borrowers, the primary obligation to repay outstanding indebtedness under a co-borrowing credit facility that had previously been allocated, as among the co-borrowers, to a subsidiary of the Company, in an amount equal to the purchase price, and the Company recorded a payable to the Managed Cable Entity for the amount of the purchase price.

This mechanism was essentially a "double whammy" accounting gimmick designed to mislead investors as to what were the true economic realities behind the Rigas Family's acquisition of Adelphia securities.   As a result of these bookkeeping entries, the Adelphia subsidiaries misleadingly transferred senior bank debt off their own books (and, hence, off Adelphia's consolidated balance sheet) to that of a Managed Entity.   At the same time, the transaction gave the appearance that the Rigas Family was injecting new capital into Adelphia subordinate to the high-yield debt purchased by Plaintiffs through Huff.   In fact, no new cash was injected into Adelphia, and Adelphia and its subsidiaries remained jointly liable for the senior bank debt that had been "reallocated" to the Managed Entities -- debt that was ostensibly senior to Plaintiffs' securities.   From the perspective of a bondholder like Plaintiffs, the equity cushion it was relying on was transformed into debt senior to the securities it held.   Moreover, by moving the bank debt off of Adelphia's balance sheet, these accounting gimmicks concealed the fact that Adelphia exceeded the restrictions on total indebtedness contained in its bond covenants, which undermined the validity of numerous bond offerings in 2000 and 2001.   In addition, the ultimate economic effect of the Rigas Family's use of co-borrowing facilities -- for which Adelphia was ultimately liable -- to purchase Adelphia securities, was to effectuate an indirect acquisition by the Company of Indebtedness of Adelphia subordinate in right of payment to Plaintiffs' notes or of shares of Adelphia capital stock, which acquisitions violated the restricted payment covenant in the bond indentures.

243.   In other instances, the Rigas Family -- acting through Highland Holdings -

- simply paid for Adelphia securities with cash withdrawn from the Adelphia CMS.

244.   *Just in the years 2000 and 2001,* the following Rigas Family securities purchases were undertaken with Adelphia's credit or with corporate funds (the last two of which are still scheduled to close):

| Date of Agreement | Purchaser | Type and Amount Of Securities | Total Aggregate Purchase Price | Form of Consideration |
|---|---|---|---|---|
| 1/24/00 | Highland Holdings | Class B Common Stock | $368,000,000 | Purchase price paid through $368,000,000 drawdown on UCA/HHC Co-Borrowing Facility and assignment of this debt to HHC in lieu of cash payment |
| 7/3/00 | Highland Holdings | Class B Common Stock | $145,000,000 | Purchase price paid through $145,000,000 drawdown on CCH Co-Borrowing Facility and assignment of this debt to HPGI in lieu of cash payment |
| 1/17/01 | Highland 2000 | 5,819,367 shares of Class B Common Stock | $259,900,000 | Agreement provided for payment of immediately available funds; purchase price paid through bookkeeping entries in lieu of cash payment |
| 1/17/01 | Highland 2000 | $167,400,000 aggregate principal amount of 6% convertible subordinated notes due 2006 | $162,500,000 | Agreement provided for payment of immediately available funds; purchase price paid through bookkeeping entries in lieu of cash payment |
| 2/1/01 | Highland Holdings | 100,000 Shares of Class A Common Stock | $4,452,000 | Cash Withdrawn from Adelphia CMS |
| 4/19/01 | Highland 2000 | $400,000,000 aggregate principal amount of 3.25% convertible subordinated notes due 2021 | $393,500,000 | Agreement provided for payment of immediately available funds; purchase price paid through bookkeeping entries in lieu of cash payment |
| 10/20/01 | Highland | Class B Common | $423,375,076 | Purchase price paid by |

| | 2000 | Stock and 6% Convertible Subordinated Notes | | transfer of co-borrowing debt to Rigas Entity Highland Video |
|---|---|---|---|---|
| 11/9/01 | Highland 2000 | 5,819,367 shares of Class B Common Stock | $154,050,000 | Agreement provides for payment of immediately available funds; scheduled to close 8/12/02 |
| 11/9/01 | Highland 2000 | 2,000,000 shares of 7.5% Series E mandatory convertible preferred stock | $48,500,000 | Agreement provides for payment of immediately available funds; scheduled to close 8/12/02 |

**2001 TOTAL:     $1,022,902,000**

245.     In October 1999, April 2000 and February 2001, the Rigases, through Highland Holdings, acquired a total of $59 million worth of Adelphia securities on the open market using funds obtained from the CMS.     Highland never reimbursed or otherwise compensated Adelphia for the purchases.

246.     In addition to using the proceeds of the co-borrowing facilities to fund its acquisition of Adelphia securities, the Rigas Family took out a series of margin loans from investment and commercial banks, to which it pledged as collateral the Adelphia securities it purchased.     When they experienced margin calls, the Rigases simply withdrew cash from the Adelphia CMS to pay off the calls -- a fact that the Company and the other Defendants failed to disclose even in Adelphia's March 27 disclosure of its off balance sheet debt.     However, as revealed in the May 2002 8-K, the Rigas Family continued this practice even after the Company's March 27 disclosure by withdrawing approximately $175 million from the CMS to make payments on margin calls:

> Certain Rigas Persons and Entities have entered into margin loan agreements with various investment banks and other financial institutions and pledged equity and debt securities issued by the Company to secure such loans.  Although the total amount of these loans is unknown, since January 1, 2001, certain Rigas Persons and Entities have made $241,167,006 of payments in connection with margin calls.  *Of that amount, $177,789,669 has been paid in 2002, with approximately $174,638,151 having been paid since March 27, 2002.*  Funds for these margin call payments by Rigas Persons and Entities came from the Adelphia CMS.

(Emphasis added).

Thus, even after Adelphia had begun disclosing the Rigases' pattern of self-dealing, the Rigases engaged in even more brazen acts of self-dealing. Adelphia and the Defendants failed to disclose the Rigases' improper conduct, even though less than six weeks after paying $175 million to cover Rigas Family margin calls to commercial and investment banks, Adelphia missed $38 million in interest payments on bonds held by the faceless public.

### E.   Management Services Provided By The Company to Related Entities

247.   While on the one hand falsely reducing its apparent liabilities by failing to disclose debts incurred on behalf of related entities, Adelphia on the other hand inflated its earnings and assets by either failing to collect actual receivables, or booking apparently dummied receivables, from related companies. The Rigas Family, who actually controlled these related companies, either paid Adelphia using Adelphia's own funds, or simply failed to make the required payments.

248.   For instance, during the year ended December 31, 2001, Adelphia purportedly provided management services to the Highland Prestige Entities for which the Highland Prestige Entities were to pay the Company up to 5% of system revenues for such services, as well as other related fixed fees charged by the Company. For the year ended December 31, 2001, the total aggregate amount of all fees and expenses that the Highland Prestige Entities were charged by the Company was $7,793,000. Apparently, the Rigas-owned Highland Prestige Entities never actually paid any of these fees to Adelphia.

249.   During the year ended December 31, 2001, the Company provided similar management services to the Rigas-owned Highland Holdings (parent of the HVA Managed Cable Entities), Doris L.P. (parent of the HHC Managed Cable Entities), and NFHLP[7]. For the year ended December 31, 2001 the fees booked as paid by each of these entities to the Company

---

[7]       NFHLP (Niagara Frontier Hockey, L.P.) owned the National Hockey League franchise for the Buffalo Sabres hockey team. John J. Rigas owned a 99% limited partnership interest in NFHLP. A 1% general partnership interest in NFHLP was owned by Patmos, Inc., a Delaware corporation which was 100% owned by the Rigas Parties.

were as follows:

- o   Highland Holdings paid $3,944,000;

- o   Doris L.P. paid $3,675,000; and

- o   NFHLP paid $3,417,000.

While it appears that Adelphia actually received these fees, Adelphia is also the one who actually

paid them.  The Special Committee has concluded that, in fact, "funds for the payment of these

services by NFHLP came from the Adelphia CMS."  In other words, the Rigas Family paid

Adelphia the fees they owed with Adelphia's own money.

**F.      Inflation of EBITDA Through Accounting Irregularities**

250.    According to the June 10, 2002 8-K, Adelphia's previously-reported

EBITDA was artificially and fraudulently inflated by the following six accounting practices:

- •    Adelphia conspired with its two main vendors of digital converter boxes to
       raise the price of each box by $26.  Thereafter, for each digital converter
       box Adelphia purchased, the vendors rebated $26 of the purchase price
       back to Adelphia for "marketing support."  Adelphia improperly treated
       these payments as a reduction of operating expenses, and treated the
       payments for the boxes as capital expenditures, resulting in overstatements
       of EBITDA by $54 million in 2001 and $37 million in 2000.

- •    Adelphia accepted financial instruments as payment from certain
       interactive cable service providers.  When the value of these instruments
       subsequently declined, Adelphia did not reflect their reduction in value in
       reported EBITDA, resulting in overstatements of EBITDA by $52 million
       in 2001 and $28 million in 2000.

- •    Adelphia improperly accounted for the cost of certain contracts for
       television programming, resulting in overstatements of EBITDA by $42
       million in 2001 and $23 million in 2000.

- •    The Company improperly capitalized labor expenses, resulting in

overstatements of EBITDA by approximately $40 million in 2001 and 2000.

- The Company failed to properly account for transactions with its (former) subsidiary, Adelphia Business Solutions, the Rigas Entities and other parties, resulting in overstatements of EBITDA by approximately $18 million in 2001 and $19 million in 2000.

- Adelphia improperly recognized revenue from subscribers under deferred billing arrangements, resulting in overstatements of EBITDA by approximately $4 million in 2001 and $13 million in 2000.

**G.    Rigas Entity Transactions For the Benefit of the Rigas Family**

251.    Besides using corporate funds and credit to purchase the Company's securities, the Rigas Entities engaged in a lengthy set of undisclosed transactions that were intended to enrich members of the Rigas Family at the expense of Adelphia and its investors. The sheer size and frequency of these transactions could not have escaped the notice of the Outside Directors. Indeed, the details of these transactions bespeak a shocking lack of internal controls at Adelphia over the use of corporate resources.

252.    **Payments by Adelphia to Rigas Entities for Products and Services.** As disclosed in the May 2002 8-K, during the year ended December 31, 2001, the Company made the following payments to related parties owned and controlled by the Rigas Family:

- o  The Company paid approximately $12,416,000 to EI[8] and $371,000 to Dobaire[9], primarily for office furniture and fixtures and related installation and design services.

- o  The Company paid approximately $2,019,000 to Wending Creek[10] for various

---

[8]    EI (Eleni Interiors, Inc.) was an interior design firm 100% owned by John J. Rigas. It is not known whether EI performed services for any parties other than the Company, its subsidiaries and the Rigas Persons and Entities.

[9]    Dobaire was a design services firm and sole proprietorship owned by Doris Rigas, the wife of John J. Rigas and the mother of Michael J. Rigas, Timothy J. Rigas, James P. Rigas and Ellen Rigas Venetis.

[10]    Wending Creek was a provider of facilities maintenance services and related materials 100% owned by John J. Rigas. Services provided by Wending Creek included electrical, heating, ventilation and air conditioning

maintenance and related services.

o   The Company paid an aggregate amount of approximately $100,000 to Rigas Persons and Entities, including Ellen Rigas Venetis, Dorellenic Cable Partners, John J. Rigas, the Coudersport Theatre[11] and Wending Creek, for office and warehouse rent.

o   The Company paid approximately $50,000 to Ellen Rigas Venetis for community service and public relations consulting services.

o   During the year ended December 31, 2001, the Company purchased approximately 50 motor vehicles from Preston Motors, a car dealership in which Defendant John J. Rigas has a material beneficial interest.

253.   **The Buffalo Sabres.**   The Rigas Family funded NFHLP's acquisition of the Buffalo Sabres with Adelphia corporate monies.  Moreover, as disclosed in the May 2002 8-K, in addition to receiving loans from the Company, NFHLP "from time to time … finances its operations through withdrawals of cash (and the generation of net payables to the Company) under the Adelphia CMS."  As of December 31, 2001, the total amount outstanding to Adelphia under various notes, assumed loans and advances to and on behalf of NFHLP was $150,157,000. This amount notwithstanding, the Company paid $744,000 to NFHLP (net of certain payables due to the Company generated for certain services rendered) for luxury suite rentals and other related expenses at HSBC Arena in Buffalo, New York, including tickets for the Company's employees to Buffalo Sabres games and other related entertainment costs.  At the same time, Adelphia provided free advertising to the Sabres on cable television networks owned by the Company.

254.   **Loans to Rigas-Controlled Affiliates.**   According to the May 2002 8-K, during 2001, and possibly in prior periods, the Company advanced funds to ErgoArts and SongCatcher Films[12] on an unsecured basis.  At December 31, 2001, the outstanding balance due

---

services, snow removal, lawn care services, landscaping and minor construction services.  It is not known whether Wending Creek performed services for any parties other than the Company, its subsidiaries and the Rigas Persons and Entities.

[11]   Coudersport Theatre was a sole proprietorship 100% owned by John J. Rigas.

[12]   ErgoArts was 100% owned by John J. Rigas and Ellen Rigas Venetis.  John J. Rigas and Ellen Rigas Venetis had an equity interest in SongCatcher Films.  ErgoArts was a film development and production company.

to the Company from ErgoArts and SongCatcher Films under these arrangements was approximately $677,000 and $3,077,000, respectively.  The advances to ErgoArts were made principally in connection with the development and potential production of documentary films. The advances to SongCatcher Films were made in connection with the creation and production of the motion picture entitled SongCatcher.

255. **Loans to Adelphia Corporate Officers.**   James R. Brown, the Company's former Vice President of Finance, received a loan from the Company in the aggregate principal amount of $700,000.  According to the May 2002 8-K, "[t]he date and terms of this loan are not known to the Company at this time."

256. **Adelphia's Payments to Praxis, Praxis Capital and Praxis Management.**  Peter Venetis, a member of the Rigas Family, was the Managing Director of Praxis Capital Partners, LLC ("Praxis Capital"), the general partner of Praxis Capital Ventures, L.P. ("Praxis"), an investment partnership.  Formed in June 2001, Praxis focuses on private equity investments in the telecommunications market.   Although without any legitimate corporate purpose, the Company signed a contract calling for the commitment of $65,000,000 of capital to Praxis, of which it has actually funded approximately $2,950,000.  The Company is the sole limited partner of Praxis and has 99.5% of the total partnership interest.

257. Praxis Capital Management, LLC ("Praxis Management"), owned by Mr. Venetis, is the management company of Praxis and receives a management fee of 2.0% of Praxis' committed capital, in the amount of approximately $1,307,000 annually, virtually all of which Praxis Management pays to Mr. Venetis in the form of salary.  Adelphia has paid management fees of approximately $1.96 million to Praxis Management out of its capital contributions to Praxis.  Thus, Adelphia has paid Peter Venetis approximately $1.96 million per year for work he has purportedly performed managing Praxis.  The Praxis entities are but another way for a Rigas Family member to skim money from the Company.

---

SongCatcher Films was a developer and provider of films.  It is not known whether ErgoArts and SongCatcher Films performed services for any parties other than the Company, its subsidiaries and Rigas Persons and Entities.

258.   **The Golf Club.**  Adelphia, through Golf Club, a wholly-owned subsidiary of the Company, constructed a golf club and golf course on approximately 830 acres of land near Coudersport, Pennsylvania, of which 535 acres were owned by Wending Creek, a Rigas Entity, 126 acres were owned by Wending 3656, another Rigas Entity, and 169 acres were owned by a wholly-owned subsidiary of the Company.  The Company expended approximately $13,000,000 on equipment and development costs for this project, with no apparent purpose but to benefit the Rigas Family.

259.   **Timber Rights Transaction.**   In February 2000, a subsidiary of the Company, ACC Operations, purchased timber rights, covering a twenty-year period from the date of closing, from an unaffiliated third party with respect to 3,656 acres of land located in Potter County, Pennsylvania, for a purchase price of $26,535,070.  At the end of the twenty-year period, the timber rights revert to the owner of the underlying land at such time.  The revenue earned by the Company during the year ended December 31, 2001, is unknown.  At or about the same time in an apparent straw transaction, Wending 3656 purchased the underlying 3,656 acres from the unaffiliated third party for a purchase price of $464,930.   The timber purchase agreement provides that if a change in ownership of the Company occurs during the twenty-year period, then the timber rights would revert to Wending 3656 as part of the consideration received by Wending 3656 as a result of the change in ownership transaction.  A change in ownership is defined to occur in the event that the cumulative voting percentage of the Company stock held by John J. Rigas and the members of his immediate family falls below 50% of all outstanding voting shares.

260.   **Corporate Perks for the Rigas Family.**   The Rigas Family has used corporate resources to fund various "perks" for themselves.  For example, Rigas Persons and Entities used Company aircraft for reasons unrelated to the business or operations of the Company or any of its subsidiaries.   Company funds and resources were used to construct, acquire or maintain condominiums in Beaver Creek, Colorado, and Cancun, Mexico, for use exclusively or primarily by Rigas Persons and Entities as opposed to Company personnel.

Finally, the Company owns two apartments in New York City that, since some time in 1998, have been used on a rent-free basis exclusively by Ellen Rigas Venetis and Peter L. Venetis.

### H.    The Highland Video Digital Converters Transaction.

261.    In another sham transaction designed to fraudulently reduce Adelphia's true debt, Adelphia removed $101 million of co-borrowing debt from its books in the fourth quarter of 2001 through a fraudulent transaction with Highland Video in which Highland Video received digital converters from Adelphia.  Highland Video had no cable operations and, consequently, no need for the digital converters.  Nevertheless, Adelphia purported to "sell" digital converters to Highland Video in order to remove excess inventory from its books.  In satisfaction of the purported purchase price for the converters, Adelphia transferred $101 million of co-borrowing debt under the CCH Co-Borrowing Facility to Highland Video, thereby also artificially reducing the debt carried on Adelphia's financial statements.

### I.    Inflation of Cable Subscribers

262.    Adelphia also artificially inflated the number of basic cable subscribers it reported through a number of gimmicks.  Adelphia counted as basic cable subscribers numerous persons who did not fit within the definition of "a home with one or more television sets connected to a cable system" set forth in Adelphia's 1999 10-K and 2000 10-K.  For example:

> o   Beginning in the first quarter of 2000, Adelphia included in its reported count of basic cable subscribers 15,000 subscribers of an unconsolidated affiliate located in Brazil in which Adelphia did not own a controlling interest.

> o   Beginning in the third quarter of 2000, Adelphia included in its reported basic cable subscriber count 28,000 customers of an unconsolidated Venezuelan affiliate in which Adelphia did not own a controlling interest.

> o   Beginning in the third quarter of 2000, Adelphia counted as basic cable subscribers customers who subscribed to long distance telephone service offered by an Adelphia subsidiary in the business of reselling long

distance capacity.

o   In the last three quarters of 2001, Adelphia included in its reported basic subscriber count tens of thousands of customers who received Adelphia's Internet service, rather than cable television services.

o   In the third and fourth quarters of 2001, Adelphia included in its reported number of basic cable subscribers 60,000 customers who subscribed to Adelphia's home security service.

o   Adelphia also began including in its basic cable subscriber count each unit in a multi-family dwelling even though only one unit may have been a paying subscriber and met Adelphia's definition of a basic cable subscriber.

o   Adelphia also at times counted as basic cable subscribers customers of Rigas Entities that competed with Adelphia.

## II.    Overview of Huff's Purchases of Adelphia and Century Communications Securities on Plaintiffs' Behalf.

263.    Adelphia was a prolific issuer of securities, often soliciting capital through public securities offerings several times a year.

264.    Huff made purchases of Adelphia high yield debt securities on Plaintiffs' behalf in the following public offerings, as well as in the secondary market following the public offerings:

a.    a November 16, 1999 offering of 9 3/8% Senior Notes due November 15, 2009 (the "November 1999 Offering");

b.    a September 20, 2000 offering of 10 7/8% Senior Notes due October 1, 2010 (the "September 2000 Offering");

c.    a January 18, 2001 offering of 6% Convertible Subordinated Notes due 2006 (the "January 2001 Offering");

d.    a June 12, 2001 offering of 10 ¼% Senior Notes due June 15, 2011

(the "June 2001 Offering"); and

   e. an October 25, 2001 offering of 10 ¼% Senior Notes due November 1, 2006 (the "October 2001 Offering").

   265. Huff made additional purchases on Plaintiffs' behalf of each of the securities described above in the secondary market following the public offerings.  In addition, since June 1, 1999, Huff has made purchases on Plaintiffs' behalf on the secondary market of the following Adelphia high yield debt securities, which were issued in public offerings made prior to November, 1999:

   a. Adelphia 8 3/8% Senior Notes due February 1, 2008;

   b. Adelphia 9 7/8% Senior Notes due March 1, 2005;

   c. Century 8 7/8% Senior Notes due January 15, 2007;

   d. Century 9 1/2% Senior Notes due March 1, 2005;

   e. Adelphia 9 7/8% Senior Notes due March 1, 2007;

   f. Century 8 3/4% Senior Notes due October 1, 2007;

   g. Adelphia 10 1/2% Senior Notes due July 15, 2004;

   h. Adelphia 9 1/4% Senior Notes due October 1, 2002;

   i. Century 0% Senior Notes due January 15, 2008;

   j. Century 0% Senior Notes due March 15, 2003;

   k. Adelphia 8 1/4% Senior Notes due July 15, 2003;

   l. Adelphia 7 7/8% Senior Notes due May 1, 2009;

   m. Century 8 3/8% Senior Notes due December 15, 2007.

   266. Details of the dates and amounts of the purchases of Adelphia securities that Huff made on Plaintiffs' behalf are set forth in Exhibits 1 through 140 attached hereto.

   267. In the course of making the above purchases on Plaintiffs' behalf, Huff eyeballed, read, reviewed and relied upon all of Adelphia's SEC filings, registration statements and prospectuses in an effort to consider all publicly-available material information about Adelphia and the securities concerned.

### III.   The Outside Directors' Involvement In Adelphia's Misconduct

268.   Because they are not affiliated with management, outside directors play an important corporate governance role in any publicly-traded company.  They act as a check on the excesses of management and a source of independent thinking for corporate plans and policies. But in a corporation like Adelphia, where the controlling shareholders dominate the board, occupy all of the top management positions and engage in frequent related party transactions, the outside directors are critical to protecting the best interests of the company's creditors and public shareholders.  It is their duty to shield the company from self-dealing and abuse by the controlling shareholders, especially in the case of related party transactions as to which the controlling shareholders and, consequently, the company's management are operating under a financial conflict of interest.

269.   In the case of Adelphia, the Rigas Family at all relevant times controlled a majority of shareholder voting power, personally occupied five out of nine board seats,[13] and held the senior positions on Adelphia's management hierarchy.  They also engaged in frequent related party transactions involving Adelphia and its subsidiaries, on the one hand, and the Rigas Family, Rigas Entities and Managed Entities, on the other.  In light of Adelphia's highly-leveraged balance sheet, these transactions, and the fact that the Rigas Family controlled Adelphia, greatly concerned investors.  As a result, bondholders bargained for specific protections in the indentures that governed Adelphia's myriad bond offerings, which required related party transactions to be approved by a majority of the Outside Directors and also required a fairness opinion for such transactions over a certain threshold.  The indentures contained a "Limitation on Indebtedness" covenant which prohibited Adelphia from incurring additional debt that would cause Adelphia's total consolidated debt on an annualized, pro forma basis to exceed 8.75 x Adelphia's EBITDA.  This limitation was important because it ensured that Adelphia would not become "over-leveraged," thereby jeopardizing the creditworthiness of the notes.  If

---

[13]   Prior to May 2000, Perry Patterson occupied a tenth board seat.  However, he was not replaced following his death that month.

Adelphia was not in compliance with the debt ratio, new bonds could not be validly issued. Moreover, the indentures contained a "Limitation on Transactions with Affiliates" covenant which, among other things, prohibited Adelphia from engaging in any transaction with an affiliate -- which by definition included the Rigas Family and the Managed Entities -- on terms less favorable than what could be obtained in a comparable arm's-length transaction with a non-affiliate. This covenant was particularly important in the case of Adelphia, because the Rigas Family's domination of the Company, coupled with their ownership of the Managed Entities, created huge potential for self-dealing. Adelphia's by-laws contained similar requirements.

270.    In exercising their discretion to approve such related party transactions, the Outside Directors had a duty to carefully scrutinize the terms of such transactions, make an independent determination of whether they were in Adelphia's best interests, and obtain the requisite fairness opinions from qualified independent professionals. If they had questions about the terms of a transaction or its ramifications for Adelphia, the Outside Directors had an obligation to seek clarification and obtain whatever information they needed to make an informed decision. What they could not do was simply rely blindly on whatever the Rigas Family or Adelphia management told them. With respect to related party transactions that implicated the Rigases' personal financial interests, the Rigas Family and Adelphia management were conflicted. That was the whole reason why approval of such transactions by a majority of the Outside Directors was required in the first place. Given that all four of the Outside Directors had extensive professional careers in high level corporate positions (including board experience) or the legal profession, this point could not have eluded them.

271.    The three Outside Directors who served on the Audit Committee (Metros, Kailbourne and Coyle) had an additional set of critical responsibilities. The Audit Committee was responsible for, among other things, policing the adequacy and integrity of Adelphia's system of financial reporting processes and internal controls, monitoring the independence and performance of Deloitte, and ensuring the integrity of the Company's audited financial statements. In this capacity as well, Defendants Metros, Kailbourne and Coyle could not blindly

rely on the Rigas Family, Adelphia's management or Deloitte for information. Defendants were required to behave proactively in carrying out their oversight responsibilities as outside directors and members of the Audit Committee.

272.    The Outside Directors all signed the Company's 1999 10-K and 2000 10-K.  Prior to affixing their signatures to those documents, the Outside Directors were required to assure themselves that the information and representations contained therein in were neither false nor materially misleading.

273.    In point of fact, the Outside Directors totally abdicated their oversight duties and, in the process, recklessly disregarded the material misstatements and omissions contained in Adelphia's 10-Ks, registration statements, prospectuses and other public filings.

274.    The Co-Borrowing Facilities constituted related party transactions, which, under the covenants in Adelphia's bond indentures, had to be voted on separately and approved by a majority of the Outside Directors.  The Outside Directors approved the UCA/HHC Co-Borrowing Facility at a board meeting held on April 22, 1999.  At a board meeting held on August 23, 1999, the Outside Directors then gave blanket approval to future related party transactions between Adelphia and the Rigas Entities/Managed Entities, including future co-borrowing facilities.  The Outside Directors gave this approval without any knowledge of the magnitude of the transactions the Rigas Family was contemplated for the future.  They also specifically approved the CCH Co-Borrowing Facility at a board meeting held on March 8, 2000, and specifically approved the Olympus Co-Borrowing Facility at a board meeting held on March 14, 2001.

275.    Because each of the Co-Borrowing Facilities allowed the relevant Rigas Entities to borrow up to the entire amount of the facility and leave the relevant Adelphia subsidiaries jointly and severally liable to pay the money back, the Rigas Family (including CFO Timothy Rigas) and Adelphia management (which, to they extent they were not members of the Rigas Family themselves, served at the Rigas Family's whim) had significant conflicts of interest that tainted any advice they gave to the Outside Directors concerning these credit facilities.

Indeed, these conflicts of interest were obvious from the basic structure of the Co-Borrowing Facilities. The Outside Directors thus could not rely on the Rigas Family or Adelphia management for unconflicted information and advice concerning the Co-Borrowing Facilities. They had a duty to analyze these transactions independently and obtain whatever unconflicted information or professional advice was necessary to enable them to conduct this independent analysis. Specifically, the Outside Directors were required to determine whether the Co-Borrowing Facilities (or any other related party transaction) were in the best interests of Adelphia and whether they were on terms that could have been obtained in arm's length transactions.

276.    In each board meeting at which they approved a Co-Borrowing Facility, the Outside Directors received a presentation from Timothy Rigas (or another member of Adelphia's management, such as James Brown) that outlined the proposed credit facility as well as a term sheet. None of the Outside Directors read the term sheets carefully, and none of them ever read any of the actual credit agreements that governed the Co-Borrowing Facilities prior to approving them.

277.    Moreover, although they all understood that the relevant Adelphia subsidiaries would be jointly and severally liable for any amounts borrowed by Rigas Entities under the Co-Borrowing Facilities (indeed, they signed 10-Ks that represented as such), and although three of them (Defendants Metros, Coyle and Gelber) knew from experience with the TALP Co-Borrowing Facility that, as explicitly provided for under that facility (which they also approved), the Rigas Family had used co-borrowed funds to purchase Adelphia securities, the Outside Directors (i) never made any efforts to confirm whether Rigas Entity borrowings under those facilities would be capped, (ii) never imposed such a cap themselves, (iii) never made any effort to confirm whether the leverage ratios (which impacted how much could be borrowed) under the Co-Borrowing Facilities would be calculated for each co-borrower separately or all co-borrowers in the aggregate, (iv) never determined whether there were any restrictions on the types of uses to which co-borrowed funds could be put (and never imposed such restrictions

themselves) and (v) never obtained any evidence or documentation of the financial ability of the Rigas Family, Rigas Entities or Managed Entities to repay any co-borrowed funds. Instead, the Outside Directors merely passively relied on the presentations by Timothy Rigas and James Brown, without asking any questions to clarify the above issues or seeking any confirmatory documentation.

278.    Nor did any of the Outside Directors ever obtain fairness opinions for any of the Co-Borrowing Facilities. Although Defendants Metros believed such fairness opinions had been obtained, he never asked to see any of them prior to voting to approve the Co-Borrowing Facilities.

279.    Defendants received specific information on several occasions indicating that the Rigas Entities and Managed Entities owed massive amounts of money under the Co-Borrowing Facilities that was not being reported on Adelphia's publicly-filed financial statements. In connection with a board meeting held on October 11, 2000, Defendants received a document entitled "Financing Alternatives Update" that revealed that Adelphia had attributed $1.1 billion of co-borrowing debt to the Rigas Family (with another $250 million projected to be incurred by March 31, 2001) and had omitted said debt from its financial statements (even though Adelphia -- as the Outside Directors indisputably knew -- was jointly and severally liable for repaying that debt to the co-borrowing lenders). Although the issue of whether this co-borrowing debt was properly excluded from Adelphia's financial statements was discussed during the meeting, Defendants recklessly accepted the unsupported (and conflicted) representation of James Brown that there was only a remote possibility that Adelphia would ever have to step in and pay this debt. Defendants made no effort to obtain any documentation of the financial wherewithal of the Rigas Family, Rigas Entities or Managed Entities or of the ability of those entities to repay what they owed. Once again, they also imposed no restrictions on how much debt the Rigas Family, Rigas Entities and Managed Entities could borrow under the Co-Borrowing Facilities or for what purposes they could use the co-borrowed funds.

280.    Moreover, the Outside Directors recklessly disregarded the fact that

Deloitte's independence had become fatally compromised by their relationship with the Rigas Family, their desire to obtain more lucrative fees by performing higher-value accounting services for Adelphia besides just audit services, and by their performance of audit and other accounting services for many of the Rigas Entities and Managed Entities. Deloitte was heavily involved in virtually every aspect of Adelphia's business. Deloitte audited Adelphia's consolidated financial statements and prepared Adelphia's tax returns. In addition, Deloitte provided auditing and accounting services to the Managed Entities and the Rigas Entities. As a result, Deloitte was on both sides of the fence, giving it a complete picture of the finances, operations and business of Adelphia, its subsidiaries, the Managed Entities and the Rigas Entities. This lack of independence caused Deloitte to become an active participant in the Rigas Family's fraud. Indeed, beginning with at least the audit for fiscal year 2000, Deloitte told the Rigas Family that Adelphia should include in a footnote the total amount of credit available under the Co-Borrowing Facilities, as well as the total amount that had been borrowed by the Rigas Entities. However, when the Rigas Defendants objected, Deloitte merely acquiesced in their desire to conceal this information, despite its material nature and the requirement that it be disclosed under GAAP. The Outside Directors -- and specifically the three who sat on Adelphia's Audit Committee -- recklessly disregarded Deloitte's conflicted approach to these issues.

281. Throughout 2001, Kailbourne was aware that the amount of off balance sheet co-borrowing debt attributed by Adelphia to the Rigas Entities was ballooning. Kailbourne requested a meeting with Deloitte to discuss this issue, which occurred on November 12, 2001. At that meeting, Kailbourne asked Deloitte for a complete reconciliation of all funds outstanding under the Co-Borrowing Facilities.

282. Without any protest from Kailbourne, Deloitte did not produce the requested reconciliation until more than three months later -- at the February 28, 2002 Audit Committee meeting. At this meeting, James Brown informed the Audit Committee that the Rigas Family/Rigas Entities had borrowed approximately $2.28 billion that was not disclosed in Adelphia's financial statements. Metros, Kailbourne and Coyle all participated in this meeting.

These Defendants again made no effort to obtain any documentation concerning the ability of the Rigas Family, Rigas Entities or Managed Entities to repay what they owed, and they imposed no restrictions on how much debt the Rigas Family, Rigas Entities and Managed Entities could borrow under the Co-Borrowing Facilities or for what purposes they could use the co-borrowed funds.

283.    Defendants' failure to obtain information about the financial wherewithal of the Rigas Family, Rigas Entities and Managed Entities -- which bore directly on the likelihood that Adelphia would have to pay the funds borrowed by these entities, for which the Company was jointly and severally liable, and hence on whether (according to what management told the board) Adelphia had to disclose the amount of such debt in its financial statements -- was reckless.

284.    Other than the actions described in the preceding paragraphs, Defendants did not monitor draws by any entity (Adelphia-related or Rigas-related) under the Co-Borrowing Facilities.

285.    Defendants also recklessly disregarded evidence of the fraud being perpetrated at Adelphia in connection with their review of other related party transactions.  For example, between 1999 and the end of 2001, the Outside Directors approved numerous direct placements of Adelphia securities to the Rigas Family, and also frequently granted the Rigas Family extensions of the deadline for them to pay for those securities.  Despite their knowledge of the existence and terms of the Co-Borrowing Facilities and of the fact that the Rigas Family had used co-borrowed funds under the TALP Co-Borrowing Facility to purchase Adelphia securities, the Outside Directors never insisted on receiving documentation of the Rigas Family's ability to pay for the securities or of the source(s) of the funds they purportedly used to do so.

286.    In addition, the Outside Directors *retroactively* approved the myriad management agreements between Adelphia and the Managed Entities -- which, as discussed above, were the source of artificially inflated management fees that Adelphia used to fraudulently increase its reported EBITDA.  In granting their approvals, Defendants never

reviewed the actual management agreements, never evaluated whether the services provided under those agreements were bona fide, and never investigated whether the fees charged under those agreements were legitimate.   In short, the Outside Directors simply rubber-stamped whatever Adelphia's management had done in connection with these arrangements.   In doing so, Defendants recklessly abdicated their responsibilities.   The Outside Directors also recklessly disregarded the rampant self-dealing taking place around them -- including the Rigas Family's looting of Adelphia funds for private purposes.

287.   Defendants also approved numerous offerings of securities by Adelphia without taking any steps to verify that Adelphia was in compliance with the Limitation on Indebtedness covenant in its bond indentures.   Seen against the backdrop of Adelphia's need to comply with this covenant in order to be able to lawfully and validly issue new securities, Defendants' failure to ascertain whether the off balance sheet co-borrowing debt attributed to the Rigas Family should be included as part of Adelphia's total debt load is the epitome of reckless conduct.

288.   The financial statements contained in the 10-Ks signed by Defendants and incorporated into the registration statements and prospectuses issued under their watch blatantly violated Generally Accepted Accounting Principles.   The core of GAAP is the principle that complete financial statements must disclose all material information necessary to fairly and validly represent the underlying events and conditions.   Capital markets cannot function properly if investors are unable to rely on auditors' work product.   Defendants were familiar with GAAP from their extensive professional experience, including serving in numerous high level corporate positions.   Moreover, Metros, Kailbourne and Coyle were required to have an understanding of GAAP in order to discharge their functions as members of Adelphia's Audit Committee.

289.   GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time.   Regulation S-X, 17 C.F.R. § 210.4-01(a)(1), states that financial statements filed with the SEC that are not prepared in conformity with GAAP are presumed to be misleading and

inaccurate.   As set forth in Financial Accounting Standards Board ("FASB") Statement of Concepts ("Concepts Statement") No. 1, one of the fundamental objectives of financial reporting is that it provide accurate and reliable information concerning an entity's financial performance during the period being presented. Concepts Statement No. 1, ¶ 42, states:

> Financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.   Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance.

290.    Four GAAP standards are of particular relevance to this case.  First, SFAS 125 (now SFAS 140) provides that debt can be extinguished from a balance sheet only when (a) the debtor pays its creditor and is relieved of its obligation for the liability, or (b) the debtor is legally released from being the primary obligor under the liability either judicially or by the creditor.

291.    Second, GAAP provides specific guidance on how to properly disclose and record loss contingencies in Statement of Financial Accounting Standard ("SFAS") No. 5. Paragraph 8 of SFAS No. 5 provides that:

> An estimated loss from a loss contingency . . . shall be accrued by a charge to income if both the following conditions are met:   (a) Information available prior to the issuance of the financial statements indicate that it is probable that . . . a liability had been incurred at the date of the financial statements.   It is implicit in this that it must be probable that one or more future events will occur confirming the fact of the loss; (b) The amount of loss can be reasonably estimable.

292.    Paragraph 10 of the SFAS No. 5 provides that

> If no accrual is made for a loss contingency because one or both of conditions in paragraph 8 are not met . . . disclosure of the contingency shall be made when there is at least a reasonable possibility that a loss or an additional loss may have been incurred . . . Disclosure is not required of a loss contingency involving an unasserted claim or assessment when there has been no manifestation by a potential claimant of an awareness of a possible claim or assessment unless it is

considered probable that a claim will be asserted and there is a reasonable possibility that the outcome will be unfavorable.

293.   Third, GAAP has a specific standard -- SFAS No. 57 -- that governs disclosures of related party transactions, which include transactions between a company and its management, principal owners or affiliates of such parties.   To comply with SFAS No. 57, a company's financial statements must disclose certain material information about such transactions, including the nature of the relationships involved, a description of the transactions, the dollar amounts involved and any amounts due to or from a related party as of the date of the balance sheet along with the terms and manner of settlement of such payments.   Sufficient information must be disclosed to enable a reviewer of the disclosure to understand the effects of the related party transactions on the financial statements.

294.   In addition to SFAS No. 57, Item 404 of Regulation S-K requires disclosure of any transaction in an amount greater than $60,000 in which an executive officer of a company has a material interest.   The instructions to this section provide that:

> The materiality of any interest is to be determined on the basis of the significance of the information to investors in light of all the circumstances of the particular case.   The importance of the interest to the person having the interest, the relationship of the parties to the transaction with each other and the amount involved in the transaction are among the factors to be considered in determining the significance of the information to investors.

295.   Fourth, Emerging Issues Task Force No. 85-1, "Classifying Notes Received for Capital Stock," which is based upon SEC Staff Accounting Bulletin No. 40, Topic 4-E, "Receivables from Sale of Stock," provides that a company that records a note or receivable as payment for its stock should record the note as a reduction to shareholder's equity and not as an asset.

296.   Item 303 of Regulation S-K imposes a duty on companies to disclose in their public filings with the SEC "known trends or any known demands, commitments, events or uncertainties" that are reasonably likely to have a material impact on the company's sales revenues, income or liquidity, or cause previously reported financial information not to be

indicative of future operating results.

297.    In addition to the specific standards discussed above, GAAP also establishes principles that govern sound financial reporting, including:

a.    The principle that financial reporting should provide information that is useful to current and potential investors and creditors and others in making rational investment, credit and similar decisions (Concepts Statement No. 1, ¶ 34);

b.    The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources (Concepts Statement No. 1, ¶ 40);

c.    The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (Concepts Statement No. 1, ¶ 50);

d.    The principle that financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (Concepts Statement No. 1, ¶ 42);

e.    The principle that financial reporting should be reliable in that it represents what it purports to represent. That information should be reliable as well as relevant is a notion that is central to accounting (Concepts Statement No. 2, ¶¶ 58-59);

f.    The principle of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events

and conditions (Concepts Statement No. 2, ¶ 79);

g.      The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (Concepts Statement No. 2, ¶¶ 95, 97);

h.      The principle embodied in SFAS No. 57 and Item 404 of Regulation S-K that all material information be disclosed concerning material related party transactions;

i.      The principle embodied in Item 303 of Regulation S-K that all known trends or any known demands, commitments, events or uncertainties that are reasonably likely to have a material impact on the company's sales revenues, income or liquidity, or cause previously reported financial information not to be indicative of future operating results be disclosed.

298.    In addition, as discussed below in greater detail, Adelphia's financial statements approved by Defendants, *inter alia*, (1) failed to adequately disclose material information about the Co-Borrowing Facilities and other related party transactions between Adelphia and its subsidiaries, on the one hand, and the Rigas Family, the Rigas Entities and the Managed Entities, on the other, in violation of SFAS 5 and SFAS 57; (2) failed to disclose any information about the Rigas Family's self-dealing and exploitation of Adelphia's corporate funds and resources for their own purposes; (3) conveyed a totally misleading picture of Adelphia's financial condition and results; (4) reported debt figures that were highly misleading due to Adelphia's reallocation of co-borrowing debt to Managed Entities in violation of SFAS 125; and (5) contained numerous accounting irregularities, as described in the June 10, 2002 8-K.

299.    Adelphia was more than simply a guarantor under the Co-Borrowing Facilities. To the contrary, Adelphia was jointly and severally liable as a primary obligor for repayment of all amounts borrowed under the Co-Borrowing Facilities -- whether nominally borrowed by an Adelphia subsidiary, a Rigas Entity or a Managed Entity. The entire amount

outstanding under the Co-Borrowing Facilities at any given time constituted an actual, non-contingent debt of Adelphia and its subsidiaries. Under GAAP, the entire amount of this debt had to be disclosed as part of the consolidated debt figures on Adelphia's balance sheet.

300.     Adelphia's pattern of "transferring" or "allocating" co-borrowing debt to Rigas Entities or Managed Entities does not change this result. Under SFAS 140, the co-borrowing debt could only be removed from Adelphia's balance sheet if a borrower repaid it to the co-borrowing lender or if the lender (or a court) released Adelphia from its obligation. Simply declaring that a Rigas Entity, rather than an Adelphia subsidiary, will now be solely responsible for repayment of the debt -- in direct contravention of the terms of the credit agreements making the Adelphia subsidiary a joint obligor -- is woefully inadequate under SFAS 140 to justify not disclosing the debt as debt of Adelphia in the financial statements. Adelphia and Deloitte's failure to disclose in Adelphia's balance sheets co-borrowing debt that was "reallocated" to Rigas Entities thus violated SFAS 140.

301.     Moreover, even if the co-borrowing debt is properly considered a contingent liability of Adelphia under SFAS 5, the failure to disclose the full amount of that debt violated GAAP under the facts of this case. The only arguable contingency on Adelphia's obligation to repay the co-borrowing loans (which requires viewing Adelphia as a guarantor and ignoring the fact that Adelphia and its subsidiaries are jointly and severally liable for repayment of the debt under the credit agreements) is the financial wherewithal of the Rigas Entities and Managed Entities. If the Rigas Entities lacked the ability to repay the borrowed amounts, Adelphia would have to repay them. Given the plainly inadequate assets of the Rigas Entities and the Managed Entities in relation to the debt owed, there was a "reasonable possibility" within the meaning of SFAS 5 that Adelphia would be called upon to repay all of the co-borrowed amounts itself. As a result, SFAS 5 required that the full amount of the co-borrowing debt be disclose as debt of Adelphia on the Company's balance sheets.

302.     In flagrant violation of SFAS 57 and Item 404 of Regulation S-K, Adelphia's financial statements and 10-Ks disclosed no details at all about any of the related

party transactions between Adelphia and the Rigas Family (or entities under their control). Even where these documents disclosed the existence of some transactions -- such as the Rigases' securities purchases or the co-borrowing facilities -- the disclosures omitted huge amounts of material information. In the case of the co-borrowing arrangements, Adelphia and Deloitte never disclosed even the fact that amounts had been drawn down on the co-borrowing facilities, who borrowed the money, or what the borrower used the money for. In the case of the securities purchases, Adelphia and Deloitte left out the critical facts that the Rigases either did not give the Company any cash for the securities or simply borrowed the money used to buy the securities from the co-borrowing facilities that Adelphia was responsible to repay.

303.    Adelphia's audited financial statements also violated GAAP -- specifically, the principles set forth in Emerging Issues Task Force No. 85-1, "Classifying Notes Received for Capital Stock" -- by failing to reduce Adelphia's reported shareholder's equity as a result of the cashless, sham purchases of Adelphia securities by the Rigases. Because Adelphia received no cash for these purchases, but merely transferred co-borrowing debt and recorded a receivable as payment from the purchasing Rigas Entity, Adelphia should have recorded a reduction to shareholder's equity on its financial statements.

304.    Indeed, Adelphia's restatement of its consolidated balance sheets and financial statements and figures for 2000, and its announced intention to restate the results for 1999 and 2001, and perhaps other periods as well, to properly account for the co-borrowing arrangements is an admission that the financial statements for these periods were false and misleading at the time they were made and that the inaccurate and omitted information therein was material to investors like Huff and Plaintiffs. In addition to restating its results for the fiscal year ended December 31, 2000, the Company released preliminary revised financial results for the fiscal year ended December 31, 2001. Under GAAP, companies may restate financial statements only when there has been a change in the reporting entity, a change in governing accounting principles or a material error in the previously issued financial statements that needs to be corrected. Adelphia's announced restatement clearly resulted from the need to correct

material errors in its previously-reported financial statements, and not from a change in reporting entity or accounting principles. Consequently, by announcing a restatement and its intention to restate further, Adelphia admitted that its previously-reported financial statements were and are materially false and misleading.

305.    Adelphia restated its financial results for 2000, and announced that its financial statements for the years 1999 and 2001 and possibly other periods must also be restated to properly account for at least $2.5 billion in borrowings by the Rigas Family under the Co-Borrowing Facilities, thereby conceding the materiality of this information to investors. Given the existence of co-borrowing arrangements going back to 1996, and the other deceptive practices appearing in Adelphia's financial statements, the data for 1996, 1997 and 1998 also probably should have been restated.

306.    Moreover, the notes Adelphia issued after early 2000 violated numerous indenture covenants. When the debts for which Adelphia was liable under the co-borrowing facilities are properly taken into account, Adelphia's total debt exceeded the Limitation on Indebtedness covenant's 8.75 x EBITDA restriction at least by the beginning of 2000 and likely during prior periods as well. While in violation of this covenant, Adelphia was prohibited from issuing new bonds unless it either paid off some existing debt or increased its earnings to come back into compliance with the covenant.

307.    Adelphia also repeatedly violated the "Limitation on Transactions with Affiliates" covenant. The Rigas Family (who, as noted above, are Adelphia affiliates for purposes of the covenant) engaged in self-dealing of unprecedented breadth. The most obvious example of improper affiliate transactions were, of course, the Co-Borrowing Facilities, under which non-Adelphia entities controlled by the Rigases obtained access to Adelphia's credit for their own private purposes, while leaving Adelphia on the hook to repay the loans. These transactions conferred no benefit on Adelphia whatsoever, and no Board member who properly discharged his responsibilities would ever have considered entering into such an arrangement with a non-affiliate on such terms.

308.   None of this chicanery was ever disclosed to investors.  Instead, Adelphia sold more and more securities to an unsuspecting public, in some instances coming to the securities market seven times in a single year.  However, because Adelphia had reached its debt ceiling and violated the affiliate transaction and restricted payment covenants, it had no legal authority -- and, indeed, was legally prohibited -- from issuing new bonds to the public in the September 2000 Offering, the January 2001 Offering, the June 2001 Offering, the October 2001 Offering and likely in earlier public offerings.  With existing indentures in default (though the defaults remained undisclosed), notes issued under new indentures could not be valid.

309.   As discussed above, Defendants recklessly disregarded the material misstatements and omissions contained in Adelphia's financial statements, 10-Ks, registration statements and prospectuses.   They also recklessly disregarded Adelphia's breach of their indenture covenants.

## IV.    The November 1999 Offering

### A.    Background

310.   The November 1999 Offering was made pursuant to a prospectus, dated May 14, 1999 (the "May 1999 Prospectus"), which Adelphia filed with the SEC as part of a Form S-3 Registration Statement, Registration No. 333-78027, on May 7, 1999 (the "May 1999 Registration Statement"), as well as a supplemental prospectus, dated November 10, 1999 (the "November 1999 Prospectus"), which Adelphia filed with the SEC on November 12, 1999 pursuant to Rule 424(b)(5).  Both the May 1999 Prospectus and the November 1999 Prospectus are incorporated as part of the May 1999 Registration Statement.

311.   Defendants were directors of Adelphia at the time the relevant registration statements and prospectuses for the November 1999 Offering were filed.

312.   As detailed below, the May 1999 Prospectus and November 1999 Prospectus, both of which were incorporated in the May 1999 Registration Statement, contained numerous materially misleading statements and omitted information material to investors in the securities issued by Adelphia in the November 1999 Offering.

313.    Huff participated in the November 1999 Offering by purchasing 9 3/8% Senior Notes from the November 1999 Offering Underwriters on Plaintiffs' behalf.  In addition, subsequent to the November 1999 Offering, Huff made additional purchases on Plaintiffs' behalf on the secondary market of 9 3/8% Senior Notes that Adelphia issued as part of the November 1999 Offering.  In making these purchases on Plaintiffs' behalf, Huff relied on the misleading statements and omissions contained in the May 1999 Prospectus, November 1999 Prospectus and May 1999 Registration Statement.

### B.    Materially Misleading Statements

314.    The November 1999 Prospectus incorporated by reference Adelphia's Form 10-K for the transition period ended December 31, 1998 (the "1998 10-K").  Far from presenting an accurate picture of the financial operations and condition of Adelphia and its subsidiaries and affiliates, the 1998 10-K contains a host of distortions, misrepresentations and outright fabrications.

315.    Beginning on page F-1, the 1998 10-K presented Adelphia's consolidated balance sheets and financial statements for the years ended March 31, 1998 and December 31, 1998.  These statements were materially false and misleading.  By failing to account for the amounts borrowed by the Managed Entities under the co-borrowing facilities, which began as early as 1996, the consolidated financial statements contained in the 1998 10-K were not prepared in accordance with GAAP and, indeed, provided a grossly deceptive presentation of the following material aspects of Adelphia's operations and financial condition:

- Total parent and subsidiary debt was represented to be $2,909,745,000 for the fiscal year ended March 31, 1998, and $3,527,452,000 for the year ended December 31, 1998.  In fact, these figures understated Adelphia's total consolidated debt by several hundred million dollars for each of these periods.

- Total convertible preferred stock, common stock and other stockholders' equity were represented to be a deficiency of $1,315,865,000 for the fiscal year ended March 31, 1998, and $1,021,746,000 for the year ended December 31, 1998.  In fact, these figures

overstated Adelphia's stockholder equity by several million dollars by failing to account for the fact that the equity securities purchased by the Rigases were paid for with funds borrowed under the co-borrowing facilities, which Adelphia and its subsidiaries are liable to repay.

- Revenues were overstated due to management fees due from the Managed Entities that were neither paid nor intended to be paid, and due to the overstatement of Adelphia's subscribers.

- Capital expenditures were overstated.

- EBITDA was overstated through improper accounting practices.

- Interest expense - net was represented to be $247,107,000 for the fiscal year ended March 31, 1998 and $191,593,000 for the nine months ended December 31, 1998.  In fact, these figures understate interest expense by several millions dollars by failing to account for interest due on the borrowings by the Managed Entities under the co-borrowing facilities.

- Similarly, total SG&A expenses are represented to be $95,731,000 for the year ended March 31, 1998, and $107,249,000 for the nine months ended December 31, 1998. In fact, these figures were understated by several million dollars by failing to account for amounts spent by Adelphia in connection with the operations of the Managed Entities.

- The understatements of SG&A and interest expenses had the further effect of understating the amount of Adelphia's net losses for the same periods, which had been represented to be $173,879,000 for the year ended March 31, 1998, and $115,130,000 for the nine months ended December 31, 1998, but which were substantially higher in reality.

- The portions of the statements concerning Adelphia's cash flows were also misleading.   Specifically, net cash provided by financing activities was represented to be $712,606,000 for the year ended March 31, 1998, and $999,079,000 for the nine months ended December 31, 1998.  These figures were overstated by several million dollars because of the failure to account for the Managed Entities' co-borrowing activities, which resulted in understatement of Adelphia's repayments of debt on which the calculation of net cash provided by financing activities depends.   In addition, the interest expenses in the calculation of

Adelphia's cash flows were also understated as a result of the concealment of the co-borrowing arrangements.

316.    Although Adelphia acknowledged the existence of the co-borrowing arrangements in the 1998 10-K, the amounts of the Managed Entities' borrowings under the co-borrowing arrangements were not included in Adelphia's statement of its total consolidated debt. Specifically, with respect to the co-borrowing arrangements, Adelphia stated in a footnote:

> A subsidiary of Adelphia is a co-borrower with a managed partnership under a $200,000[,000] credit agreement. Each of the co-borrowers is liable for all borrowings under this credit agreement, although the lenders have no recourse against Adelphia other than against Adelphia's interest in such subsidiary.

317.    This is the entire disclosure related to the co-borrowing facilities. This statement's rank inadequacy is apparent simply by contrasting it to the disclosures concerning the co-borrowing arrangements in Adelphia's May 2002 8-K.

318.    This statement was materially false and misleading in that it represented to Adelphia investors that the co-borrowing arrangements were simply additional credit lines available for the legitimate business purposes of Adelphia's subsidiary, but which were also available for the use for legitimate business purposes of the Managed Entity. In reality, this disclosure hid from Adelphia's investors the true state of affairs, which was that the co-borrowing arrangement was strictly an artifice to conceal what was in actuality a guarantee by Adelphia of loans issued for the private use and benefit of the Rigas Family. In addition, when combined with the failure to include the amounts borrowed by the Managed Entity under the co-borrowing arrangements in the figures for Adelphia's consolidated debt, the disclosure quoted above misleads readers into believing that no amounts had been borrowed under the co-borrowing facilities, when in fact the Rigases had drawn down a substantial portion of the credit facility.

319.    The statement regarding the co-borrowing arrangement was also materially misleading in that it failed to disclose:

(1) whether and in what amounts the co-borrowing facility had been drawn down, which left the misleading impression that no amounts had been drawn down;

(2) which entity drew down on the facilities, which would inform the investor whether the credit of Adelphia's subsidiary was being used for a legitimate purpose;

(3) what the proceeds were used for. In fact, the 1998 10-K concealed the fact that the Managed Entities were using the proceeds of the co-borrowing facilities to purchase securities in Adelphia and other assets for the private use of the Rigas family; and

(4) whether the entity that borrowed funds under the facilities had the financial ability to repay those borrowings. If it had been disclosed that the Managed Entity actually lacked the ability to repay, then Huff would have known that a high likelihood existed that Adelphia's subsidiary would have to repay the loan.

320. The 1998 10-K contained the following additional material misrepresentations and omissions:

• Under Item 2, the 1998 10-K stated that substantially all of the assets of Adelphia's subsidiaries "are subject to encumbrances as collateral in connection with the Company's credit arrangements, either directly with a security interest or indirectly through a pledge of the stock in the respective subsidiaries." What this failed to disclose was that the assets of Adelphia's subsidiaries were pledged as collateral for loans taken by the Managed Entities and the Rigas Family that conferred no legitimate business benefits on Adelphia or its subsidiaries. Moreover, when considered in light of the failure to disclose the amounts borrowed by Managed Entities and the Rigas Family and the inability of those entities to repay, this disclosure misled Huff as to the degree to which the assets of Adelphia and its subsidiaries -- to which Huff looked to satisfy Adelphia's obligations under the securities purchased on Plaintiffs' behalf by Huff -- were at risk of being unavailable to support Adelphia's debt to Plaintiffs.

- Under Item 7, the 1998 10-K described Adelphia's "financing strategy." This Item repeated the false figure of $3,527,452,000 for Adelphia's total outstanding debt for the year ended December 31, 1998. In addition, there was no disclosure that part of Adelphia's "financing strategy" included the use of co-borrowing facilities with the Managed Entities to finance the Rigas Family's acquisition of Adelphia securities and other assets for the Rigas Family's personal use.

- The 1998 10-K set forth "mandatory reductions in principal under all debt agreements for the next five years based on amounts outstanding at December 31, 1998" as follows: (a) $101,402,000 during the year ended December 31, 1999; (b) $236,795,000 during the year ended December 31, 2000; (c) $190,403,000 during the year ended December 31, 2001; (d) $540,318,000 during the year ended December 31, 2002; and (e) $693,663,000 during the year ended December 31, 2003. These amounts were understated, given that the "amounts outstanding at December 31, 1998" did not include amounts borrowed by the Managed Entities under the co-borrowing facilities.

321. On pages S-3 and S-5, the November 1999 Prospectus discussed two direct placements of Adelphia common stock with the Rigases in April and October 1999. These statements were materially false and misleading in that they failed to disclose that the Rigases were using proceeds from borrowings under the co-borrowing facilities to finance a substantial portion of their direct purchases of these securities, and that they lacked the ability to repay those borrowings. By failing to disclose this information, the November 1999 Prospectus misled investors into believing that the Rigases were injecting new equity into Adelphia by means of these direct placements, when, in fact, Adelphia was merely incurring additional, undisclosed debt under the co-borrowing facilities that was senior to the notes purchased by Huff on Plaintiffs' behalf. Furthermore, by not disclosing these borrowings, the November 1999 Prospectus concealed from investors the risk that Adelphia's exposure on the co-borrowing arrangement would increase if the value of the assets supporting the Rigas Family's borrowings - - namely, the price of the Adelphia stock and other securities they bought with those borrowings

-94-

-- fell to the point that a new infusion of cash into the Managed Entities became necessary in order to service the loans, or that the Managed Entities were unable to repay, leaving only Adelphia. Nor does the November 1999 Prospectus disclose the risk of a severe adverse impact on Adelphia's stock price in the event that the lender on the co-borrowing facility is required to liquidate the Rigas Family's securities holdings in order to obtain repayment of the loan.

322.    On pages S-7 to S-8, the November 1999 Prospectus represented that, as of June 30, 1999, the "Notes would have been effectively subordinated to approximately $6.0 billion of indebtedness and redeemable preferred stock of Adelphia's subsidiaries; and our total indebtedness excluding redeemable preferred stock would have been approximately $8.6 billion." These statements were materially false and misleading because, by not taking the amount of borrowings by the Rigases and the Managed Entities under the co-borrowing arrangements into account, the November 1999 Prospectus understated the amounts of indebtedness ostensibly senior to the notes and Adelphia's total indebtedness. This materially misleading representation was repeated on page S-10 of the November 1999 Prospectus.

323.    On page S-10, in its discussion of "Risk Factors," the November 1999 Prospectus disclosed that Adelphia had total indebtedness of $3.8 billion as of June 30, 1999. This statement was materially false and misleading in that the figure for total indebtedness did not include amounts borrowed by the Rigases and the Managed Entities under the co-borrowing arrangements, which omission resulted in an understatement of Adelphia's total indebtedness.

324.    On page S-12, the November 1999 Prospectus represented that Adelphia's total convertible preferred stock, common stock and other stockholders' equity at June 30, 1999 was approximately $267.7 million. This statement was materially false and misleading in that it overstated stockholders' equity by failing to account for the fact that the Rigases purchased Adelphia equity securities using proceeds from the co-borrowing arrangements which the Company was liable to repay. Rather than inject new equity into Adelphia, the securities purchased by the Rigases in reality created bank debt that was senior to the notes purchased by Huff.

325.    On page S-18, the November 1999 Prospectus stated that the Rigases at the time effectively controlled the voting power of Adelphia's outstanding common stock.  This disclosure was materially false and misleading in that it did not disclose the far more pervasive extent to which the Rigas Family exercised day-to-day control over Adelphia and its cash resources beyond simply its ability to elect the Board of Directors.  Nor did the November 1999 Prospectus disclose the degree to which the Rigases were exercising that day-to-day control to self-deal.

326.    On page S-18, the November 1999 Prospectus disclosed that the outside business activities of the Rigases -- including their engagement in the cable television business outside of Adelphia -- "could present a conflict of interest with Adelphia."  In addition, the prospectus noted that "there have been and will continue to be transactions between us and the executive officers or the other entities they own or with which they have affiliations."  These disclosures were materially false and misleading in the following respects:  First, while noting only that a conflict of interest "could" arise at some point in the future, the prospectus failed to disclose that severe conflicts of interest between the Rigases and Adelphia had already arisen by virtue of the Rigases' repeated pattern of engaging in self-dealing with Adelphia's financial resources.  Second, although giving the impression that conflicts and transactions with the Rigas Family, when they do arise, will be brought to the attention of Adelphia's Board of Directors, approved by a majority of disinterested directors, and evaluated for their fairness to Adelphia after disclosure of all material facts as required by § 2.10 of Adelphia's By-Laws, the November 1999 Prospectus did not disclose that, in fact, the conflicts of interest that had already arisen had been disregarded by the Defendants in contravention of the By-Laws and the transactions were not fair to the Company.  Third, the disclosure that transactions between Adelphia and its officers' affiliates will continue to occur was inadequate in that it did not disclose: (1) the nature of the transactions; (2) the parties involved; (3) the amounts at stake in such transactions; (4) the impact of such transactions on the operations and financial condition of Adelphia; and (5) the utter lack of internal controls to ensure fairness and prevent self-dealing.  Specifically, the

November 1999 Prospectus did not disclose that the Rigases had borrowed substantial amounts under the co-borrowing arrangements which they were unable to repay and for which Adelphia and its subsidiaries were liable, had used the proceeds of those borrowings for their own personal benefit, and had received numerous cash "advances" from Adelphia which they used for their own personal benefit.

327.    On page S-23, the November 1999 Prospectus represented that Adelphia's total debt as of June 30, 1999 was $3,794,539,000.  This statement was materially false and misleading in that the figure for total indebtedness did not include amounts borrowed by the Rigases and the Managed Entities under the co-borrowing arrangements, which omission resulted in an understatement of Adelphia's total indebtedness.

328.    On page 4, in its discussion of "Risk Factors," the May 1999 Prospectus stated that Adelphia had total indebtedness of approximately $3.5 billion as of March 31, 1999.  This statement was materially false and misleading in that the figure for total indebtedness did not include amounts borrowed by the Rigases and the Managed Entities under the co-borrowing arrangements, which omission resulted in an understatement of Adelphia's total indebtedness.

329.    On pages 10-11, the May 1999 Prospectus disclosed the fact that the Rigases at the time effectively controlled the voting power of Adelphia's outstanding common stock.  This disclosure was materially false and misleading in that it did not disclose the far more pervasive extent to which the Rigas Family exercised day-to-day control over Adelphia and its cash resources beyond simply its ability to elect the Board of Directors.  Nor did the May 1999 Prospectus disclose the degree to which Rigases were exercising that day-to-day control to self-deal.

330.    On page 11, the May 1999 Prospectus stated that the outside business activities of the Rigases -- including their engagement in the cable television business outside of Adelphia -- "could present a conflict of interest with Adelphia."  In addition, the May 1999 Prospectus noted that "there have been and will continue to be transactions between us and the executive officers or the other entities they own or with which they have affiliations."  These

disclosures were materially false and misleading in that they failed to disclose that (1) severe conflicts of interest between the Rigases and Adelphia had already arisen by virtue of the Rigases' repeated pattern of engaging in self-dealing with Adelphia's financial resources; (2) the Rigases had borrowed various amounts under the co-borrowing arrangements which they were unable to repay and for which Adelphia and its subsidiaries were liable; (3) the Rigases had used the proceeds of those borrowings for their own personal benefit; (4) the Rigases received numerous cash "advances" from Adelphia which they used for their own personal benefit; and (5) the utter lack of internal controls to ensure fairness and prevent self-dealing.

**V.     The September 2000 Offering**

        **A.     Background**

     331.   The September 2000 Offering was made pursuant to the May 1999 Prospectus, the May 1999 Registration Statement, as well as a supplemental prospectus, dated September 15, 2000 (the "September 2000 Prospectus"), which Adelphia filed with the SEC on September 18, 2000 pursuant to Rule 424(b)(5).   Both the May 1999 Prospectus and the September 2000 Prospectus are incorporated as part of the May 1999 Registration Statement.

     332.   Defendants were directors of Adelphia when the registration statement and prospectuses relevant to the September 2000 Offering were filed.

     333.   As detailed below, the May 1999 Prospectus and September 2000 Prospectus, both of which were incorporated in the May 1999 Registration Statement, contained numerous materially misleading statements and omitted information material to investors in the securities issued by Adelphia in the September 2000 Offering.

     334.   Huff participated in the September 2000 Offering by purchasing 10 7/8% Senior Notes from the September 2000 Offering Underwriters on Plaintiffs' behalf.  In addition, subsequent to the September 2000 Offering, Huff made additional purchases on Plaintiffs' behalf on the secondary market of 10 7/8% Senior Notes that Adelphia issued as part of the September 2000 Offering.   In making these purchases on Plaintiffs' behalf, Huff actually relied on the misleading statements and omissions contained in the May 1999 Prospectus, September 2000

Prospectus and May 1999 Registration Statement, as well as subsequent public filings by the Company.

### B. Materially Misleading Statements

335. The September 2000 Prospectus incorporated by reference Adelphia's Form 10-K for the year ended December 31, 1999 (the "1999 10-K"). Defendants all signed the 1999 10-K. Far from presenting an accurate picture of the financial operations and condition of Adelphia and its subsidiaries and affiliates, the 1999 10-K contains a host of distortions, misrepresentations and outright fabrications.

336. Beginning on page F-1, the 1999 10-K presents Adelphia's consolidated balance sheets and financial statements for the years ended December 31, 1998 and December 31, 1999.

337. The consolidated financial statements for Adelphia contained in the 1999 10-K stated that the total consolidated debt for Adelphia and its subsidiaries was $3,527,452,000 for the year ended December 31, 1998, and $9,291,732,000 for the year ended December 31, 1999. By failing to account for the amounts borrowed by the Managed Entities under the co-borrowing facilities, the consolidated financial statements contained in the 1999 10-K were not prepared in accordance with GAAP and, indeed, provided a grossly deceptive presentation of the following material aspects of Adelphia's operations and financial condition:

- Total parent and subsidiary debt was represented to be $3,527,452,000 for the year ended December 31, 1998, and $9,291,732,000 for the year ended December 31, 1999. In fact, these figures understated Adelphia's total consolidated debt by at least $700 million for the period ending December 31, 1999.

- Total convertible preferred stock, common stock and other stockholders' equity were represented to be a deficiency of $1,021,746,000 for the year ended December 31, 1998, and a positive of $3,721,187,000 for the year ended December 31, 1999. In fact, these figures overstated Adelphia's stockholder equity by hundreds of millions of dollars by failing to account for the fact that the equity securities purchased by the Rigases were paid for with funds

borrowed under the co-borrowing facilities, which Adelphia and its subsidiaries are liable to repay.

   •   Revenue was overstated due to management fees due from the Managed Entities that were neither paid nor intended to be paid, and due to the inflation of Adelphia's subscribers.

   •   Capital expenditures were overstated.

   •   Interest expense - net was represented to be $180,452,000 for the nine months ended December 31, 1998, and $359,585,000 for the year ended December 31, 1999.  In fact, these figures understated interest expense by hundreds of millions of dollars by failing to account for interest due on the borrowings by the Managed Entities under the co-borrowing facilities.

   •   Similarly, total SG&A expenses were represented to be $107,249,000 for the nine months ended December 31, 1998, and $340,579,000 for the year ended December 31, 1999.  In fact, these figures were understated by hundreds of millions of dollars by failing to account for amounts spent by Adelphia in connection with the operations of the Managed Entities.

   •   The understatements of SG&A expenses and interest expenses had the further effect of understating the amount of Adelphia's net losses for the same periods, which had been represented to be $115,130,000 for the nine months ended December 31, 1998, and $240,530,000 for the year ended December 31, 1999, but which were substantially higher in reality.

   •   Portions of the statements concerning Adelphia's cash flows were also misleading.  Specifically, net cash provided by financing activities was represented to be $999,079,000 for the nine months ended December 31, 1998, and $2,978,313,000 for the year ended December 31, 1999.  These figures were overstated by several hundred million dollars because of the failure to account for the Managed Entities' co-borrowing activities and purchases of Adelphia debt securities using co-borrowed funds, which resulted in overstatement of

Adelphia's proceeds from debt and understatement of Adelphia's repayments of debt on which figures the calculation of net cash provided by financing activities depends.   In addition, the interest expenses in the calculation of Adelphia's cash flows were also understated as a result of the concealment of the co-borrowing arrangements.

338.   Although Adelphia acknowledged the existence of the co-borrowing arrangements in the 1999 10-K, the amounts of the Managed Entities' borrowings under the co-borrowing arrangements were not included in Adelphia's statement of its total consolidated debt. Specifically, with respect to the co-borrowing facilities, Adelphia stated in a footnote:

> Certain subsidiaries of Adelphia are co-borrowers with Managed Entities under credit facilities for borrowings of up to $3,751,250[,000].   Each of the co-borrowers is liable for all borrowings under the credit agreements, and may borrow up to the entire amount of the available credit under the facility.   The lenders have no recourse against Adelphia other than against Adelphia's interest in such subsidiaries.

339.   This is the entire disclosure related to the co-borrowing facilities.   The statement's rank inadequacy is apparent simply by contrasting it to the disclosures concerning the co-borrowing facilities contained in Adelphia's May 2002 8-K.

340.   This statement was materially false and misleading in that it represented to Adelphia investors that the co-borrowing arrangements were simply additional credit lines available for the legitimate business purposes of Adelphia's subsidiaries, but which were also available for the use for legitimate business purposes of the Managed Entities, all of which were managed by Adelphia for a fee.   In reality, this disclosure hid from Adelphia's investors the true state of affairs, which was that the co-borrowing arrangements were strictly an artifice to conceal what was in actuality a guarantee by Adelphia of loans issued for the private use and benefit of the Rigas Family.   In addition, when combined with the failure to include the amounts borrowed by the Managed Entities under the co-borrowing arrangements in the figures for Adelphia's consolidated debt, the disclosure quoted above misleads readers into believing that no amounts had been borrowed under the co-borrowing facilities, when in fact the Rigases had borrowed at

least $700 million as of December 31, 1999.

341.     The statement concerning the co-borrowing arrangements was also materially misleading in that it failed to disclose:

> (1) whether and in what amounts the co-borrowing facilities had been drawn down, which left the misleading impression that no amounts had been drawn down;

> (2) which entities drew down on the facilities, which would inform the investor whether the credit of Adelphia's subsidiaries was being used for a legitimate purpose;

> (3) what the proceeds were used for.  In fact, the 1999 10-K concealed the fact that the Managed Entities were using the proceeds of the co-borrowing facilities to purchase securities in Adelphia and other assets for the private use of the Rigas family; and

> (4) whether the entities that borrowed funds under the facilities had the financial ability to repay those borrowings.  If it had been disclosed that the Managed Entities actually lacked the ability to repay, then Huff would have known that a high likelihood existed that Adelphia and its subsidiaries would have to pay those loans.

342.     The 1999 10-K contained the following additional material misrepresentations and omissions:

> • Under Item 1, the 1999 10-K stated that Adelphia "provides management and consulting services" to the Managed Entities, without disclosing that those Managed Entities, in the course of their operations, have borrowed money under the co-borrowing arrangements to finance the purchase of Adelphia securities by the Rigases and other Rigas entities.

> • Also under Item 1, the 1999 10-K stated that Adelphia's "operations consist of providing telecommunications services primarily over networks," without disclosing

that Adelphia's operations also included advancing and lending money to the Rigas Family and entities controlled by the Rigas Family for a wide variety of other businesses and investments, including golf course development, real estate, provision of venture capital, professional hockey and filmmaking.

- Item 1 of the 1999 10-K incorporates by reference the financial information contained in the audited financial statements discussed above, which, for the reasons stated above are materially incomplete and misleading.

- Under Item 2, the 1999 10-K stated that substantially all of the assets of Adelphia's subsidiaries "are subject to encumbrances as collateral in connection with the Company's credit arrangements, either directly with a security interest or indirectly through a pledge of the stock in the respective subsidiaries." What this failed to disclose was that the assets of Adelphia's subsidiaries were pledged as collateral for loans taken by the Managed Entities and the Rigas Family that conferred no legitimate business benefits on Adelphia or its subsidiaries. Moreover, when considered in light of the failure to disclose the amounts borrowed by Managed Entities and the Rigas Family and the inability of those entities to repay, this disclosure misled Huff as to the degree to which the assets of Adelphia and its subsidiaries -- to which Huff looked to satisfy Adelphia's obligations under the securities purchased on Plaintiffs' behalf by Huff -- were at risk of being unavailable to support Adelphia's debt to Plaintiffs.

- Under Item 7, the 1999 10-K discussed Adelphia's need for liquidity and continual financing to conduct, maintain, upgrade and acquire its cable systems, noting that Adelphia's "ability to generate cash to meet its future needs will depend generally on its results of operations and the continued availability of external financing." This disclosure failed to mention that Adelphia lacked the ability to obtain such external financing because it was contractually prohibited from taking on additional indebtedness by covenants in the indenture agreements for its previous bond issues and the restrictions in its credit agreements.

- Also under Item 7, the 1999 10-K described Adelphia's "financing strategy." This disclosure repeated the false figure of $9,291,732,000 for Adelphia's total

outstanding debt for the year ended December 31, 1999.  In addition, there was no disclosure that part of Adelphia's "financing strategy" included the use of co-borrowing facilities with the Managed Entities to finance the Rigas Family's acquisition of Adelphia securities and other assets for the Rigas Family's personal use.  As for the financing transactions, there was no disclosure of Adelphia's breach of its indentures' restrictions on indebtedness or that purchases of Adelphia securities by the Rigas Family were financed with proceeds from the co-borrowing facilities.

- The 1999 10-K set forth "mandatory reductions in principal under all debt agreements for the next five years based on amounts outstanding at December 31, 1999" as follows:  (a) $390,746,000 during the year ended December 31, 2000; (b) $285,401,000 during the year ended December 31, 2001; (c) $886,571,000 during the year ended December 31, 2002; (d) $1,341,190,000 during the year ended December 31, 2003; and (e) $919,147,000 during the year ended December 31, 2004.  These amounts were dramatically understated, given that the "amounts outstanding at December 31, 1999" did not include amounts borrowed by the Managed Entities under the co-borrowing facilities.

343.   The September 2000 Prospectus incorporated by reference Adelphia's Form 10-Q for the quarter ended March 31, 2000 (filed with the SEC on or about May 15, 2000) (the "March 2000 10-Q").  The March 2000 10-Q falsely reported that Adelphia had total unconsolidated debt of $8,531,911,000 and total consolidated debt of $9,384,508,000, including subsidiary debt of $6,606,251,000 and parent debt of $2,778,257,000.

344.   The March 2000 10-Q also stated:

The accompanying unaudited condensed consolidated financial statements of Adelphia Communications Corporation and its majority owned subsidiaries . . . have been prepared in accordance with the rules and regulations of the Securities and Exchange Commission.

In the opinion of management, all adjustments, consisting only of normal recurring accruals necessary for a fair presentation of the financial position of Adelphia at March 31, 2000, and the results of operations for the three and six months ended March 31, 1999 and 2000, have been included.

345.    The March 2000 10-Q also falsely represented that Adelphia had a total of 5,003,517 basic cable subscribers.

346.    Adelphia's publicly-reported results for the first quarter of 2000 as reported in the March 2000 10-Q were materially false and misleading. As detailed above, Adelphia failed to disclose the full amount of its liability under the co-borrowing facilities. Adelphia's total consolidated debt and total liabilities were understated by at least $618 million through the deliberate omission of co-borrowing debt. The March 2000 10-Q also overstated Adelphia's subscribers by tens of thousands. As a result, the representation in the March 2000 10-Q that Adelphia's financial statements were fairly presented in accordance with SEC rules was also false.

347.    The September 2000 Prospectus incorporated by reference Adelphia's Form 10-Q for the quarter ended June 30, 2000 (filed with the SEC on or about August 14, 2000) (the "June 2000 10-Q"). The June 2000 10-Q falsely reported that Adelphia had total unconsolidated debt of $9,011,675,000 and total consolidated debt of $9,978,775,000, including subsidiary debt of $7,200,203,000 and parent debt of $2,778,572,000.

348.    The June 2000 10-Q also stated:

The accompanying unaudited condensed consolidated financial statements of Adelphia Communications Corporation and its majority owned subsidiaries . . . have been prepared in accordance with the rules and regulations of the Securities and Exchange Commission.

In the opinion of management, all adjustments, consisting only of normal recurring accruals necessary for a fair presentation of the financial position of Adelphia at June 30, 2000, and the results of operations for the three and six months ended June 30, 1999 and 2000, have been included.

349.    The June 2000 10-Q also falsely represented that Adelphia had a total of 5,018,068 basic cable subscribers.

350.    Adelphia's publicly-reported results for the second quarter of 2000 as reported in the June 2000 10-Q were materially false and misleading.  As detailed above, Adelphia failed to disclose the full amount of its liability under the co-borrowing facilities. Adelphia's total consolidated debt and total liabilities were understated by at least $397 million through the deliberate omission of co-borrowing debt.  The March 2000 10-Q also overstated Adelphia's subscribers by tens of thousands.  As a result, the representation in the March 2000 10-Q that Adelphia's financial statements were fairly presented in accordance with SEC rules was also false.

351.    The September 2000 Prospectus did not provide any additional disclosures concerning the amounts borrowed by the Rigases and the Managed Entities under the co-borrowing arrangements or the uses to which the proceeds of those borrowings were put.

352.    On page S-3, the September 2000 Prospectus discusses a direct placement of 2,500,000 shares of Adelphia common stock with the Rigases in July 2000 for $145 million. These statements were materially false and misleading in that they failed to disclose that the Rigases had used proceeds from borrowings under the co-borrowing facilities to finance a substantial portion of their direct purchases of these securities, and that they lacked the ability to repay those borrowings.  By failing to disclose this information, the September 2000 Prospectus misled investors into believing that the Rigases were injecting new equity into Adelphia by

means of these direct placements, when, in fact, Adelphia was merely incurring additional, undisclosed debt under the co-borrowing facilities that was senior to the notes purchased by Huff.   Furthermore, by not disclosing these borrowings, the September 2000 Prospectus concealed from investors the risk that Adelphia's exposure on the co-borrowing arrangement would increase if the value of the assets supporting the Rigas Family's borrowings -- namely, the price of the Adelphia stock and other securities they bought with those borrowings -- fell to the point that a new infusion of cash into the Managed Entities became necessary in order to service the loans, or that the Managed Entities would be unable to repay.  Nor does the September 2000 Prospectus disclose the risk of a severe adverse impact on Adelphia's stock price in the event that the lender on the co-borrowing facility is required to liquidate the Rigas Family's securities holdings in order to obtain repayment of the loan.

353.    On pages S-5 to S-6, the September 2000 Prospectus represented that, as of June 30, 2000, the "Notes would have been effectively subordinated to approximately $9.2 billion of indebtedness and redeemable preferred stock of Adelphia's subsidiaries; and our total indebtedness excluding redeemable preferred stock would have been approximately $12.4 billion."  These statements were materially false and misleading because, by not taking the amount of borrowings by the Rigases and the Managed Entities under the co-borrowing arrangements into account, the prospectus understated the amounts of indebtedness senior to the notes and Adelphia's total indebtedness by at least $700 million.  This materially misleading representation was repeated on page S-8 of the September 2000 Prospectus.

354.    On page S-8, in its discussion of "Risk Factors," the September 2000 Prospectus stated that Adelphia had total indebtedness of $10.0 billion as of June 30, 2000.  This statement was materially false and misleading in that the figure for total indebtedness did not include amounts borrowed by the Rigases and the Managed Entities under the co-borrowing arrangements, which omission resulted in an understatement of Adelphia's total indebtedness of at least $700 million.

355.    On page S-9, the September 2000 Prospectus represented that Adelphia's

total convertible preferred stock, common stock and other stockholders' equity at June 30, 2000 was approximately $3.9 billion. This statement was materially false and misleading in that it overstated stockholders' equity by failing to account for the fact that the Rigases purchased Adelphia equity securities using proceeds from the co-borrowing arrangements, which the Company was liable to repay. Rather than inject new equity into Adelphia, the securities purchased by the Rigases in reality created bank debt that was senior to the notes purchased by Huff.

356.    On page S-15, the September 2000 Prospectus stated that the Rigases at the time effectively controlled the voting power of Adelphia's outstanding common stock. This disclosure was materially false and misleading in that it did not disclose the far more pervasive extent to which the Rigas Family exercised day-to-day control over Adelphia and its cash resources beyond simply its ability to elect the Board of Directors. Nor did the September 2000 Prospectus disclose the degree to which the Rigases were exercising that day-to-day control to self-deal.

357.    On pages S-16 to S-17, the September 2000 Prospectus stated that the outside business activities of the Rigases -- including their engagement in the cable television business outside of Adelphia -- "could present a conflict of interest with Adelphia." In addition, the September 2000 Prospectus noted that "there have been and will continue to be transactions between us and the executive officers or the other entities they own or with which they have affiliations." These disclosures were materially false and misleading in the following respects: First, while noting only that a conflict of interest "could" arise at some point in the future, the September 2000 Prospectus failed to disclose that severe conflicts of interest between the Rigases and Adelphia had already arisen by virtue of the Rigases' repeated pattern of engaging in self-dealing with Adelphia's financial resources. Second, although giving the impression that conflicts and transactions with the Rigas Family, when they do arise, will be brought to the attention of Adelphia's Board of Directors, approved by a majority of disinterested directors, and evaluated for their fairness to Adelphia after disclosure of all material facts as required by § 2.10

-108-

of Adelphia's By-Laws, the September 2000 Prospectus did not disclose that, in fact, the conflicts of interest that had already arisen had been disregarded by the Defendants in contravention of the By-Laws and the transactions were not fair to the Company.   Third, the disclosure that transactions between Adelphia and its officers' affiliates will continue to occur was inadequate in that it did not disclose (1) the nature of the transactions; (2) the parties involved; (3) the amounts at stake in such transactions; (4) the impact of such transactions on the operations and financial condition of Adelphia; and (5) the utter lack of internal controls to ensure fairness and prevent self-dealing.   Specifically, the September 2000 Prospectus did not disclose that the Rigases had borrowed substantial amounts under the co-borrowing arrangements which they were unable to repay and for which Adelphia and its subsidiaries were liable, had used the proceeds of those borrowings for their own personal benefit, and had received numerous cash "advances" from Adelphia which they used for their own personal benefit.

358.    On page S-19, the September 2000 Prospectus represented that Adelphia's total debt as of June 30, 2000 was $9,978,775,000.  This statement was materially false and misleading in that the figure for total indebtedness did not include amounts borrowed by the Rigases and the Managed Entities under the co-borrowing arrangements, which omission resulted in an understatement of Adelphia's total indebtedness of at least $700 million.

359.    On page 4, in its discussion of "Risk Factors," the May 1999 Prospectus stated that Adelphia had total indebtedness of approximately $3.5 billion as of December 31, 1998. This statement was materially false and misleading in that the figure for total indebtedness did not include amounts borrowed by the Rigases and the Managed Entities under the co-borrowing arrangements, which omission resulted in an understatement of Adelphia's total indebtedness.

360.    On pages 10-11, the May 1999 Prospectus disclosed the fact that the Rigases at the time effectively controlled the voting power of Adelphia's outstanding common stock.  This disclosure was materially false and misleading in that it did not disclose the far more

pervasive extent to which the Rigas Family exercised day-to-day control over Adelphia and its cash resources beyond simply its ability to elect the Board of Directors. Nor did the May 1999 Prospectus disclose the degree to which the Rigases were exercising that day-to-day control to self-deal.

361. On page 11, the May 1999 Prospectus stated that the outside business activities of the Rigases -- including their engagement in the cable television business outside of Adelphia -- "could present a conflict of interest with Adelphia." In addition, the May 1999 Prospectus noted that "there have been and will continue to be transactions between us and the executive officers or the other entities they own or with which they have affiliations." These disclosures were materially false and misleading in the following respects: First, while noting only that a conflict of interest "could" arise at some point in the future, the May 1999 Prospectus failed to disclose that severe conflicts of interest between the Rigases and Adelphia had already arisen by virtue of the Rigases' repeated pattern of engaging in self-dealing with Adelphia's financial resources. Second, although giving the impression that conflicts, when they do arise, will be brought to the attention of Adelphia's Board of Directors and evaluated for their fairness to Adelphia, the May 1999 Prospectus did not disclose that, in fact, the conflicts of interest that had already arisen had been disregarded by the Defendants and were not the subject of fairness opinions. Third, the disclosure that transactions between Adelphia and its officers' affiliates will continue to occur was inadequate in that it did not disclose (1) the nature of the transactions; (2) the parties involved; (3) the amounts at stake in such transactions; (4) the impact of such transactions on the operations and financial condition of Adelphia; and (5) the utter lack of internal controls to ensure fairness and prevent self-dealing. Specifically, the May 1999 Prospectus did not disclose that the Rigases had borrowed substantial amounts under the co-borrowing arrangements which they were unable to repay and for which Adelphia and its subsidiaries were liable, had used the proceeds of those borrowings for their own personal benefit, and had received numerous cash "advances" from Adelphia which they used for their own personal benefit.

## VI.    The January 2001 Offering

### A.    Background

362.    The January 2001 Offering, which was accompanied by an issuance of 17,000,000 shares of Adelphia Class A Common Stock, was made pursuant to the May 1999 Prospectus, the May 1999 Registration Statement, as well as a supplemental prospectus, dated January 17, 2001 (the "January 2001 Prospectus"), which Adelphia filed with the SEC on January 18, 2001 pursuant to Rule 424(b)(5).  Both the May 1999 Prospectus and the January 2001 Prospectus are incorporated as part of the May 1999 Registration Statement.

363.    Defendants were directors of Adelphia when the registration statements and prospectuses relevant to the January 2001 Offering were filed.

364.    As detailed below, the May 1999 Prospectus and January 2001 Prospectus, both of which were incorporated in the May 1999 Registration Statement, contained numerous materially misleading statements and omitted information material to investors in the securities issued by Adelphia in the January 2001 Offering.

365.    Subsequent to the January 2001 Offering, Huff made purchases on Plaintiffs' behalf on the secondary market of 6% Convertible Subordinated Notes that Adelphia issued as part of the January 2001 Offering.  In making these purchases on Plaintiffs' behalf, Huff actually relied on the misleading statements and omissions contained in the May 1999 Prospectus, January 2001 Prospectus and May 1999 Registration Statement.

### B.    Materially Misleading Statements

366.    The January 2001 Prospectus incorporated by reference Adelphia's 1999 10-K, which all of the Defendants signed.  Far from presenting an accurate picture of the financial operations and condition of Adelphia and its subsidiaries and affiliates, the 1999 10-K contained a host of distortions, misrepresentations and outright fabrications.

367.    Beginning on page F-1, the 1999 10-K presented Adelphia's consolidated balance sheets and financial statements for the years ended December 31, 1998 and December 31, 1999.

368.     The consolidated financial statements for Adelphia contained in the 1999 10-K stated that the total consolidated debt for Adelphia and its subsidiaries was $3,527,452,000 for the year ended December 31, 1998, and $9,291,732,000 for the year ended December 31, 1999.  By failing to account for the amounts borrowed by the Managed Entities under the co-borrowing facilities, the consolidated financial statements contained in the 1999 10-K were not prepared in accordance with GAAP and, indeed, provided a grossly deceptive presentation of the following material aspects of Adelphia's operations and financial condition:

•     Total parent and subsidiary debt was represented to be $3,527,452,000 for the year ended December 31, 1998, and $9,291,732,000 for the year ended December 31, 1999. In fact, these figures understated Adelphia's total consolidated debt by at least $700 million for the period ending December 31, 1999.

•     Total convertible preferred stock, common stock and other stockholders' equity were represented to be a deficiency of $1,021,746,000 for the year ended December 31, 1998, and a positive $3,721,187,000 for the year ended December 31, 1999.  In fact, these figures overstated Adelphia's stockholder equity by hundreds of millions of dollars by failing to account for the fact that the equity securities purchased by the Rigases were paid for with funds borrowed under the co-borrowing facilities, which Adelphia and its subsidiaries are liable to repay.

•     Revenue was overstated due to management fees due from the Managed Entities that were neither paid nor intended to be paid, and due to the inflation of Adelphia's subscribers.

•     Capital expenditures were grossly overstated.

•     EBITDA was overstated through improper accounting practices.

•     Interest expense - net was represented to be $180,452,000 for the nine months ended December 31, 1998, and $359,585,000 for the year ended December 31, 1999.  In fact, these figures understated interest expense by hundreds of millions of dollars by failing to account for interest due on the borrowings by the Managed Entities under the co-borrowing

facilities.

- Similarly, total SG&A expenses are represented to be $107,249,000 for the nine months ended December 31, 1998, and $340,579,000 for the year ended December 31, 1999.  In fact, these figures were understated by hundreds of millions of dollars by failing to account for amounts spent by Adelphia in connection with the operations of the Managed Entities.

- The understatements of SG&A expenses and interest expenses had the further effect of understating the amount of Adelphia's net losses for the same periods, which had been represented to be $115,130,000 for the nine months ended December 31, 1998, and $240,530,000 for the year ended December 31, 1999, but which were substantially higher in reality.

- Portions of the statements concerning Adelphia's cash flows were also misleading.  Specifically, net cash provided by financing activities was represented to be $999,079,000 for the nine months ended December 31, 1998, and $2,978,313,000 for the year ended December 31, 1999.  These figures were overstated by several hundred million dollars because of the failure to account for the Managed Entities' co-borrowing activities and purchases of Adelphia debt securities using co-borrowed funds, which resulted in overstatement of Adelphia's proceeds from debt and understatement of Adelphia's repayments of debt on which figures the calculation of net cash provided by financing activities depends.  In addition, the interest expenses in the calculation of Adelphia's cash flows were also understated as a result of the concealment of the co-borrowing arrangements.

369.    Although Adelphia acknowledged the existence of co-borrowing arrangements in the 1999 10-K, the amounts of the Managed Entities' borrowings under the co-borrowing arrangements were not included in Adelphia's statement of its total consolidated debt.  Specifically, with respect to the co-borrowing facilities, Adelphia stated in a footnote:

> Certain subsidiaries of Adelphia are co-borrowers with Managed Entities under credit facilities for borrowings of up to $1,025,000[,000].    Each of the co-borrowers is liable for all

borrowings under the credit agreements, although the lenders have no recourse against Adelphia other than against Adelphia's interest in such subsidiaries.

370.     This is the entire disclosure related to the co-borrowing facilities.  The statement's rank inadequacy is apparent simply by contrasting it to the disclosures concerning the co-borrowing facilities contained in Adelphia's May 2002 8-K.

371.     This statement was materially false and misleading in that it represented to Adelphia investors that the co-borrowing arrangements were simply additional credit lines available for the legitimate business purposes of Adelphia's subsidiaries, but which were also available for use for legitimate business purposes of the Managed Entities, all of which were managed by Adelphia for a fee.  In reality, this disclosure hid from Adelphia's investors the true state of affairs, which was that the co-borrowing arrangements were strictly an artifice to conceal what was in actuality a guarantee by Adelphia of loans issued for the private use and benefit of the Rigas Family.  In addition, when combined with the failure to include the amounts borrowed by the Managed Entities under the co-borrowing arrangements in the figures for Adelphia's consolidated debt, the disclosure quoted above misleads readers into believing that no amounts had been borrowed under the co-borrowing facilities, when in fact the Rigases had borrowed at least $700 million as of December 31, 1999.

372.     The statement concerning the co-borrowing arrangements was also materially misleading in that it failed to disclose:

(1) whether and in what amounts the co-borrowing facilities had been drawn down, which left the misleading impression that no amounts had been drawn down;

(2) which entities drew down on the facilities, which would inform the investor whether the credit of Adelphia's subsidiaries was being used for a legitimate purpose;

(3) what the proceeds were used for.  In fact, the 1999 10-K concealed the fact that the Managed Entities were using the proceeds of the co-borrowing

facilities to purchase securities in Adelphia and other assets for the private use
of the Rigas family; and

(4) whether the entities that borrowed funds under the facilities had the financial
ability to repay those borrowings.  If it had been disclosed that the Managed
Entities actually lacked the ability to repay, then Huff would have known that
a high likelihood existed that Adelphia and its subsidiaries would have to pay
those loans.

373.   The   1999   10-K   contained   the   following   additional   material
misrepresentations and omissions:

- Under Item 1, the 1999 10-K stated that Adelphia "provides management
and consulting services" to the Managed Entities, without disclosing that those Managed
Entities, in the course of their operations, have borrowed money under the co-borrowing
arrangements to finance the purchase of Adelphia securities by the Rigases and other Rigas
entities.

- Also under Item 1, the 1999 10-K stated that Adelphia's "operations
consist of providing telecommunications services primarily over networks," without disclosing
that Adelphia's operations also included advancing and lending money to the Rigas Family and
entities controlled by the Rigas Family for a wide variety of other businesses and investments,
including golf course development, real estate, provision of venture capital, professional hockey
and filmmaking.

- Item 1 of the 1999 10-K incorporated by reference the financial
information contained in the audited financial statements discussed above, which, for the reasons
stated above were materially incomplete and misleading.

- Under Item 2, the 1999 10-K stated that substantially all of the assets of
Adelphia's subsidiaries "are subject to encumbrances as collateral in connection with the
Company's credit arrangements, either directly with a security interest or indirectly through a
pledge of the stock in the respective subsidiaries."  What this failed to disclose was that the

assets of Adelphia's subsidiaries were pledged as collateral for loans taken by the Managed Entities and the Rigas Family that conferred no legitimate business benefits on Adelphia or its subsidiaries. Moreover, when considered in light of the failure to disclose the amounts borrowed by Managed Entities and the Rigas Family and the inability of those entities to repay, this disclosure misled Huff as to the degree to which the assets of Adelphia and its subsidiaries -- to which Huff looked to satisfy Adelphia's obligations under the securities purchased on Plaintiffs' behalf by Huff -- were at risk of being unavailable to support Adelphia's debt to Plaintiffs.

• Under Item 7, the 1999 10-K discussed Adelphia's need for liquidity and continual financing to conduct, maintain, upgrade and acquire its cable systems, noting that Adelphia's "ability to generate cash to meet its future needs will depend generally on its results of operations and the continued availability of external financing." This disclosure fails to mention that Adelphia lacked the ability to obtain such external financing because it was contractually prohibited from taking on additional indebtedness by covenants in the indenture agreements for its previous bond issues and the restrictions in its credit agreements.

• Also under Item 7, the 1999 10-K described Adelphia's "financing strategy." This disclosure repeated the false figure of $9,291,732,000 for Adelphia's total outstanding debt for the year ended December 31, 1999. In addition, there was no disclosure that part of Adelphia's "financing strategy" included the use of co-borrowing facilities with the Managed Entities to finance the Rigas Family's acquisition of Adelphia securities and other assets for their personal use. As for the financing transactions, there was no disclosure of Adelphia's breach of its indentures' restrictions on indebtedness or that purchases of Adelphia securities by the Rigas Family were financed with proceeds from the co-borrowing facilities.

• The 1999 10-K sets forth "mandatory reductions in principal under all debt agreements for the next five years based on amounts outstanding at December 31, 1999" as follows: (a) $390,746,000 during the year ended December 31, 2000; (b) $285,401,000 during the year ended December 31, 2001; (c) $886,571,000 during the year ended December 31, 2002; (d) $1,341,190,000 during the year ended December 31, 2003; and (e) $919,147,000 during the

year ended December 31, 2004. These amounts were dramatically understated, given that the "amounts outstanding at December 31, 1999" did not include amounts borrowed by the Managed Entities under the co-borrowing facilities.

374.    The January 2001 Prospectus incorporated by reference the materially false and misleading March 2000 10-Q and June 2000 10-Q described above.

375.    In addition, the January 2001 Prospectus incorporated by reference Adelphia's Form 10-Q for the quarter ended September 30, 2000 (filed with the SEC on or about November 14, 2000) (the "September 2000 10-Q"). The September 2000 10-Q falsely reported that Adelphia had total unconsolidated debt of $9,769,046,000 and total consolidated debt of $11,005,411,000, including subsidiary debt of $7,582,178,000 and parent debt of $3,423,233,000.

376.    The September 2000 10-Q also stated:

> The accompanying unaudited condensed consolidated financial statements have been prepared in accordance with generally accepted accounting principles for interim financial information and with the instructions of Form 10-Q and Rule 10-01 of Regulation S-X. Such principles are applied on a basis consistent with those reflected in the December 31, 1999 Form 10-K Report of the Company filed with the Securities and Exchange Commission. The condensed consolidated financial statements contained herein should be read in conjunction with the consolidated financial statements and related notes contained in the Company's 1999 Annual Report on Form 10-K. In the opinion of management, the unaudited condensed financial statements contained herein include all adjustments (consisting of only recurring adjustments) necessary for a fair presentation of the results of operations for the interim periods presented.

377.    The September 2000 10-Q also falsely represented that Adelphia had a total of 5,190,506 basic cable subscribers.

378.    Adelphia's publicly-reported results for the third quarter of 2000 as reported in the September 2000 10-Q were materially false and misleading. As detailed above, Adelphia failed to disclose the full amount of its liability under the co-borrowing facilities.

Adelphia's total consolidated debt and total liabilities were understated by at least $1.4 billion through the deliberate omission of co-borrowing debt.  The September 2000 10-Q also overstated Adelphia's subscribers by tens of thousands.  As a result, the representation in the September 2000 10-Q that Adelphia's financial statements were fairly presented in accordance with SEC rules was also false.

379.    The January 2001 Prospectus did not provide any additional disclosures concerning the amounts borrowed by the Rigases and the Managed Entities under the co-borrowing arrangements or the uses to which the proceeds of those borrowings were put.

380.    On page S-6, the January 2001 Prospectus represented that the "Notes are unsecured indebtedness of the Adelphia Parent Company ranking junior to other unsubordinated indebtedness of the Adelphia Parent Company and pari passu in right of payment to any future subordinated indebtedness of the Adelphia Parent Company."  This statement was materially false and misleading in that it failed to disclose that, in fact, the Rigases had purchased hundreds of millions of dollars worth of notes constituting the other "subordinated indebtedness" using proceeds from the co-borrowing arrangements and that they lacked the ability to repay their borrowings.  Because Adelphia and its subsidiaries are liable to repay the amounts borrowed by the Rigases under the co-borrowing arrangements, and because the debt under the co-borrowing facilities is senior in repayment priority to the notes issued in the January 2001 Offering as well as to unsubordinated notes senior to the January 2001 notes, a substantial portion of the other "subordinated indebtedness" was, in fact, senior to, and not subordinated to, those notes.

381.    On pages S-6 to S-7, the January 2001 Prospectus represented that, as of September 30, 2000, the "Notes would have been subordinated to approximately $3.4 billion of senior debt of Adelphia Parent Company and the Notes would have been effectively subordinated to approximately $8.8 billion of indebtedness and redeemable preferred stock of Adelphia's subsidiaries; and Adelphia and its subsidiaries' total indebtedness excluding redeemable preferred stock would have been approximately $12.9 billion."  These statements were materially false and misleading because, by not taking the amount of borrowings by the

Rigases and the Managed Entities under the co-borrowing arrangements into account, the January 2001 Prospectus understated the amounts of indebtedness senior to the notes and Adelphia's total indebtedness by at least $1.2 billion.  This materially misleading representation was repeated on page S-8 of the January 2001 Prospectus.

382.    On page S-7, the January 2001 Prospectus represented that the net proceeds from the January 2001 Offering would be used to repay proceeds under its revolving credit facilities, "all of which, subject to compliance with the terms of and maturity of that revolving credit facility, may be reborrowed."  This statement was materially false and misleading in that it failed to disclose that, once the amounts borrowed by the Rigases and the Managed Entities under co-borrowing arrangements are included in the figures for Adelphia's total consolidated debt, Adelphia was in breach of the restrictions on incurring additional indebtedness contained in its agreements with its bank lenders, thereby enabling those lenders to accelerate the amounts due.   The January 2001 Prospectus repeated these misleading representations on page S-22.

383.    On page S-9, in its discussion of "Risk Factors," the January 2001 Prospectus stated that Adelphia had total indebtedness of $11.0 billion as of September 30, 2000. This statement was materially false and misleading in that the figure for total indebtedness did not include amounts borrowed by the Rigases and the Managed Entities under the co-borrowing arrangements, which omission resulted in an understatement of Adelphia's total indebtedness of at least $1.2 billion.

384.    The description of the maturity for various classes of Adelphia's debt that appeared on page S-9 of the January 2001 Prospectus was materially false and misleading in that it failed to disclose that, once the amounts borrowed by the Rigases and the Managed Entities under co-borrowing arrangements are included in the figures for Adelphia's total consolidated debt, Adelphia was in breach of the restrictions on incurring additional indebtedness contained in its agreements with its bank lenders, thereby enabling those lenders to accelerate the amounts due.

385.   On page S-9, the January 2001 Prospectus stated that Adelphia's total convertible preferred stock, common stock and other stockholders' equity at September 30, 2000 was approximately $3.9 billion.  This statement was materially false and misleading in that it overstated stockholders' equity by failing to account for the fact that the Rigases purchased Adelphia equity securities using proceeds from the co-borrowing arrangements which the Company was liable to repay.  Rather than inject new equity into Adelphia, the securities purchased by the Rigases in reality created bank debt that was senior to the notes purchased by Huff.

386.   On page S-17, the January 2001 Prospectus stated that the Rigases at the time effectively controlled the voting power of Adelphia's outstanding common stock.  This disclosure was materially false and misleading in that it did not disclose the far more pervasive extent to which the Rigas Family exercised day-to-day control over Adelphia and its cash resources beyond simply its ability to elect the Board of Directors.  Nor did the January 2001 Prospectus disclose the degree to which the Rigases were exercising that day-to-day control to self-deal.

387.   On page S-18, the January 2001 Prospectus stated that the outside business activities of the Rigases -- including their engagement in the cable television business outside of Adelphia -- "could present a conflict of interest with Adelphia."  In addition, the January 2001 Prospectus noted that "there have been and will continue to be transactions between us and the executive officers or the other entities they own or with which they have affiliations."  These disclosures were materially false and misleading in the following respects:  First, while noting only that a conflict of interest "could" arise at some point in the future, the January 2001 Prospectus failed to disclose that severe conflicts of interest between the Rigases and Adelphia had already arisen by virtue of the Rigases' repeated pattern of engaging in self-dealing with Adelphia's financial resources.  Second, although giving the impression that conflicts and transactions with the Rigas Family, when they do arise, will be brought to the attention of Adelphia's Board of Directors, approved by a majority of disinterested directors, and evaluated

for their fairness to Adelphia after disclosure of all material facts as required by § 2.10 of Adelphia's By-Laws, the January 2001 Prospectus did not disclose that, in fact, the conflicts of interest that had already arisen had been disregarded by the Defendants in contravention of the By-Laws and the transactions were not fair to the Company.    Third, the disclosure that transactions between Adelphia and its officers' affiliates will continue to occur was inadequate in that it did not disclose (1) the nature of the transactions; (2) the parties involved; (3) the amounts at stake in such transactions; (4) the impact of such transactions on the operations and financial condition of Adelphia and (5) the utter lack of internal controls to ensure fairness and prevent self-dealing.    Specifically, the January 2001 Prospectus did not disclose that the Rigases had borrowed substantial amounts under the co-borrowing arrangements which they were unable to repay and for which Adelphia and its subsidiaries were liable, had used the proceeds of those borrowings for their own personal benefit, and had received numerous cash "advances" from Adelphia which they used for their own personal benefit.

388.    On page S-23, the January 2001 Prospectus represented that Adelphia's total debt as of September 30, 2000 was $11,005,411,000.  This statement was materially false and misleading in that the figure for total indebtedness did not include amounts borrowed by the Rigases and the Managed Entities under the co-borrowing arrangements, which omission resulted in an understatement of Adelphia's total indebtedness of at least $1.2 billion.

389.    On page 4, in its discussion of "Risk Factors," the May 1999 Prospectus stated that Adelphia had total indebtedness of approximately $3.5 billion as of December 31, 1998.  This statement was materially false and misleading in that the figure for total indebtedness did not include amounts borrowed by the Rigases and the Managed Entities under the co-borrowing arrangements, which omission resulted in an understatement of Adelphia's total indebtedness.

390.    On pages 10-11, the May 1999 Prospectus stated that the Rigases at the time effectively controlled the voting power of Adelphia's outstanding common stock.  This disclosure was materially false and misleading in that it did not disclose the far more pervasive

extent to which the Rigas Family exercised day-to-day control over Adelphia and its cash resources beyond simply its ability to elect the Board of Directors.  Nor did the May 1999 Prospectus disclose the degree to which Rigases were exercising that day-to-day control to self-deal.

391.    On page 11, the May 1999 Prospectus stated that the outside business activities of the Rigases -- including their engagement in the cable television business outside of Adelphia -- "could present a conflict of interest with Adelphia."   In addition, the prospectus noted that "there have been and will continue to be transactions between us and the executive officers or the other entities they own or with which they have affiliations."  These disclosures were materially false and misleading in the following respects:  First, while noting only that a conflict of interest "could" arise at some point in the future, the May 1999 Prospectus failed to disclose that severe conflicts of interest between the Rigases and Adelphia had already arisen by virtue of the Rigases' repeated pattern of engaging in self-dealing with Adelphia's financial resources.  Second, although giving the impression that conflicts, when they do arise, will be brought to the attention of Adelphia's Board of Directors and evaluated for their fairness to Adelphia, the May 1999 Prospectus did not disclose that, in fact, the conflicts of interest that had already arisen had been disregarded by the Defendants and were not the subject of fairness opinions.  Third, the disclosure that transactions between Adelphia and its officers' affiliates will continue to occur was inadequate in that it did not disclose (1) the nature of the transactions; (2) the parties involved; (3) the amounts at stake in such transactions; and (4) the impact of such transactions on the operations and financial condition of Adelphia.  Specifically, the May 1999 Prospectus did not disclose that the Rigases had borrowed substantial amounts under the co-borrowing arrangements which they were unable to repay and for which Adelphia and its subsidiaries were liable, had used the proceeds of those borrowings for their own personal benefit, and had received numerous cash "advances" from Adelphia which they used for their own personal benefit.

## VII.    The June 2001 Offering

A.    **Background**

392.    The June 2001 Offering was made pursuant to the May 1999 Prospectus, the May 1999 Registration Statement, as well as a supplemental prospectus, dated June 7, 2001 (the "June 2001 Prospectus"), which Adelphia filed with the SEC on June 8, 2001 pursuant to Rule 424(b)(5). Both the May 1999 Prospectus and the June 2001 Prospectus are incorporated as part of the May 1999 Registration Statement.

393.    Defendants were directors of Adelphia when the registration statements and prospectuses relevant to the June 2001 Offering were filed.

394.    As detailed below, the May 1999 Prospectus and June 2001 Prospectus, both of which were incorporated in the May 1999 Registration Statement, contained numerous materially misleading statements and omitted information material to investors in the securities issued by Adelphia in the June 2001 Offering.

395.    Huff participated in the June 2001 Offering by purchasing 10 ¼% Senior Notes from the June 2001 Offering Underwriters on Plaintiffs' behalf. In addition, subsequent to the June 2001 Offering, Huff made additional purchases on Plaintiffs' behalf on the secondary market of 10 ¼% Senior Notes that Adelphia issued as part of the June 2001 Offering. In making these purchases on Plaintiffs' behalf, Huff actually relied on the misleading statements and omissions contained in the May 1999 Prospectus, June 2001 Prospectus and May 1999 Registration Statement.

B.    **Materially Misleading Statements**

396.    The June 2001 Prospectus incorporated by reference Adelphia's Form 10-K for the year ended December 31, 2000, as amended by its Form 10-K/A (the "2000 10-K"). Defendants signed the 2000 10-K. Far from presenting an accurate picture of the financial operations and condition of Adelphia and its subsidiaries and affiliates, the 2000 10-K contains a host of distortions, misrepresentations and outright fabrications.

397.    Beginning on page F-1, the 2000 10-K presented Adelphia's consolidated balance sheets and financial statements for the years ended December 31, 1999 and December

31, 2000.

398.    The consolidated financial statements for Adelphia contained in the 2000 10-K stated that the total consolidated debt for Adelphia and its subsidiaries was $9,291,732,000 for the year ended December 31, 1999, and $12,603,413,000 for the year ended December 31, 2000.  By failing to account for the amounts borrowed by the Managed Entities under the co-borrowing facilities, the consolidated financial statements contained in the 2000 10-K were not prepared in accordance with GAAP and, indeed, provided a grossly deceptive presentation of the following material aspects of Adelphia's operations and financial condition:

•    Total parent and subsidiary debt was represented to be $9,291,732,000 for the year ended December 31, 1999 and $12,603,413,000 for the year ended December 31, 2000. In fact, these figures understated Adelphia's total consolidated debt by at least $700 million for the period ending December 31, 1999 and $1.2 billion for the year ended December 31, 2000.

•    Total convertible preferred stock, common stock and other stockholders' equity were represented to be $3,742,302,000 for the year ended December 31, 1999 and $4,150,279,000 for the year ended December 31, 2000.  In fact, these figures overstated Adelphia's stockholder equity by hundreds of millions of dollars by failing to account for the fact that the equity securities purchased by the Rigases were paid for with funds borrowed under the co-borrowing facilities, which Adelphia and its subsidiaries are liable to repay.

•    Revenues were overstated due to management fees due from the Managed Entities which were neither paid nor intended to be paid, and due to the inflation of Adelphia's subscribers.

•    Capital expenditures were grossly overstated.

•    As subsequently disclosed in the June 10, 2002 8-K, EBITDA was overstated by at least $160 million for the year ended December 31, 2000.

•    Interest expense - net was represented to be $180,452,000 for the nine months ended December 31, 1998, $359,585,000 for the year ended December 31, 1999, and $922,865,000 for the year ended December 31, 2000.  In fact, these figures understated interest

expense by hundreds of millions of dollars by failing to account for interest due on the borrowings by the Managed Entities under the co-borrowing facilities.

• Similarly, total SG&A expenses were represented to be $107,249,000 for the nine months ended December 31, 1998, $340,579,000 for the year ended December 31, 1999, and $749,612,000 for the year ended December 31, 2000. In fact, these figures were understated by hundreds of millions of dollars by failing to account for amounts spent by Adelphia in connection with the operations of the Managed Entities.

• The understatements of SG&A expenses and interest expenses had the further effect of understating the amount of Adelphia's net losses for the same periods, which had been represented to be $93,826,000 for the nine months ended December 31, 1998, $240,719,000 for the year ended December 31, 1999, and $602,484,000 for the year ended December 31, 2000, but which were substantially higher in reality.

• The portions of the statements concerning Adelphia's cash flows were also misleading. Specifically, net cash provided by financing activities was represented to be $999,079,000 for the nine months ended December 31, 1998, $2,978,313,000 for the year ended December 31, 1999, and $3,516,804,000 for the year ended December 31, 2000. These figures were overstated by several hundred million dollars because of the failure to account for the Managed Entities co-borrowing activities and purchases of Adelphia debt securities using co-borrowed funds, which resulted in overstatement of Adelphia's proceeds from debt and understatement of Adelphia's repayments of debt on which figures the calculation of net cash provided by financing activities depends. In addition, the interest expenses in the calculation of Adelphia's cash flows were also understated as a result of the concealment of the co-borrowing arrangements.

399. Although Adelphia acknowledged the existence of the co-borrowing arrangements in the 2000 10-K, the amounts of the Managed Entities' borrowings under the co-borrowing arrangements were not included in Adelphia's statement of its total consolidated debt. Specifically, with respect to the co-borrowing facilities, Adelphia stated in a footnote:

> Certain subsidiaries of Adelphia are co-borrowers with Managed
> Entities under credit facilities for borrowings of up to
> $3,751,250[,000].   Each of the co-borrowers is liable for all
> borrowings under the credit agreements, and may borrow up to the
> entire amount of the available credit under the facility.  The lenders
> have no recourse against Adelphia other than against Adelphia's
> interest in such subsidiaries.

400.    This is the entire disclosure related to the co-borrowing facilities.  This statement's rank inadequacy is apparent simply by contrasting it to the disclosures concerning the co-borrowing facilities contained in Adelphia's May 2002 8-K.

401.    This statement was materially false and misleading in that it represented to Adelphia investors that the co-borrowing arrangements were simply additional credit lines available for the legitimate business purposes of Adelphia's subsidiaries, but which were also available for the use for legitimate business purposes of the Managed Entities, all of which were managed by Adelphia for a fee.  In reality, this disclosure hid from Adelphia's investors the true state of affairs, which was that the co-borrowing arrangements were strictly an artifice to conceal what was in actuality a guarantee by Adelphia of loans issued for the private use and benefit of the Rigas Family.  In addition, when combined with the failure to include the amounts borrowed by the Managed Entities under the co-borrowing arrangements in the figures for Adelphia's consolidated debt, the disclosure quoted above misleads readers into believing that no amounts had been borrowed under the co-borrowing facilities, when in fact the Rigases had borrowed $1.2 billion as of December 31, 2000.

402.    The statement concerning the co-borrowing arrangements was also materially misleading in that it failed to disclose:

> (1) whether and in what amounts the co-borrowing facilities had been drawn
>     down, which left the misleading impression that no amounts had been drawn
>     down;
>
> (2) which entities drew down on the facilities, which would inform the investor
>     whether the credit of Adelphia's subsidiaries was being used for a legitimate

purpose;

(3) what the proceeds were used for.  In fact, the 2000 10-K concealed the fact that the Managed Entities were using the proceeds of the co-borrowing facilities to purchase securities in Adelphia and other assets for the private use of the Rigas family; and

(4) whether the entities that borrowed funds under the facilities had the financial ability to repay those borrowings.  If it had been disclosed that the Managed Entities actually lacked the ability to repay, then Huff would have known that a high likelihood existed that Adelphia and its subsidiaries would have to pay those loans.

403.    The    2000    10-K    contained    the    following    additional    material misrepresentations and omissions:

- Under Item 1, the 2000 10-K stated that Adelphia "provides management and consulting services" to the Managed Entities, without disclosing that those Managed Entities, in the course of their operations, have borrowed money under the co-borrowing arrangements to finance the purchase of Adelphia securities by the Rigases and other Rigas entities.

- Also under Item 1, the 2000 10-K stated that Adelphia's "operations consist of providing telecommunications services primarily over its broadband networks," without disclosing that Adelphia's operations also included advancing and lending money to the Rigas Family and entities controlled by the Rigas Family for a wide variety of other businesses and investments, including golf course development, real estate, provision of venture capital, professional hockey and filmmaking.

- Item 1 of the 2000 10-K incorporated by reference the financial information contained in the audited financial statements discussed above, which, for the reasons stated above are materially incomplete and misleading.

- Under Item 2, the 2000 10-K stated that substantially all of the assets of

Adelphia's subsidiaries "are subject to encumbrances as collateral in connection with the Company's credit arrangements, either directly with a security interest or indirectly through a pledge of the stock in the respective subsidiaries." What this failed to disclose was that the assets of Adelphia's subsidiaries were pledged as collateral for loans taken by the Managed Entities and the Rigas Family that conferred no legitimate business benefits on Adelphia or its subsidiaries. Moreover, when considered in light of the failure to disclose the amounts borrowed by Managed Entities and the Rigas Family and the inability of those entities to repay, this disclosure misled Huff as to the degree to which the assets of Adelphia and its subsidiaries -- to which Huff looked to satisfy Adelphia's obligations under the securities purchased on Plaintiffs' behalf by Huff -- were at risk of being unavailable to support Adelphia's debt to Plaintiffs.

- Under Item 7, the 2000 10-K discussed Adelphia's need for liquidity and continual financing to conduct, maintain, upgrade and acquire its cable systems, noting that Adelphia's "ability to generate cash to meet its future needs will depend generally on its results of operations and the continued availability of external financing." This disclosure fails to mention that Adelphia lacked the ability to obtain such external financing because it was contractually prohibited from taking on additional indebtedness by covenants in the indenture agreements for its previous bond issues and the restrictions in its credit agreements.

- Also under Item 7, the 2000 10-K described Adelphia's "financing strategy" and discussed various financing transactions that took place between July and September 2000. This disclosure repeated the false figure of $12,603,413,000 for Adelphia's total outstanding debt for the year ended December 31, 2000. In addition, there was no disclosure that part of Adelphia's "financing strategy" included the use of co-borrowing facilities with the Managed Entities to finance the Rigas Family's acquisition of Adelphia securities and other assets for their personal use. As for the financing transactions, there was no disclosure of Adelphia's breach of its indentures' restrictions on indebtedness or that purchases of Adelphia securities by the Rigas Family were financed with proceeds from the co-borrowing facilities.

- The 2000 10-K set forth "mandatory reductions in principal under all debt

agreements for the next five years based on amounts outstanding at December 31, 2000" as follows:  (a) $306,000,000 during the year ended December 31, 2001; (b) $986,866,000 during the year ended December 31, 2002; (c) $1,506,454,000 during the year ended December 31, 2003; (d) $1,244,571,000 during the year ended December 31, 2004; and (e) $1,360,647,000 during the year ended December 31, 2005.  These amounts were dramatically understated, given that the "amounts outstanding at December 31, 2000" did not include amounts borrowed by the Managed Entities under the co-borrowing facilities.

    •    In Item 8, the 2000 10-K discussed a direct placement of Adelphia stock with the Rigases in January 2001.  These statements were materially false and misleading in that they failed to disclose that the Rigases had used proceeds from borrowings under the co-borrowing facilities to finance a substantial portion of their direct purchases of these securities, and that they lacked the ability to repay those borrowings.  By failing to disclose this information, the 2000 10-K misled investors into believing that the Rigases were injecting new liquidity into Adelphia by means of these direct placements, when, in fact, Adelphia was merely incurring additional, undisclosed debt under the co-borrowing facilities.  Furthermore, by not disclosing these borrowings, the 2000 10-K concealed from investors the risk that Adelphia's exposure on the co-borrowing arrangement would increase if the value of the assets supporting the Rigas Family's borrowings -- namely, the price of the Adelphia stock and other securities they bought with those borrowings -- fell to the point that a new infusion of cash into the Managed Entities became necessary in order to service the loans.  Nor does the 2000 10-K disclose the risk of a severe adverse impact on Adelphia's stock price in the event that the lender on the co-borrowing facility is required to liquidate the Rigas Family's securities holdings in order to obtain repayment of the loan.

    404.    The June 2001 Prospectus incorporated by reference Adelphia's Form 10-Q for the quarter ended March 31, 2001 (filed with the SEC on or about May 15, 2001) (the "March 2001 10-Q").  The March 2001 10-Q falsely reported that Adelphia had total unconsolidated debt of $12,474,439,000 and total consolidated debt of $13,661,372,000,

including subsidiary debt of $9,374,821,000 and parent debt of $4,286,372,000.

405. The March 2001 10-Q also stated:

> The accompanying unaudited condensed consolidated financial statements have been prepared in accordance with generally accepted accounting principles for interim financial information and with the instructions of Form 10-Q and Rule 10-01 of Regulation S-X. Such principles are applied on a basis consistent with those reflected in the December 31, 2000 Form 10-K Report of the Company filed with the Securities and Exchange Commission. The condensed consolidated financial statements contained herein should be read in conjunction with the consolidated financial statements and related notes contained in the December 31, 2000 Annual Report on Form 10-K. In the opinion of management, the unaudited condensed financial statements contained herein include all adjustments (consisting of only recurring adjustments) necessary for a fair presentation of the results of operations for the interim periods presented.

406. The March 2001 10-Q also falsely represented that Adelphia had a total of 5,723,315 basic cable subscribers.

407. Adelphia's publicly-reported results for the first quarter of 2001 as reported in the March 2001 10-Q were materially false and misleading. As detailed above, Adelphia failed to disclose the full amount of its liability under the co-borrowing facilities. Adelphia's total consolidated debt and total liabilities were understated by at least $1.2 billion through the deliberate omission of co-borrowing debt. The March 2001 10-Q also overstated Adelphia's subscribers by tens of thousands. As a result, the representation in the March 2001 10-Q that Adelphia's financial statements were fairly presented in accordance with SEC rules was also false.

408. The June 2001 Prospectus did not provide any additional disclosures concerning the amounts borrowed by the Rigases and the Managed Entities under the co-borrowing arrangements or the uses to which the proceeds of those borrowings were put.

409. As a result of Adelphia's concealment of the true amount of its consolidated debt, the June 2001 Prospectus was materially misleading because Adelphia lacked

the authority to issue any securities in the June 2001 Offering.  The indenture agreements for each of Adelphia's offerings of senior notes prior to the June 2001 Offering contained a covenant limiting Adelphia's ability to incur new debt.    Specifically, the limitation on indebtedness covenant provided that

> Adelphia will not, and will not permit any Restricted Subsidiary to, directly or indirectly, create, incur, issue, assume or become liable for, contingently or otherwise (collectively an "incurrence"), any Indebtedness unless, after giving effect to such incurrence on a pro forma basis, Indebtedness of Adelphia and its Restricted Subsidiaries, on a consolidated basis, shall not be more than the product of the Annualized Pro Forma EBITDA for the latest fiscal quarter preceding such incurrence for which financial statements are available, multiplied by 8.75.

410.    Had the amounts borrowed by the Managed Entities been included in Adelphia's total consolidated debt, which they should have been, Adelphia's total Indebtedness prior to the June 2001 Offering would have exceeded 8.75 x its Annualized Pro Forma EBITDA for the most recent fiscal quarter preceding the June 2001 Offering.  Consequently, Adelphia was prohibited by the indenture agreements for its prior bond offerings from issuing any securities in connection with the June 2001 Offering, and its representation to the contrary in the June 2001 Prospectus was materially false and misleading.

411.    On pages S-2 to S-3, the June 2001 Prospectus discussed three direct placements of Adelphia subordinated notes and stock with the Rigases in January and April 2001.  These statements were materially false and misleading in that they failed to disclose that the Rigases had used proceeds from borrowings under the co-borrowing facilities to finance a substantial portion of their direct purchases of these securities, and that they lacked the ability to repay those borrowings.  By failing to disclose this information, the June 2001 Prospectus misled investors into believing that the Rigases were injecting new equity into Adelphia by means of these direct placements, when, in fact, Adelphia was merely incurring additional, undisclosed debt under the co-borrowing facilities which was senior to the notes Huff purchased.  Furthermore, by not disclosing these borrowings, the June 2001 Prospectus concealed from

investors the risk that Adelphia's exposure on the co-borrowing arrangement would increase if the value of the assets supporting the Rigas Family's borrowings -- namely, the price of the Adelphia stock and other securities they bought with those borrowings -- fell to the point that a new infusion of cash into the Managed Entities became necessary in order to service the loans, or that the Managed Entities were unable to repay.  Nor does the June 2001 Prospectus disclose the risk of a severe adverse impact on Adelphia's stock price in the event that the lender on the co-borrowing facility is required to liquidate the Rigas Family's securities holdings in order to obtain repayment of the loan.

412.    On page S-5, the June 2001 Prospectus represented that the "Notes are unsecured indebtedness of the Adelphia Parent Company ranking pari passu with other unsubordinated indebtedness of the Adelphia Parent Company and senior in right of payment to any future subordinated indebtedness of the Adelphia Parent Company."  This statement was materially false and misleading in that it failed to disclose that, in fact, the Rigases had purchased hundreds of millions of dollars worth of notes constituting the "subordinated indebtedness" using proceeds from the co-borrowing arrangements and that they lacked the ability to repay their borrowings.  Because Adelphia and its subsidiaries are liable to repay the amounts borrowed by the Rigases under the co-borrowing arrangements, and because the debt under the co-borrowing facilities is senior in repayment priority to the notes issued in the June 2001 Offering, a substantial portion of the "subordinated indebtedness" was, in fact, senior to, and not subordinated to, those notes.

413.    On pages S-5 to S-6, the June 2001 Prospectus represented that, as of March 31, 2001, the "Notes would have been effectively subordinated to approximately $7.4 billion of indebtedness and redeemable preferred stock of Adelphia's subsidiaries; and our total indebtedness excluding redeemable preferred stock would have been approximately $13.5 billion."  These statements were materially false and misleading because, by not taking the amount of borrowings by the Rigases and the Managed Entities under the co-borrowing arrangements into account, the June 2001 Prospectus understated the amounts of indebtedness

senior to the notes and Adelphia's total indebtedness by at least $1.2 billion.  This materially misleading representation was repeated on page S-8 of the June 2001 Prospectus.

414.   On page S-7, the June 2001 Prospectus represented that the net proceeds from the June 2001 Offering would be "used to repay borrowings under its revolving credit facility, all of which, subject to compliance with the terms of and maturity of that revolving credit facility, may be reborrowed."  This statement was materially false and misleading in that it failed to disclose that, once the amounts borrowed by the Rigases and the Managed Entities under co-borrowing arrangements are included in the figures for Adelphia's total consolidated debt, Adelphia was in breach of the restrictions on incurring additional indebtedness contained in its agreements with its bank lenders, thereby enabling those lenders to accelerate the amounts due.  The June 2001 Prospectus repeated these misleading representations on page S-20.

415.   On page S-8, in its discussion of "Risk Factors," the June 2001 Prospectus stated that Adelphia had total indebtedness of $13.7 billion as of March 31, 2001.  This statement was materially false and misleading in that the figure for total indebtedness did not include amounts borrowed by the Rigases and the Managed Entities under the co-borrowing arrangements, which omission resulted in an understatement of Adelphia's total indebtedness of at least $1.2 billion.

416.   The description of the maturity for various classes of Adelphia's debt that appears on pages S-8 to S-9 of the June 2001 Prospectus was materially false and misleading in that it failed to disclose that, once the amounts borrowed by the Rigases and the Managed Entities under co-borrowing arrangements are included in the figures for Adelphia's total consolidated debt, Adelphia was in breach of the restrictions on incurring additional indebtedness contained in its agreements with its bank lenders, thereby enabling those lenders to accelerate the amounts due.

417.   On page S-9, the June 2001 Prospectus stated that Adelphia's total convertible preferred stock, common stock and other stockholders' equity at March 31, 2001 was approximately $5.2 billion.  This statement was materially false and misleading in that it

overstated stockholders' equity by failing to account for the fact that the Rigases purchased Adelphia equity securities using proceeds from the co-borrowing arrangements which the Company was liable to repay.   Rather than inject new equity into Adelphia, the securities purchased by the Rigases in reality created bank debt that was senior to the notes purchased by Huff.

418.   On page S-16, the June 2001 Prospectus stated that the Rigases at the time effectively controlled the voting power of Adelphia's outstanding common stock.   This disclosure was materially false and misleading in that it did not disclose the far more pervasive extent to which the Rigas Family exercised day-to-day control over Adelphia and its cash resources beyond simply its ability to elect the Board of Directors.   Nor did the June 2001 Prospectus disclose the degree to which Rigases were exercising that day-to-day control to self-deal.

419.   On page S-17, the June 2001 Prospectus stated that the outside business activities of the Rigases -- including their engagement in the cable television business outside of Adelphia -- "could present a conflict of interest with Adelphia."   In addition, the prospectus noted that "there have been and will continue to be transactions between us and the executive officers or the other entities they own or with which they have affiliations."   These disclosures were materially false and misleading in the following respects:   First, while noting only that a conflict of interest "could" arise at some point in the future, the June 2001 Prospectus failed to disclose that severe conflicts of interest between the Rigases and Adelphia had already arisen by virtue of the Rigases' repeated pattern of engaging in self-dealing with Adelphia's financial resources.   Second, although giving the impression that conflicts and transactions with the Rigas Family, when they do arise, will be brought to the attention of Adelphia's Board of Directors, approved by a majority of disinterested directors, and evaluated for their fairness to Adelphia after disclosure of all material facts as required by § 2.10 of Adelphia's By-Laws, the June 2001 Prospectus did not disclose that, in fact, the conflicts of interest that had already arisen had been disregarded by the Defendants in contravention of the By-Laws and the transactions were not fair

to the Company.    Third, the disclosure that transactions between Adelphia and its officers' affiliates will continue to occur was inadequate in that it did not disclose (1) the nature of the transactions; (2) the parties involved; (3) the amounts at stake in such transactions; (4) the impact of such transactions on the operations and financial condition of Adelphia and (5) the utter lack of internal controls to ensure fairness and prevent self-dealing.    Specifically, the June 2001 Prospectus did not disclose that the Rigases had borrowed substantial amounts under the co-borrowing arrangements which they were unable to repay and for which Adelphia and its subsidiaries were liable, had used the proceeds of those borrowings for their own personal benefit, and had received numerous cash "advances" from Adelphia which they used for their own personal benefit.

420.    On page S-21, the June 2001 Prospectus represented that Adelphia's total debt as of March 31, 2001 was $13,661,372,000.    This statement was materially false and misleading in that the figure for total indebtedness did not include amounts borrowed by the Rigases and the Managed Entities under the co-borrowing arrangements, which omission resulted in an understatement of Adelphia's total indebtedness of at least $1.2 billion.

421.    On page S-28, the June 2001 Prospectus represented that Adelphia's "6% convertible subordinated notes due 2006 and 3.25% convertible subordinated notes due 2021 are subordinated to our other senior public debt and we will designate the Notes as senior debt for purposes of these subordinated notes."    This statement was materially false and misleading in that it failed to disclose that, in fact, the Rigases had purchased hundreds of millions of dollars worth of the "subordinated notes" using proceeds from the co-borrowing arrangements and that they lacked the ability to repay their borrowings.    Because Adelphia and its subsidiaries are liable to repay the amounts borrowed by the Rigases under the co-borrowing arrangements, and because the debt under the co-borrowing facilities is ostensibly senior in repayment priority to the notes issued in the June 2001 Offering, a substantial portion of the "subordinated notes" was, in fact, effectively senior to, and not subordinated to, the notes issued in the June 2001 Offering.

422.    On page 4, in its discussion of "Risk Factors," the May 1999 Prospectus

stated that Adelphia had total indebtedness of approximately $3.5 billion as of December 31, 1998. This statement was materially false and misleading in that the figure for total indebtedness did not include amounts borrowed by the Rigases and the Managed Entities under the co-borrowing arrangements, which omission resulted in an understatement of Adelphia's total indebtedness.

423.     On pages 10-11, the May 1999 Prospectus stated the fact that the Rigases at the time effectively controlled the voting power of Adelphia's outstanding common stock. This disclosure was materially false and misleading in that it did not disclose the far more pervasive extent to which the Rigas Family exercised day-to-day control over Adelphia and its cash resources beyond simply its ability to elect the Board of Directors. Nor did the May 1999 Prospectus disclose the degree to which Rigases were exercising that day-to-day control to self-deal.

424.     On page 11, the May 1999 Prospectus stated that the outside business activities of the Rigases -- including their engagement in the cable television business outside of Adelphia -- "could present a conflict of interest with Adelphia." In addition, the May 1999 Prospectus noted that "there have been and will continue to be transactions between us and the executive officers or the other entities they own or with which they have affiliations." These disclosures were materially false and misleading in the following respects: First, while noting only that a conflict of interest "could" arise at some point in the future, the May 1999 Prospectus failed to disclose that severe conflicts of interest between the Rigases and Adelphia had already arisen by virtue of the Rigases' repeated pattern of engaging in self-dealing with Adelphia's financial resources. Second, although giving the impression that conflicts, when they do arise, will be brought to the attention of Adelphia's Board of Directors and evaluated for their fairness to Adelphia, the May 1999 Prospectus did not disclose that, in fact, the conflicts of interest that had already arisen had been disregarded by the Defendants and were not the subject of fairness opinions. Third, the disclosure that transactions between Adelphia and its officers' affiliates will continue to occur was inadequate in that it did not disclose (1) the nature of the transactions; (2)

-136-

the parties involved; (3) the amounts at stake in such transactions; and (4) the impact of such transactions on the operations and financial condition of Adelphia.  Specifically, the May 1999 Prospectus did not disclose that the Rigases had borrowed substantial amounts under the co-borrowing arrangements which they were unable to repay and for which Adelphia and its subsidiaries were liable, had used the proceeds of those borrowings for their own personal benefit, and had received numerous cash "advances" from Adelphia which they used for their own personal benefit.

## VIII.  The October 2001 Offering

### A.    Background

425.    The October 2001 Offering was made pursuant to a prospectus, dated July 20, 2001 (the "July 2001 Prospectus"), which Adelphia filed with the SEC as part of a Form S-3 Registration Statement, Registration No. 333-64224, on July 20, 2001 (the "July 2001 Registration Statement"), as well as a supplemental prospectus, dated October 19, 2001 (the "October 2001 Prospectus"), which Adelphia filed with the SEC on October 23, 2001 pursuant to Rule 424(b)(5).  Both the July 2001 Prospectus and the October 2001 Prospectus are incorporated as part of the July 2001 Registration Statement.

426.    Defendants were directors of Adelphia when the registration statements and prospectuses relevant to the October 2001 Offering were filed.

427.    As detailed below, the July 2001 Prospectus and October 2001 Prospectus, both of which were incorporated in the July 2001 Registration Statement, contained numerous materially misleading statements and omitted information material to investors in the securities issued by Adelphia in the October 2001 Offering.

428.    Subsequent to the October 2001 Offering, Huff made additional purchases on Plaintiffs' behalf on the secondary market of 10 ¼% Senior Notes that Adelphia issued as part of the October 2001 Offering.  In making these purchases on Plaintiffs' behalf, Huff actually relied on the misleading statements and omissions contained in the July 2001 Prospectus, October 2001 Prospectus and July 2001 Registration Statement.

### B.    Materially Misleading Statements

429.    The July 2001 Prospectus, October 2001 Prospectus and the July 2001 Registration Statement incorporated by reference Adelphia's 2000 10-K.  Far from presenting an accurate picture of the financial operations and condition of Adelphia and its subsidiaries and affiliates, the 2000 10-K contained a host of distortions, misrepresentations and outright fabrications.

430.    Beginning on page F-1, the 2000 10-K presented Adelphia's consolidated balance sheets and financial statements for the years ended December 31, 1999 and December 31, 2000.

431.    The consolidated financial statements for Adelphia contained in the 2000 10-K stated that the total consolidated debt for Adelphia and its subsidiaries was $9,291,732,000 for the year ended December 31, 1999, and $12,603,413,000 for the year ended December 31, 2000.  By failing to account for the amounts borrowed by the Managed Entities under the co-borrowing facilities, the consolidated financial statements contained in the 2000 10-K were not prepared in accordance with GAAP and, indeed, provided a grossly deceptive presentation of the following material aspects of Adelphia's operations and financial condition:

• Total parent and subsidiary debt was represented to be $9,291,732,000 for the year ended December 31, 1999 and $12,603,413,000 for the year ended December 31, 2000.  In fact, these figures understated Adelphia's total consolidated debt by at least $700 million for the period ending December 31, 1999 and $1.2 billion for the year ended December 31, 2000.

• Total convertible preferred stock, common stock and other stockholders' equity were represented to be $3,742,302,000 for the year ended December 31, 1999 and $4,150,279,000 for the year ended December 31, 2000.  In fact, these figures overstated Adelphia's stockholder equity by hundreds of millions of dollars by failing to account for the fact that the equity securities purchased by the Rigases were paid for with funds borrowed under the co-borrowing facilities, which Adelphia and its subsidiaries are liable to repay.

• Revenues were overstated due to management fees due from the Managed

Entities that were neither paid nor intended to be paid, and due to the inflation of Adelphia's subscribers.

- Capital expenditures were grossly overstated.

- As subsequently disclosed in the June 10, 2002 8-K, EBITDA was overstated by at least $160 million for the year ended December 31, 2000.

- Interest expense - net was represented to be $180,452,000 for the nine months ended December 31, 1998, $359,585,000 for the year ended December 31, 1999, and $922,865,000 for the year ended December 31, 2000. In fact, these figures understated interest expense by hundreds of millions of dollars by failing to account for interest due on the borrowings by the Managed Entities under the co-borrowing facilities.

- Similarly, total SG&A expenses were represented to be $107,249,000 for the nine months ended December 31, 1998, $340,579,000 for the year ended December 31, 1999, and $749,612,000 for the year ended December 31, 2000. In fact, these figures were understated by hundreds of millions of dollars by failing to account for amounts spent by Adelphia in connection with the operations of the Managed Entities.

- The understatements of SG&A expenses and interest expenses had the further effect of understating the amount of Adelphia's net losses for the same periods, which had been represented to be $93,826,000 for the nine months ended December 31, 1998, $240,719,000 for the year ended December 31, 1999, and $602,484,000 for the year ended December 31, 2000, but which were substantially higher in reality.

- The portions of the statements concerning Adelphia's cash flows were also misleading. Specifically, net cash provided by financing activities was represented to be $999,079,000 for the nine months ended December 31, 1998, $2,978,313,000 for the year ended December 31, 1999, and $3,516,804,000 for the year ended December 31, 2000. These figures were overstated by several hundred million dollars because of the failure to account for the Managed Entities' co-borrowing activities and purchases of Adelphia debt securities using co-borrowed funds, which resulted in overstatement of Adelphia's proceeds from debt and

understatement of Adelphia's repayments of debt on which figures the calculation of net cash provided by financing activities depends.  In addition, the interest expenses in the calculation of Adelphia's cash flows were also understated as a result of the concealment of the co-borrowing arrangements.

432.     Although Adelphia acknowledged the existence of the co-borrowing arrangements in the 2000 10-K, the amounts of the Managed Entities' borrowings under the co-borrowing arrangements were not included in Adelphia's statement of its total consolidated debt Specifically, with respect to the co-borrowing facilities, Adelphia stated in a footnote:

> Certain subsidiaries of Adelphia are co-borrowers with Managed Entities under credit facilities for borrowings of up to $3,751,250[,000].   Each of the co-borrowers is liable for all borrowings under the credit agreements, and may borrow up to the entire amount of the available credit under the facility.  The lenders have no recourse against Adelphia other than against Adelphia's interest in such subsidiaries.

433.     This is the entire disclosure related to the co-borrowing facilities.  This statement's rank inadequacy is apparent simply by contrasting it to the disclosures concerning the co-borrowing facilities made in Adelphia's May 2002 8-K.

434.     This statement was materially false and misleading in that it represented to Adelphia investors that the co-borrowing arrangements were simply additional credit lines available for the legitimate business purposes of Adelphia's subsidiaries, but which were also available for the use for legitimate business purposes of the Managed Entities, all of which were managed by Adelphia for a fee.  In reality, this disclosure hid from Adelphia's investors the true state of affairs, which was that the co-borrowing arrangements were strictly an artifice to conceal what was in actuality a guarantee by Adelphia of loans issued for the private use and benefit of the Rigas Family.  In addition, when combined with the failure to include the amounts borrowed by the Managed Entities under the co-borrowing arrangements in the figures for Adelphia's consolidated debt, the disclosure quoted above misleads readers into believing that no amounts had been borrowed under the co-borrowing facilities, when in fact the Rigases had borrowed

$1.2 billion as of December 31, 2000.

435.    The statement concerning the co-borrowing arrangements was also materially misleading in that it failed to disclose:

(1) whether and in what amounts the co-borrowing facilities had been drawn down, which left the misleading impression that no amounts had been drawn down;

(2) which entities drew down on the facilities, which would inform the investor whether the credit of Adelphia's subsidiaries was being used for a legitimate purpose;

(3) what the proceeds were used for.  In fact, the 2000 10-K concealed the fact that the Managed Entities were using the proceeds of the co-borrowing facilities to purchase securities in Adelphia and other assets for the private use of the Rigas family; and

(4) whether the entities that borrowed funds under the facilities had the financial ability to repay those borrowings.  If it had been disclosed that the Managed Entities actually lacked the ability to repay, then Huff would have known that a high likelihood existed that Adelphia and its subsidiaries would have to pay those loans.

436.    The 2000 10-K contained the following additional material misrepresentations and omissions:

• Under Item 1, the 2000 10-K stated that Adelphia "provides management and consulting services" to the Managed Entities, without disclosing that those Managed Entities, in the course of their operations, have borrowed money under the co-borrowing arrangements to finance the purchase of Adelphia securities by the Rigases and other Rigas entities.

• Also under Item 1, the 2000 10-K stated that Adelphia's "operations consist of providing telecommunications services primarily over its broadband networks,"

without disclosing that Adelphia's operations also included advancing and lending money to the Rigas Family and entities controlled by the Rigas Family for a wide variety of other businesses and investments, including golf course development, real estate, provision of venture capital, professional hockey and filmmaking.

•   Item 1 of the 2000 10-K incorporates by reference the financial information contained in the audited financial statements discussed above, which, for the reasons stated above are materially incomplete and misleading.

•   Under Item 2, the 2000 10-K stated that substantially all of the assets of Adelphia's subsidiaries "are subject to encumbrances as collateral in connection with the Company's credit arrangements, either directly with a security interest or indirectly through a pledge of the stock in the respective subsidiaries." What this failed to disclose was that the assets of Adelphia's subsidiaries were pledged as collateral for loans taken by the Managed Entities and the Rigas Family that conferred no legitimate business benefits on Adelphia or its subsidiaries. Moreover, when considered in light of the failure to disclose the amounts borrowed by Managed Entities and the Rigas Family and the inability of those entities to repay, this disclosure misled Huff as to the degree to which the assets of Adelphia and its subsidiaries -- to which Huff looked to satisfy Adelphia's obligations under the securities purchased on Plaintiffs' behalf by Huff -- were at risk of being unavailable to support Adelphia's debt to Plaintiffs.

•   Under Item 7, the 2000 10-K discussed Adelphia's need for liquidity and continual financing to conduct, maintain, upgrade and acquire its cable systems, noting that Adelphia's "ability to generate cash to meet its future needs will depend generally on its results of operations and the continued availability of external financing." This disclosure failed to mention that Adelphia lacked the ability to obtain such external financing because it was contractually prohibited from taking on additional indebtedness by covenants in the indenture agreements for its previous bond issues and the restrictions in its credit agreements.

•   Also under Item 7, the 2000 10-K described Adelphia's "financing strategy" and discussed various financing transactions that took place between July and

September 2000.  This disclosure repeated the false figure of $12,603,413,000 for Adelphia's total outstanding debt for the year ended December 31, 2000.  In addition, there was no disclosure that part of Adelphia's "financing strategy" included the use of co-borrowing facilities with the Managed Entities to finance the Rigas Family's acquisition of Adelphia securities and other assets for their personal use.  As for the financing transactions, there was no disclosure of Adelphia's breach of its indentures' restrictions on indebtedness or that purchases of Adelphia securities by the Rigas Family were financed with proceeds from the co-borrowing facilities.

•   The 2000 10-K set forth "mandatory reductions in principal under all debt agreements for the next five years based on amounts outstanding at December 31, 2000" as follows:  (a) $306,000,000 during the year ended December 31, 2001; (b) $986,866,000 during the year ended December 31, 2002; (c) $1,506,454,000 during the year ended December 31, 2003; (d) $1,244,571,000 during the year ended December 31, 2004; and (e) $1,360,647,000 during the year ended December 31, 2005.  These amounts were dramatically understated, given that the "amounts outstanding at December 31, 2000" did not include amounts borrowed by the Managed Entities under the co-borrowing facilities.

•   In Item 8, the 2000 10-K discussed a direct placement of Adelphia stock with the Rigases in January 2001.  These statements were materially false and misleading in that they failed to disclose that the Rigases had used proceeds from borrowings under the co-borrowing facilities to finance a substantial portion of their direct purchases of these securities, and that they lacked the ability to repay those borrowings.  By failing to disclose this information, the 2000 10-K misled investors into believing that the Rigases were injecting new liquidity into Adelphia by means of these direct placements, when, in fact, Adelphia was merely incurring additional, undisclosed debt under the co-borrowing facilities.  Furthermore, by not disclosing these borrowings, the 2000 10-K concealed from investors the risk that Adelphia's exposure on the co-borrowing arrangement would increase if the value of the assets supporting the Rigas Family's borrowings -- namely, the price of the Adelphia stock and other securities they bought with those borrowings -- fell to the point that a new infusion of cash into the

Managed Entities became necessary in order to service the loans. Nor does the 2000 10-K disclose the risk of a severe adverse impact on Adelphia's stock price in the event that the lender on the co-borrowing facility is required to liquidate the Rigas Family's securities holdings in order to obtain repayment of the loan.

437.    The October 2001 Prospectus incorporated by reference the materially false and misleading March 2001 10-Q described above.

438.    In addition, the October 2001 Prospectus incorporated by reference Adelphia's Form 10-Q for the quarter ended June 30, 2001 (filed with the SEC on or about August 14, 2001) (the "June 2001 10-Q"). The June 2001 10-Q falsely reported that Adelphia had total unconsolidated debt of $13,060,880,000 and total consolidated debt of $14,407,631,000, including subsidiary debt of $8,545,665,000 and parent debt of $5,861,966,000.

439.    The June 2001 10-Q also stated:

> The accompanying unaudited condensed consolidated financial statements have been prepared in accordance with generally accepted accounting principles for interim financial information and with the instructions of Form 10-Q and Rule 10-01 of Regulation S-X. Such principles are applied on a basis consistent with those reflected in the December 31, 2000 Form 10-K Report of the Company filed with the Securities and Exchange Commission. The condensed consolidated financial statements contained herein should be read in conjunction with the consolidated financial statements and related notes contained in the December 31, 2000 Annual Report on Form 10-K. In the opinion of management, the unaudited condensed financial statements contained herein include all adjustments (consisting of only recurring adjustments) necessary for a fair presentation of the results of operations for the interim periods presented.

440.    The June 2001 10-Q also falsely represented that Adelphia had a total of 5,672,225 basic cable subscribers.

441.    Adelphia's publicly-reported results for the second quarter of 2001 as reported in the June 2001 10-Q were materially false and misleading. As detailed above,

Adelphia failed to disclose the full amount of its liability under the co-borrowing facilities. Adelphia's total consolidated debt and total liabilities were understated by at least $1.2 billion through the deliberate omission of co-borrowing debt.  The June 2001 10-Q also overstated Adelphia's subscribers by tens of thousands.  As a result, the representation in the June 2001 10-Q that Adelphia's financial statements were fairly presented in accordance with SEC rules was also false.

442.    Neither the July 2001 Prospectus nor the October 2001 Prospectus provided any additional disclosures concerning the amounts borrowed by the Rigases and the Managed Entities under the co-borrowing arrangements or the uses to which the proceeds of those borrowings were put.

443.    As a result of Adelphia's concealment of the true amount of its consolidated debt, the October 2001 Prospectus was materially misleading because Adelphia lacked the authority to issue any securities in the October 2001 Offering.  The indenture agreements for each of Adelphia's offerings of senior notes prior to the October 2001 Offering contained a covenant limiting Adelphia's ability to incur new debt.  Specifically, the limitation on indebtedness covenant provides that

> Adelphia will not, and will not permit any Restricted Subsidiary to, directly or indirectly, create, incur, issue, assume or become liable for, contingently or otherwise (collectively an "incurrence"), any Indebtedness unless, after giving effect to such incurrence on a pro forma basis, Indebtedness of Adelphia and its Restricted Subsidiaries, on a consolidated basis, shall not be more than the product of the Annualized Pro Forma EBITDA for the latest fiscal quarter preceding such incurrence for which financial statements are available, multiplied by 8.75.

444.    Had the amounts borrowed by the Managed Entities been included in Adelphia's total consolidated debt, which they should have been, Adelphia's total Indebtedness prior to the October 2001 Offering would have exceeded 8.75 x its Annualized Pro Forma EBITDA for the most recent fiscal quarter preceding the October 2001 Offering.  Consequently, Adelphia was prohibited by the indenture agreements for its prior bond offerings from issuing

-145-

any securities in connection with the October 2001 Offering, and its representation to the contrary in the October 2001 Prospectus was materially false and misleading.

445.    The cover page of the October 2001 Prospectus stated that the notes to be issued "will be unsecured and will rank senior to our subordinated indebtedness and equally with our other senior indebtedness."  This statement was materially false and misleading in that it failed to disclose that, in fact, the Rigases had purchased hundreds of millions of dollars worth of notes constituting the "subordinated indebtedness" using proceeds from the co-borrowing arrangements and that they lacked the ability to repay their borrowings.  Because Adelphia and its subsidiaries are liable to repay the amounts borrowed by the Rigases under the co-borrowing arrangements, and because the debt under the co-borrowing facilities is senior in repayment priority to the notes issued in the October 2001 Offering, a substantial portion of the "subordinated indebtedness" was, in fact, senior to, and not subordinated to, those notes.

446.    On page S-2, the October 2001 Prospectus stated that Adelphia's "subsidiaries and affiliates" closed on a new $2.03 billion revolving term credit facility on September 28, 2001.  After noting that proceeds from the new facility were used to pay amounts due under prior credit agreements, the October 2001 Prospectus noted that the "balance of the facility is available for general corporate purposes."  This statement was materially false and misleading in that it failed to disclose that a portion of the balance of the proceeds would be used for the personal benefit of the Rigases.

447.    On pages S-1 to S-3, the October 2001 Prospectus discussed three direct placements of Adelphia subordinated notes and stock with the Rigases in January and April 2001.  These statements were materially false and misleading in that they failed to disclose that the Rigases had used proceeds from borrowings under the co-borrowing facilities to finance a substantial portion of their direct purchases of these securities, and that they lacked the ability to repay those borrowings.  By failing to disclose this information, the October 2001 Prospectus misled investors into believing that the Rigases were injecting new liquidity into Adelphia by means of these direct placements, when, in fact, Adelphia was merely incurring additional,

undisclosed debt under the co-borrowing facilities.   Furthermore, by not disclosing these borrowings, the October 2001 Prospectus concealed from investors the risk that Adelphia's exposure on the co-borrowing arrangement would increase if the value of the assets supporting the Rigas Family's borrowings -- namely, the price of the Adelphia stock and other securities they bought with those borrowings -- fell to the point that a new infusion of cash into the Managed Entities became necessary in order to service the loans.   Nor does the October 2001 Prospectus disclose the risk of a severe adverse impact on Adelphia's stock price in the event that the lender on the co-borrowing facility is required to liquidate the Rigas Family's securities holdings in order to obtain repayment of the loan.

448.   On page S-5, the October 2001 Prospectus represented that the "Notes are unsecured indebtedness of the Adelphia Parent Company ranking pari passu with other unsubordinated indebtedness of the Adelphia Parent Company and senior in right of payment to any future subordinated indebtedness of the Adelphia Parent Company."   This statement was materially false and misleading in that it failed to disclose that, in fact, the Rigases had purchased hundreds of millions of dollars worth of notes constituting the "subordinated indebtedness" using proceeds from the co-borrowing arrangements and that they lacked the ability to repay their borrowings.   Because Adelphia and its subsidiaries are liable to repay the amounts borrowed by the Rigases under the co-borrowing arrangements, and because the debt under the co-borrowing facilities is senior in repayment priority to the notes issued in the October 2001 Offering, a substantial portion of the "subordinated indebtedness" was, in fact, senior to, and not subordinated to, those notes.

449.   On page S-6, the October 2001 Prospectus represented that, as of June 30, 2001, the "Notes would have been effectively subordinated to approximately $8.1 billion of indebtedness and redeemable preferred stock of Adelphia's subsidiaries; and our total indebtedness excluding redeemable preferred stock would have been approximately $14.7 billion."   These statements were materially false and misleading because, by not taking the amount of borrowings by the Rigases and the Managed Entities under the co-borrowing

arrangements into account, the October 2001 Prospectus understated the amounts of indebtedness senior to the notes and Adelphia's total indebtedness by at least $1.2 billion. This materially misleading representation was repeated on page S-9 of the October 2001 Prospectus.

450.   On page S-7, the October 2001 Prospectus represented that the net proceeds from the October 2001 Offering would be used to repay proceeds under its revolving credit facilities, "all of which, subject to compliance with the terms of and maturity of that revolving credit facility, may be reborrowed." This statement was materially false and misleading in that it failed to disclose that, once the amounts borrowed by the Rigases and the Managed Entities under co-borrowing arrangements are included in the figures for Adelphia's total consolidated debt, Adelphia was in breach of the restrictions on incurring additional indebtedness contained in its agreements with its bank lenders, thereby enabling those lenders to accelerate the amounts due.

451.   On page S-8, in its discussion of "Risk Factors," the October 2001 Prospectus stated that Adelphia had total indebtedness of $14.4 billion as of June 30, 2001. This statement was materially false and misleading in that the figure for total indebtedness did not include amounts borrowed by the Rigases and the Managed Entities under the co-borrowing arrangements, which omission resulted in an understatement of Adelphia's total indebtedness of at least $1.2 billion.

452.   On page S-10, the October 2001 Prospectus represented that Adelphia's total convertible preferred stock, common stock and other stockholders' equity at June 30, 2001 was approximately $4.9 billion. This statement was materially false and misleading in that it overstated stockholders' equity by failing to account for the fact that the Rigases purchased Adelphia equity securities using proceeds from the co-borrowing arrangements which the Company was liable to repay. Rather than inject new equity into Adelphia, the securities purchased by the Rigases in reality created bank debt that was senior to the notes purchased by Huff.

453.   The description of the maturity for various classes of Adelphia's debt that

appeared on page S-9 of the October 2001 Prospectus was materially false and misleading in that it failed to disclose that, once the amounts borrowed by the Rigases and the Managed Entities under co-borrowing arrangements are included in the figures for Adelphia's total consolidated debt, Adelphia was in breach of the restrictions on incurring additional indebtedness contained in its agreements with its bank lenders, thereby enabling those lenders to accelerate the amounts due. The October 2001 Prospectus repeated these misleading representations on page S-21.

454. On page S-10, the October 2001 Prospectus represented that Adelphia's "Total Convertible Preferred Stock, Common Stock and Other Stockholders' Equity at June 30, 2001 was approximately $4.9 billion." This statement was materially false and misleading in that it overstated the amount of shareholder equity by failing to account for the fact that Rigases had purchases Adelphia stock with the proceeds from borrowings under the co-borrowing arrangements, that the Rigases lacked the ability to repay those borrowings, and that Adelphia and its subsidiaries were, in fact, liable for repayment of that debt.

455. On page S-17, the October 2001 Prospectus stated that the Rigases at the time effectively controlled the voting power of Adelphia's outstanding common stock. This disclosure was materially false and misleading in that it did not disclose the far more pervasive extent to which the Rigas Family exercised day-to-day control over Adelphia and its cash resources beyond simply its ability to elect the Board of Directors. Nor did the October 2001 Prospectus disclose the degree to which Rigases were exercising that day-to-day control to self-deal.

456. On the same page, the October 2001 Prospectus stated that the outside business activities of the Rigases -- including their engagement in the cable television business outside of Adelphia -- "could present a conflict of interest with Adelphia." In addition, the October 2001 Prospectus noted that "there have been and will continue to be transactions between us and the executive officers or the other entities they own or with which they have affiliations." These disclosures were materially false and misleading in the following respects: First, while noting only that a conflict of interest "could" arise at some point in the future, the

-149-

prospectus failed to disclose that severe conflicts of interest between the Rigases and Adelphia had already arisen by virtue of the Rigases' repeated pattern of engaging in self-dealing with Adelphia's financial resources.   Second, although giving the impression that conflicts and transactions with the Rigas Family, when they do arise, will be brought to the attention of Adelphia's Board of Directors, approved by a majority of disinterested directors, and evaluated for their fairness to Adelphia after disclosure of all material facts as required by § 2.10 of Adelphia's By-Laws, the October 2001 Prospectus did not disclose that, in fact, the conflicts of interest that had already arisen were disregarded by the Defendants in contravention of the By-Laws and the transactions were not fair to the Company.   Third, the disclosure that transactions between Adelphia and its officers' affiliates will continue to occur was inadequate in that it did not disclose (1) the nature of the transactions; (2) the parties involved; (3) the amounts at stake in such transactions; (4) the impact of such transactions on the operations and financial condition of Adelphia; and (5) the utter lack of internal controls to ensure fairness and prevent self-dealing. Specifically, the October 2001 Prospectus did not disclose that the Rigases had borrowed substantial amounts under the co-borrowing arrangements which they were unable to repay and for which Adelphia and its subsidiaries were liable, had used the proceeds of those borrowings for their own personal benefit, and had received numerous cash "advances" from Adelphia which they used for their own personal benefit.

457.   On page S-22, the October 2001 Prospectus represented that Adelphia's total debt as of June 30, 2001 was $14,407,631,000.  This statement was materially false and misleading in that the figure for total indebtedness did not include amounts borrowed by the Rigases and the Managed Entities under the co-borrowing arrangements, which omission resulted in an understatement of Adelphia's total indebtedness of at least $1.2 billion.

458.   On page S-29, the October 2001 Prospectus represented that Adelphia's "6% convertible subordinated notes due 2006 and 3.25% convertible subordinated notes due 2021 are subordinated to our other senior public debt and we will designate the Notes as senior debt for purposes of these subordinated notes."   This statement was materially false and

-150-

misleading in that it failed to disclose that, in fact, the Rigases had purchased hundreds of millions of dollars worth of the "subordinated notes" using proceeds from the co-borrowing arrangements and that they lacked the ability to repay their borrowings.  Because Adelphia and its subsidiaries are liable to repay the amounts borrowed by the Rigases under the co-borrowing arrangements, and because the debt under the co-borrowing facilities is senior in repayment priority to the notes issued in the October 2001 Offering, a substantial portion of the "subordinated notes" was, in fact, effectively senior to, and not subordinated to, the notes issued in the October 2001 Offering.

459.    On page S-48, the October 2001 Prospectus stated that Adelphia is "in compliance with the terms of our credit facilities."  This statement was materially false and misleading in that it failed to disclose that, once the amounts borrowed by the Rigases and the Managed Entities under co-borrowing arrangements are included in the figures for Adelphia's total consolidated debt, Adelphia was (1) in breach of the restrictions on incurring additional indebtedness contained in its credit facilities with its bank lenders, thereby enabling those lenders to accelerate the amounts due; and (2) in breach of the limitation on indebtedness covenants in the indenture agreements for its prior senior note issues.

460.    On page 3, in its discussion of "Risk Factors," the July 2001 Prospectus stated that Adelphia had total indebtedness of $13.7 billion as of March 31, 2001.  This statement was materially false and misleading in that the figure for total indebtedness did not include amounts borrowed by the Rigases and the Managed Entities under the co-borrowing arrangements, which omission resulted in an understatement of Adelphia's total indebtedness of at least $1.2 billion.

461.    The description of the maturity for various classes of Adelphia's debt that appears on page 4 of the July 2001 Prospectus was materially false and misleading in that it failed to disclose that, once the amounts borrowed by the Rigases and the Managed Entities under co-borrowing arrangements are included in the figures for Adelphia's total consolidated debt, Adelphia was in breach of the restrictions on incurring additional indebtedness contained in

its agreements with its bank lenders, thereby enabling those lenders to accelerate the amounts due.

462.    On pages 12-13, the July 2001 Prospectus stated that the Rigases at the time effectively controlled the voting power of Adelphia's outstanding common stock.  This disclosure was materially false and misleading in that it did not disclose the far more pervasive extent to which the Rigas Family exercised day-to-day control over Adelphia and its cash resources beyond simply its ability to elect the Board of Directors.  Nor did the July 2001 Prospectus disclose the degree to which Rigases were exercising that day-to-day control to self-deal.

463.    On page 13, the July 2001 Prospectus stated that the outside business activities of the Rigases -- including their engagement in the cable television business outside of Adelphia -- "could present a conflict of interest with Adelphia."  In addition, the July 2001 Prospectus noted that "there have been and will continue to be transactions between us and the executive officers or the other entities they own or with which they have affiliations."  These disclosures were materially false and misleading in the following respects:  First, while noting only that a conflict of interest "could" arise at some point in the future, the prospectus failed to disclose that severe conflicts of interest between the Rigases and Adelphia had already arisen by virtue of the Rigases' repeated pattern of engaging in self-dealing with Adelphia's financial resources.  Second, although giving the impression that conflicts and transactions with the Rigas Family, when they do arise, will be brought to the attention of Adelphia's Board of Directors, approved by a majority of disinterested directors, and evaluated for their fairness to Adelphia after disclosure of all material facts as required by § 2.10 of Adelphia's By-Laws, the July 2001 Prospectus did not disclose that, in fact, the conflicts of interest that had already arisen were disregarded by the Defendants in contravention of the By-Laws and the transactions were not fair to the Company.  Third, the disclosure that transactions between Adelphia and its officers' affiliates will continue to occur was inadequate in that it did not disclose (1) the nature of the transactions; (2) the parties involved; (3) the amounts at stake in such transactions; and (4) the

impact of such transactions on the operations and financial condition of Adelphia; and (5) the utter lack of internal controls to ensure fairness and prevent self-dealing. Specifically, the July 2001 Prospectus did not disclose that the Rigases had borrowed substantial amounts under the co-borrowing arrangements which they were unable to repay and for which Adelphia and its subsidiaries were liable, had used the proceeds of those borrowings for their own personal benefit, and had received numerous cash "advances" from Adelphia which they used for their own personal benefit.

## XI.     No Safe Harbor

464.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false and misleading statements pleaded in this Complaint. None of the allegedly false and misleading statements with regard to Adelphia's financial statements, reported revenues, and earnings pleaded herein was a forward looking statement nor were those statements identified as "forward-looking statements" when made. Nor was it stated that actual results "could differ materially from those projected." Nor did meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statements accompany those statements.

### COUNT I

### Violations of Section 11 of the Securities Act

465.    Except as described in paragraph 467, Plaintiffs repeat and reallege the allegations contained in the above paragraphs as if fully set forth herein.

466.    For purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this claim is based on solely on claims of strict liability and/or negligence under the Securities Act.

467.    This Count is asserted against all Defendants, for violations of Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of Plaintiffs, who were damaged thereby.

468.    Taking into account tolling of the limitations period while the class action in *In re Adelphia Communications Corporation Sec. & Deriv. Litig.*, No. 03 MD 1529 (LMM),

was pending against Defendants and prior to Plaintiffs' exclusion from that class, Plaintiffs have brought this claim within one year of discovery of the violations alleged herein, and within three years after the public offerings in connection with which the violations occurred, in accordance with relation back principles under the applicable Federal Rules of Civil Procedure.

469.    As set forth in greater detail above, the May 1999 Registration Statement and the July 2001 Registration Statement, as well as the prospectuses filed with the SEC and made part of those registration statements, contained untrue statements of material fact and/or omitted to state material facts necessary to make the statements therein not misleading as of when such misleading parts of the registration statements became effective.

470.    Defendants were all directors of Adelphia at the time one or more of these materially false and misleading registration statements were filed by Adelphia to register securities acquired by Plaintiffs through Huff, and as such are liable to Plaintiffs for damages.

471.    In ignorance of the falsity of the material misrepresentations and omissions in the May 1999 Registration Statement and the July 2001 Registration Statement, as well as the prospectuses filed with the SEC and made part of those registration statements or of the true facts, Huff purchased Adelphia securities on Plaintiffs' behalf in reliance upon the representations contained therein.   Had Huff known the true facts, Huff would not have purchased the securities on Plaintiffs' behalf at the inflated offering prices.

472.    By reason of the foregoing, all Defendants are liable to Plaintiffs for damages resulting from their violations of Section 11 of the Securities Act, 15 U.S.C. §77*k*.

## COUNT II

### Controlling Person Liability Pursuant to Section 15 of the Securities Act

473.    Except as described in paragraph 475, Plaintiffs repeat and reallege the allegations contained in the above paragraphs as if fully set forth herein.

474.    For purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this claim is based on solely on claims of strict liability and/or negligence under the Securities Act.

475.    This Count is asserted against all Defendants, for violations of Section 15 of the Securities Act, 15 U.S.C. §77o, on behalf of Plaintiffs, who were damaged thereby.

476.    Taking into account tolling of the limitations period while the class action in *In re Adelphia Communications Corporation Sec. & Deriv. Litig.*, No. 03 MD 1529 (LMM), was pending against Defendants and prior to Plaintiffs' exclusion from that class, Plaintiffs have brought this claim within one year of discovery of the violations alleged herein, and within three years of the public offerings and/or sales of securities complained of, in accordance with relation back principles under the applicable Federal Rules of Civil Procedure.

477.    As alleged herein, Adelphia, by reason of the numerous material misstatements and omissions contained in the May 1999 Registration Statement, the July 2001 Registration Statement, the May 1999 Prospectus, the November 1999 Prospectus, the September 2000 Prospectus, the June 2001 Prospectus, the July 2001 Propectus and/or the October 2001 Prospectus used in connection with the offer and sale of its debt securities as alleged herein, violated Section 11 of the Securities Act.

478.    Defendants, by virtue of their positions as members of Adelphia's board of directors and Audit Committee, their stock ownership and their specific acts as described herein, were, at the time of the wrongs alleged herein, controlling persons of Adelphia within the meaning of Section 15 of the Securities Act.

479.    Defendants had the power, influence and authority to direct or cause the direction of the management and policies of Adelphia, and, therefore, to cause or to prevent the wrongful conduct and practices complained of herein, and in fact, directed and caused, in whole or in material part, such management and policies of Adelphia, so as to cause, and to fail to prevent, the wrongful conduct alleged herein.

480.    As a direct and proximate result of the Defendants' wrongful conduct, Plaintiffs were damaged in connection with their purchases of Adelphia debt securities through Huff.

481.    By reason of the conduct alleged in Count I, Defendants are liable jointly

and severally and to the same extent as Adelphia for the wrongful conduct alleged herein, and are liable to Plaintiffs for the substantial damages which they suffered in connection with their purchases of Adelphia bonds through Huff at artificially inflated prices as a result of Adelphia's violations of the Securities Act.

## COUNT III

### Violations of Section 18 of the Exchange Act

482.    Except as described in paragraph 484, Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

483.    For purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this claim is based on solely on claims of strict liability and/or negligence under Section 18 of the Securities Exchange Act.

484.    This Count is asserted against all Defendants for violations of Section 18 of the Exchange Act, 15 U.S.C. §78r, on behalf of Plaintiffs who were damaged thereby.

485.    Taking into account tolling of the limitations period while the class action in *In re Adelphia Communications Corporation Sec. & Deriv. Litig.*, No. 03 MD 1529 (LMM), was pending against Defendants and prior to Plaintiffs' exclusion from that class, Plaintiffs have brought this claim within one year of discovery of the violations alleged herein, and within three years of the accrual of this cause of action, in accordance with relation back principles under the applicable Federal Rules of Civil Procedure.

486.    As alleged herein, Defendants made or caused to be made statements in documents filed with the SEC pursuant to the rules or regulations of the Exchange Act or undertakings contained in registration statements as provided in subsection (d) of section 15 of the Exchange Act, which statements were, at the time and in light of the circumstances under which made, false or misleading with respect to material facts.

487.    Huff actually read, reviewed and relied on the false and materially misleading statements contained in these documents in making the decision to purchase Adelphia

securities on Plaintiffs' behalf.

488.    In ignorance of the falsity of the Defendants' statements or of the true facts, Huff purchased Adelphia debt securities on Plaintiffs' behalf in actual, eyeball reliance upon Defendants' representations.

489.    Defendants' materially false or misleading statements artificially inflated the price of Adelphia securities.

490.    Had it known the true facts, Huff would not have purchased the Adelphia debt securities and/or would not have purchased them at the inflated price on Plaintiffs' behalf.

491.    Upon disclosure of the true facts, the price of the Adelphia debt securities purchased by Huff on Plaintiffs' behalf dropped, and Plaintiffs suffered damages in an amount to be proven at trial.

492.    By reason of the foregoing, Defendants are liable to Plaintiffs for violations of Section 18 of the Exchange Act, 15 U.S.C. §78*r*.

## COUNT IV

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder

493.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 493 as if fully set forth herein.

494.    This Count is asserted against all Defendants, for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder, on behalf of Plaintiffs, who were damaged thereby.

495.    Taking into account tolling of the limitations period while the class action in *In re Adelphia Communications Corporation Sec. & Deriv. Litig.*, No. 03 MD 1529 (LMM), was pending against Defendants and prior to Plaintiffs' exclusion from that class, Plaintiffs have brought this claim within one year of discovery of the violations alleged herein, and within three years of the violations alleged herein, in accordance with relation back principles under the applicable Federal Rules of Civil Procedure.

496.    As alleged herein, Defendants, individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and of the mails, engaged and participated in a continuous course of conduct to artificially inflate the reported financial value of Adelphia and to conceal its true financial condition.    Such defendants employed devices, schemes, and artifices to defraud and engaged in acts, practices, and a course of conduct that included the making of, or participation in the making of, untrue and misleading statements of material facts and omitting to state material facts necessary in order to make the statements made about Adelphia not misleading.

497.    Defendants knew or recklessly disregarded that Adelphia's financial statements for the years 1998, 1999, 2000 and 2001 as reported in registration statements, prospectuses and filings with the SEC, and disseminated to the investing public, were materially overstated, failed to disclose material liabilities and were not prepared and presented in accordance with GAAP.  In addition, those defendants knew or recklessly disregarded that the registration statements, prospectuses and filings with the SEC complained of were materially false and misleading for the reasons alleged herein.

498.    Defendants, as directors of Adelphia, are liable as direct participants in the wrongs complained of herein.  Through their positions of control and authority as directors of Adelphia, Defendants were able to and did control the content of the public statements disseminated by Adelphia.  With reckless disregard of the truth as pertains to the statements contained therein, Adelphia and Defendants caused the heretofore complained of public statements to contain material misstatements and omissions of material facts as alleged herein.

499.    The misrepresentations and omissions of Defendants were reckless and done for the purpose of concealing Adelphia's true operating and financial condition from Plaintiffs and the investing public, and inducing Huff to purchase Adelphia securities on Plaintiffs' behalf at artificially high prices.

500.    Defendants acted with scienter, in that they acted with reckless disregard for the truth in that they failed to ascertain and disclose the true facts, even though such facts

were available to them.  Defendants were directors of Adelphia, and, therefore, were directly responsible for false and misleading statements and omissions disseminated to the public through financial statements, press releases, news reports, and filings with the SEC including (but not limited to) the 1999 10-K and 2000 10-K, which Defendants signed.

501.    As a result of the deceptive practices, common schemes and artifices, and false and misleading statements and omissions alleged herein, the prices of Adelphia securities were artificially inflated.  In ignorance of the false and misleading statements, the material omissions, and the deceptive and manipulative devices and contrivances employed by Defendants, Huff relied on the statements complained of herein in purchasing Adelphia securities on Plaintiffs' behalf.  Had Huff known the truth, it would not have purchased the bonds on Plaintiffs' behalf or would not have purchased them on Plaintiffs' behalf at the artificially inflated prices that they actually paid.

502.    Upon disclosure of the true facts, the price of Adelphia debt securities dropped precipitously, and Plaintiffs suffered damages in an amount to be proven at trial.

503.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, or courses of business which operated as a fraud and deceit upon Huff and the Plaintiffs in connection with Huff's purchases of Adelphia debt securities on Plaintiffs' behalf.

## COUNT V

### Control Person Liability
### Pursuant to Section 20(a) of the Exchange Act

504.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 504 as if fully set forth herein.

505.    Defendants, by virtue of their positions as directors of Adelphia and their

specific acts as described herein, were, at the time of the wrongs alleged herein, controlling persons of Adelphia within the meaning of Section 20(a) of the Exchange Act.

506.    Defendants had the power, influence and authority to direct or cause the direction of the management and policies of Adelphia, and, therefore, to cause or to prevent the wrongful conduct and practices complained of herein, and in fact, directed and caused, in whole or in material part, such management and policies of the Company, so as to cause, and to fail to prevent, the wrongful conduct alleged herein.  For the reasons set forth herein, Defendants culpably participated in Adelphia's wrongdoing.

507.    As a direct and proximate result of the Defendants' wrongful conduct, Plaintiffs were damaged in connection with their purchase of Adelphia debt securities through Huff.

508.    By reason of the conduct alleged in Count IV, Defendants are liable jointly and severally for the wrongful conduct alleged herein, and are liable to Plaintiffs for the substantial damages that they suffered in connection with their purchases of Adelphia debt securities through Huff at artificially inflated prices as a result of Adelphia's violations of the Exchange Act.

509.    Taking into account tolling of the limitations period while the class action in *In re Adelphia Communications Corporation Sec. & Deriv. Litig.*, No. 03 MD 1529 (LMM), was pending against Defendants and prior to Plaintiffs' exclusion from that class, Plaintiffs have brought this claim within one year of discovery of the violations alleged herein, and within three years of the violations alleged herein, in accordance with relation back principles under the applicable Federal Rules of Civil Procedure.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment as follows:

1.    Awarding Plaintiffs compensatory damages as a result of the wrongs alleged in Counts I - V of the Complaint;

2.    Awarding Plaintiffs their costs and expenses in this litigation, including

reasonable attorneys' fees and experts' fees and other costs and disbursements; and

3.      Awarding Plaintiffs such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury for all issues so triable.

Dated:  June 8, 2010
        Roseland, New Jersey

LOWENSTEIN SANDLER P C
1251 Avenue of the Americas
18th Floor
New York, NY  10020
Tel. 212.262.6700
Fax 212.262.7402

-and-

65 Livingston Avenue
Roseland, New Jersey  07068
Tel. 973.597.2500
Fax 973.597.2400

By:_____
        Lawrence M. Rolnick
        Marc B. Kramer
        Thomas E. Redburn, Jr.
        Sheila A. Sadighi

Attorneys for Plaintiffs